## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, *Plaintiffs*, <br><br> v. <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as Administrator for the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, *Defendants*. | Civ. Action No. _____ |

## ORIGINAL COMPLAINT

1.     Every day, Texas's Medicaid program ensures access to high-quality medical care for nearly 5 million Texans. For decades, the program has been a bedrock part of the State's social safety net, and its enduring vitality depends on the joint collaborative efforts of the State and the federal government.

2.     Unfortunately, for the second time in three years, the Centers for Medicare and Medicaid Services (CMS), which administers Medicaid at the federal level, has wielded its oversight role as a cudgel to force Texas to adopt its policy

preferences. In the process, it has shaken the structural foundation of Medicaid's operations in Texas.

3.       This case implicates how Medicaid gets funded, which is always an important issue and recently has become a contentious one. As a general matter, Medicaid is jointly paid for by the federal and state governments. Texas finances a large share of its contributions to Medicaid through the collection of healthcare provider taxes. Such taxes are expressly permissible under the Social Security Act, but the Act imposes several notable conditions on those taxes. The most relevant to this suit is that States may not hold taxpaying providers harmless for the cost of such taxes. *See* 42 U.S.C. § 1396b(w); *see also* 42 C.F.R. § 433.68. If CMS concludes that such a hold harmless provision exists, the financial consequences for the State are severe: the amount of the State's requested reimbursement from the federal government must be "reduced by the sum of any revenues received by the State" through a "broad-based health care related tax" that operates as "a hold harmless provision." *Id.* § 1396b(w)(1)(A)(iii).

4.       The Act provides three separate definitions of a hold harmless provision. *Id.* § 1396b(w)(4)(A)-(C). Only one is relevant to this case: a hold harmless provision exists if "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i).

5.       This definition is straightforward: when *the State or other government unit* provides a payment, offset, or waiver that (directly or indirectly) guarantees to

hold a taxpayer harmless, that arrangement constitutes a prohibited hold harmless provision. Rather than apply that plain text, CMS has adopted the view that an agreement between two *private* providers to protect against financial loss constitutes "a hold harmless arrangement involving Medicaid payment redistribution" if there is a "reasonable expectation" that the taxpaying provider will receive a portion of its provider tax costs returned as part of a private agreement. Ex. A at 3-4. And CMS has done so not through notice-and-comment rulemaking but by issuing an informational bulletin purporting to give immediate force and effect to this extra-textual reading of the Social Security Act. The bulletin follows years of failed rulemakings and unsuccessful threats to compel Texas's compliance with the agency's preferred interpretation of the Act. And, perhaps most disturbingly, this expanded definition applies not just prospectively but also retroactively to payments that were made years ago, requiring Texas to monitor private-party arrangements on pain of the loss of billions of dollars in federal funding.

6. The bulletin is unlawful under the Administrative Procedure Act (APA) and should be set aside. It is inconsistent with the plain language of the Social Security Act and CMS's own regulations. It was not issued with an opportunity for notice and comment. And it is arbitrary and capricious because it contradicts CMS's prior position—that private arrangements do *not* fall within the ambit of a prohibited hold harmless provision—without even attempting to explain why that position was incorrect. In the interim, the bulletin is already causing the State irreparable harm.

CMS and the other federal defendants should not be permitted to enforce or rely on the bulletin pending a final resolution of its legality.

**PARTIES**

7.     Plaintiff Texas is a sovereign State. *See* Tex. Const. art. I, § 1. Texas brings this suit on its own behalf and on behalf of its citizens *parens patriae* to ensure that federal officials comply with the statutory and regulatory limits on their power when making decisions that will affect millions of Texans. Texas has the authority and responsibility to protect the health, safety, and welfare of its citizens.

8.     Plaintiff Texas Health and Human Services Commission (HHSC) is an executive branch agency organized under the laws of Texas.  It is the state agency designated under 42 C.F.R. § 431.10 to administer Texas's Medicaid program. For ease of reference, HHSC will be referred to collectively with the State as "Texas."

9.     Defendant CMS is a federal agency organized under the laws of the United States. It is responsible for federally administering Medicaid. Although HHSC has been informed that certain actions relating to this suit are being coordinated out of CMS's office in Baltimore, CMS maintains a regional office located in Texas for administering its operations in Arkansas, Louisiana, New Mexico, Oklahoma, and Texas.

10.     Defendant United States Department of Health and Human Services (HHS) is a cabinet-level federal executive branch agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department of which CMS is a part.

11. Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

12. Defendant Chiquita Brooks-LaSure is the Administrator for CMS. She is sued in her official capacity.

13. Defendant United States of America is the federal sovereign.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this suit concerns the legality of actions taken by federal agencies and federal officers in their official capacities.

15. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, 28 U.S.C. §§ 2201-2202, Federal Rules of Civil Procedure 57 and 65, and by the Court's general legal and equitable powers.

16. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because the United States, two of its agencies, and two of its officers in their official capacities are defendants. Plaintiff Texas resides in this judicial district, and a substantial part of the events or omissions giving rise to Texas's claims occurred in this district. Texas previously sued these same defendants in this Court to prevent CMS from arbitrarily revoking its approval of Texas's request to extend and amend the State's managed-care system, *see Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021), and the defendants did not challenge venue in that case. Moreover, the first federal audit, initiated by the HHS Office of the Inspector General

to ensure that a Texas jurisdiction is in compliance with the bulletin, is of Smith County. That action began roughly contemporaneously with CMS approving Texas's state directed payment programs (SDPs) to avoid sanctions in the last suit. The audit has occurred and will continue to occur in this judicial district and division.

## BACKGROUND

### I.    Overview of Medicaid and Hold Harmless Provisions

#### A.    Medicaid's cooperative federalism framework

17.    Medicaid is designed as a cooperative federal-state program that has provided medically necessary healthcare to low-income families and individuals with disabilities since 1965. *See* 42 U.S.C. § 1396 *et seq*.; *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). At the federal level, Medicaid is administered by the Secretary of Health and Human Services, who in turn exercises his authority through CMS. *Ahlborn*, 547 U.S. at 275. At the state level, participating States are required to designate a single agency to administer their Medicaid programs. *See* 42 U.S.C. § 1396a(a)(5). HHSC fills that role for the State of Texas.

18.    A State that chooses to participate in the Medicaid program—as all States, including Texas have—must submit a state Medicaid plan to CMS for federal approval. 42 U.S.C. § 1396a. After CMS approves the state plan, "the state administers Medicaid with little to no federal oversight," *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2022 WL 741065, at *2 (E.D. Tex. Mar. 11, 2022), and the participating State is entitled to receive reimbursement from the federal government for the federal share of specified covered services. 42 U.S.C. § 1396b; 42 C.F.R. § 430.30(a)(1).

19.    The federal share of a participating State's Medicaid expenditures is primarily based on the federal medical assistance percentage (FMAP). *See* 42 U.S.C. § 1396d(b), 42 U.S.C. § 1396b(a). In Texas, that percentage is presently approximately 60%. The compensation to which a State is entitled can also include supplemental Medicaid payments such as payments for incentive arrangements, pass-through payments, and directed payment programs. 42 C.F.R. § 438.6. "Although the federal contribution to a State's Medicaid program is referred to as a 'reimbursement,' the stream of revenue is actually a series of huge quarterly advance payments that are based on the State's estimate . . . of future expenditures." *Bowen v. Massachusetts*, 487 U.S. 879, 883-84 (1988) (citing 42 U.S.C. § 1396b(d)).

**B.    The Social Security Act's prohibition on hold harmless provisions**

20.    To receive reimbursements from the federal government, States must provide assurances that they have adequate methods to pay the state share of Medicaid. *See* 42 U.S.C. § 1396b; 42 C.F.R. § 430.30.

21.    Congress passed the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments in 1991, which addresses CMS's authority to restrict or reduce federal matching funds for Medicaid. Pub. L. No. 102-234, § 2, 105 Stat. 1793 (1991) (adding subsection 1903(w), codified at 42 U.S.C. § 1396b(w), to the Social Security Act).

22.    The 1991 amendments require a reduction in the amount of patient-care costs for which the States may seek reimbursement—and which are used to calculate

the federal financial participation payment—when the State obtains revenues from certain sources. *See* 42 U.S.C. § 1396b(w)(1)(A).

23.     Relevant here, the amendments require the amount of the State's requested reimbursement to be "reduced by the sum of any revenues received by the State" through a "broad-based health-care-related tax" that operates as "a hold harmless provision." *Id.* § 1396b(w)(1)(A)(iii). The amendments include three definitions of a "hold harmless provision." The first is when the State or local government entity "provides (directly or indirectly) for a payment . . . to taxpayers" that is "positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan." *Id.* § 1396b(w)(4)(A). The second is when "[a]ll or any portion of the payment made under this subchapter to the taxpayer varies based only upon the amount of the total tax paid." *Id.* § 1396b(w)(4)(B). And the third, and the subject of the February 17 bulletin, is when the State or local government entity "provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i).

### C.     CMS's regulations implementing the 1991 amendments

24.     In 1993, HHS promulgated a rule to implement these amendments. *See* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993) (codified at 42 C.F.R. §§ 433, 447).

25.     The regulations incorporate the Social Security Act's definition of a hold harmless provision into subsection (f) of 42 C.F.R. § 433.68 by "set[ting] out the three

ways of finding a 'hold harmless provision' for a state tax program." *Brooks-LaSure*, 2022 WL 741065, at *5 (setting out this history).

26.     The regulation also "added detail on the third hold harmless definition" by adopting a two-part test—later formally adopted by Congress—for determining when the government entity's levy of an excessive amount of taxes on a healthcare provider rises to the level of a hold harmless "guarantee." *Id.* at *5-6; *see also* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals 57 Fed. Reg. 55,129-30 (Nov. 24, 1992) (interim final rule).

27.     Under that test, "[i]f the tax on the providers' revenue was at or below 6% (selected as the national average sales tax), the tax would be assumed permissible," but if "the tax was above 6%," "a numerical test would deem a hold harmless situation to exist when Medicaid rates are used to repay (within a 12-month period) at least 75 percent of providers for at least 75 percent of their total tax cost." *Brooks-LaSure*, 2022 WL 741065, at *5 (citing 57 Fed. Reg. at 55,142-55,143).

28.     Twelve years elapsed until a new development, spurred by CMS's own internal adjudicative body, prompted CMS to again take regulatory action. In 2005, after years of litigation, HHS's Departmental Appeals Board rejected CMS's effort to retroactively disallow years of federal funding to five States based on an overbroad interpretation of what constitutes a hold harmless provision. Specifically, without basis in statute, CMS had determined that certain state programs providing grants to nursing homes or tax credits to patients constituted impermissible hold harmless

provisions under CMS's regulations. *See Brooks-LaSure*, 2022 WL 741065, at *6-7 (citing *In re: Hawaii Dep't of Human Servs.*, Docket No. A-01-40, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005)).

29. The Board held, however, that the programs at issue did not meet either the first or third definitions of a hold harmless provision. *Id.* As to the third definition, the Board explained that no language in the States' grant or credit programs offered an explicit or direct assurance of any payment to a taxpayer-provider, and it rejected CMS's argument that the third definition was merely a "broad catch-all provision." *Id.* at *6. Ultimately, the Board found that for a state taxing authority to guarantee a payment, offset, or waiver the Board expected to see a "legally enforceable promise" in "these States' laws." *Id.* at *7.

30. Following the Board's ruling, CMS's enforcement arm sought to alleviate the purported "confusion" that the ruling caused and "clarify" the tests for finding an impermissible hold harmless arrangement. *See, e.g.*, Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9,685, 9,686, 9,690 (Feb. 22, 2008) (final rule). CMS amended the regulatory definition of the third hold harmless provision to "cover[] the situation where a government provides for a certain financial measure 'such that' the measure guarantees" the taxpayer will be held harmless. *Brooks-LaSure*, 2022 WL 741065, at *8. This was a departure from the statutory definition in which Congress defined a hold harmless provision to include "certain financial measure[s] 'that guarantees' indemnification." *Id.* at *7. This change "deliberate[ly]"

"remove[d] the statute's tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." *Id.*

31.     As a result of the agency's "loosen[ing]" of the required link between the state taxing authority and the guarantee itself, CMS has contended that the third definition "focus[es] on the 'reasonable expectation' [of the taxpayer] about the 'result' of a state payment, as opposed to what the state provided when making a payment." *Id.* (citing 73 Fed. Reg. 9,694-95).

### D.     CMS's failed 2019 amendment efforts

32.     In 2019, CMS tried to stretch the definition of a hold harmless provision in section 1396b(w)(4)(C)(i) even farther to cover private, non-governmental arrangements. *See* Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63,722, 63,742 (Nov. 18, 2019).

33.     CMS's proposed rule conflicted with the agency's prior representations to providers across the country. In early 2019, Kristin Fan, then Director of CMS's Financial Management Group, told counsel for concerned providers that though CMS is "aware that there may be arrangements" between providers that CMS may "not particularly like," CMS "do[es] not have statutory authority to address" those arrangements. Fan also agreed that States should not be expected "to seek information about these agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." This exchange was widely circulated across the country.

34.     In the proposed rule, issued only nine months later, CMS took a different approach entirely. The proposal said that the agency had "become aware of

impermissible arrangements that exist where a state or other unit of government imposes a health-care related tax, then uses the tax revenue to fund the non-federal share of Medicaid payments back to the taxpayers." 84 Fed. Reg. at 63,734. Critically, CMS clarified that it considered such arrangements to violate the law even if "a private entity makes the redistribution" to another private entity. *Id.* at 63,735. It reasoned that a purely private arrangement still "constitutes an indirect payment from the [S]tate or unit of government to the entity being taxed that holds it harmless for the cost of the tax." *Id.* That is because "[t]he taxpayers have a reasonable expectation to be held harmless for all or a portion of their tax amount." *Id.* at 63,734.

35.    As a result, CMS proposed to amend 42 C.F.R. § 433.68(f)(3) to specify that CMS would consider the "net effect" of a particular arrangement—*i.e.*, whether the "net effect" is a "reasonable expectation" by the taxpayer that it will recoup all or a portion of its tax payment through Medicaid payments—to determine whether a hold harmless arrangement exists. *Id.* at 63,735.

36.    CMS received more than 10,000 comments on the proposal, many of which faulted CMS for "lack[ing] statutory authority" and "creating regulatory provisions that were ambiguous or unclear and subject to excessive Agency discretion." This ultimately led CMS to "withdraw the proposed provisions." Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105, 5,105 (Jan. 19, 2021).

37.    One such commenter was Daniel Tsai—the author of the February 17 bulletin and CMS's current Deputy Administrator and Director for the Center for

Medicaid and CHIP Services—who was then serving as the Medicaid Director for the State of Massachusetts. Tsai explained that the proposed rule—including its "'net effect[]' test"—"introduce[d] new state obligations" and "significant administrative and operational burdens" that "represent[ed] an unprecedented federal overreach," "exceed[ed] CMS' statutory authority," contain[ed] "provisions [that] are highly susceptible to arbitrary and capricious application," "[was] not supported by the underlying statute," and "includ[ed] reporting on business dealings of private entities that are not available to the state." HHSC submitted a similar comment letter along those lines, as did many others.

## II. Overview of Texas Medicaid[1] and the State's Funding Mechanisms

38.    To allow flexibility from the default requirements of the Social Security Act, CMS may issue a waiver that exempts a State from those otherwise mandatory requirements. One common waiver is authorized by section 1115 of the Act, codified at 42 U.S.C. § 1315. Such a waiver allows a State to implement an "experimental, pilot, or demonstration project" that diverges from federal requirements so long as

---

[1] A more fulsome background of the Texas Medicaid system, including its section 1115 waiver, is available in Texas's First Amended Complaint from its earlier-filed lawsuit, which is expressly incorporated herein by reference. *See Texas v. Brooks-LaSure*, No. 6:21-cv-00191 (E.D. Tex. Aug. 31, 2021), ECF No. 54. To avoid burdening the Court, this complaint discusses only those aspects of Texas Medicaid necessary for resolving the parties' current dispute, which was first litigated in the context of Texas's motion to enforce the Court's preliminary injunction. *See id.*, Mot. to Enforce J., (Nov. 2, 2021), ECF No. 75; *id.*, Reply in Supp. of Mot. to Enforce J., (Nov. 22, 2021), ECF No. 84.

the project "is likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a).

39.     In 2011, Texas applied for and received a section 1115 waiver for a demonstration project called the Texas Healthcare Transformation and Quality Improvement Program. The waiver allowed Texas to transition its Medicaid program from a fee-for-service model to a managed-care model. Through that updated model, Texas contracts with health-insurance companies to deliver healthcare services through Medicaid. The State pays a monthly capitation payment to a managed care organization for each Medicaid recipient, which reduces the overall state and federal government Medicaid expenditures by encouraging recipients to take advantage of preventative care.

40.     The Texas Legislature authorized another important change to Medicaid in 2013. In addition to furthering the transition to a managed-care model, as was discussed in the prior lawsuit, Texas law was amended to allow designated hospital districts, counties, and municipalities to "administer a healthcare provider participation program to provide additional compensation to certain hospitals located in the hospital district, county, or municipality by collecting mandatory payments from each of those hospitals to be used to provide the nonfederal share of a Medicaid supplemental payment program[.]" Tex. Health & Safety Code § 300.0001; *see* Act of May 24, 2013, 83d Leg., R.S., ch. 1369, 2013 Tex. Gen. Laws 3630 (codified at Tex. Health & Safety Code ch. 288); Tex. Health & Safety Code ch. 288–300A.

41.     These mandatory payments are deposited into a Local Provider Participation Fund (LPPF), which is a dedicated-purpose account that local governments may use for certain statutorily authorized purposes, including intergovernmental transfers to HHSC to support specified Medicaid programs. HHSC uses these statutorily permitted local funds as the non-federal share of Medicaid funds that are then matched with federal funds.

42.     The LPPFs are managed by local government entities and are subject to a host of relevant restrictions. If the government entity authorizes a healthcare provider participation program, it must require an annual mandatory payment to be assessed based upon the net patient revenue of each institutional healthcare provider located in the applicable local unit of government.[2] Tex. Health & Safety Code § 300.0151. Money deposited into the local provider participation fund is authorized for limited purposes, including the intergovernmental transfers from the local government to the State to provide the state share of Medicaid payments for statutorily specified Medicaid programs. *See* Tex. Health & Safety Code § 300.0103(b)(1). The levies imposed by the local unit of government must be broad-based and uniform, as required under federal law. *See id.* § 300.0151(b). All local governments authorized to collect mandatory payments in LPPFs are prohibited from assessing mandatory payments that exceed six percent of net patient revenue. *Id.*

---

[2] The Texas statutes which authorize hospital districts to collect and deposit mandatory payments into LPPFs explicitly state that such mandatory payments are not taxes for the purposes of Article IX of Texas Constitution. However, these payments are considered healthcare-related taxes for purposes of federal law. *See, e.g.*, 42 U.S.C. § 1396b(w)(3)(A); 42 C.F.R. § 433.55.

§ 300.0151(c). And consistent with the Social Security Act, Texas law specifically prohibits these programs from holding harmless any institutional healthcare provider. *Id.* § 300.0151(b).

43.     CMS encouraged Texas to implement these funds, which have grown more important to the State over time. Collectively, the funds comprised about 17.7% of Texas's state share of Medicaid funding in the last fiscal year. HHSC expects this trend: when the funding mechanism was first piloted, it required express permission from the Legislature on a jurisdiction-by-jurisdiction basis. *E.g.*, 2013 Tex. Gen. Laws 3630. With the encouragement of CMS, the Texas Legislature has since made the authorization more general. Tex. Health & Safety Code §§ 300.0001, .0003.

44.     As the statewide administrator of Texas Medicaid, HHSC ensures that the authority that administers each LPPF does not provide for any payment, offset, or waiver that directly or indirectly guarantees to hold the taxpaying providers harmless for any portion of their tax costs. But HHSC does not have statutorily conferred taxing or regulatory authority over the local government entities that manage those funds, nor does HHSC have authority to examine or consider any contractual arrangements that might exist between private businesses whose taxes contribute to those funds.

45.     The taxes that flow into those funds are unrelated to the methodology for calculating the Medicaid reimbursements that HHSC disburses to healthcare providers. The State does not make any such reimbursements based on the amount that a provider is taxed by a local government. Instead, Medicaid payments to

providers are based exclusively on programmatic methodologies that consider, among other factors, what an estimated Medicare or average commercial payer would have paid for those same services.

46. CMS has approved SDPs that use LPPF to fund as the non-federal share. Those programs include:

- The Comprehensive Hospital Increase Reimbursement Program (CHIRP), which began on September 1, 2021, (but not approved by CMS until March 25, 2022) and replaced a prior directed payment program no longer in effect. CHIRP provides increased Medicaid payments to hospitals for inpatient and outpatient services to eligible recipients. On August 1, 2022, CMS renewed approval for CHIRP for the program period covering September 1, 2022, to August 31, 2023.

- The Quality Incentive Payment Program (QIPP), which is a performance-based payment program designed to incentivize eligible nursing facilities to improve the quality and innovation of their services. CMS has approved this program for six straight years (but delayed approval for the program period that began on September 1, 2021, until November 15, 2021). On August 1, 2022, CMS approved QIPP for the program period covering September 1, 2022, to August 31, 2023.

- The Texas Incentives for Physicians and Professional Services (TIPPS) program, which began on September 1, 2021 (but not approved by CMS until March 25, 2022), provides increased Medicaid payments to certain physician groups providing healthcare services to eligible Medicaid recipients. On August 1, 2022, CMS renewed approval for TIPPS for the program period covering September 1, 2022, to August 31, 2023.

- The Rural Access to Primary and Preventive Services (RAPPS) program, which began on September 1, 2021 (but not approved by CMS until March 25, 2022), is designed to incentivize rural health clinics that provide primary and preventive care services to eligible Medicaid recipients in rural areas of Texas. On August 1, 2022, CMS renewed approval for RAPPS for the program period covering September 1, 2022, to August 31, 2023.

- The Directed Payment Program for Behavioral Health Services (DPP BHS), which began on September 1, 2021 (but not approved by CMS until November 15, 2021), is designed to promote and improve access to

17

behavioral health services, coordination of care, and successful care transitions for eligible Medicaid recipients. On August 1, 2022, CMS renewed approval for DPP BHS for the program period covering September 1, 2022, to August 31, 2023.

47. The directed payment programs are complex, and Texas must have its directed-payment-program proposals, called "preprints," approved annually by August to process the payments the following September. Texas typically submits the preprints to CMS for approval in March. In total, CMS has approved pre-prints that contemplate the use of LPPFs at least nine times since the funds were first introduced in 28 local jurisdictions. CMS has also issued federal financial participation for the Delivery System Reform Incentive Payment (DSRIP) program and the Uncompensated Care (UC) program, which have used LPPF funds at least four times per year since 2016.

## III. CMS's Initial Encouragement of LPPFs and Sudden About-Face

48. CMS has been involved in the development of LPPFs in Texas from the outset of their existence. It was at CMS's encouragement that the Texas Legislature began authorizing LPPFs for certain jurisdictions. Later, in 2018 and 2019, CMS and Texas had lengthy discussions about the structure of LPPFs. At the time, Texas and CMS were working to resolve a disallowance that had been issued by CMS related to funds transferred from government entities in Dallas and Tarrant Counties. (Texas challenged the disallowance, and litigation is ongoing.) CMS reviewed the structure of the proposed LPPFs in Dallas and Tarrant Counties and allowed Texas to substitute funds derived from the LPPFs operated by the hospital districts in those counties for the disallowed funds.

49. Texas has long understood that its LPPFs do not run afoul of the Social Security Act's hold harmless prohibition and structured its regulatory regime accordingly. That understanding was gained in part based on CMS's assurances. In early 2019, HHSC first became aware of the possibility that business agreements might exist between private entities. HHSC officials promptly contacted CMS for guidance. CMS assured HHSC that, so long as neither the State nor a unit of local government was providing a guarantee, there was no prohibition on private business arrangements. This assurance was consistent with the email discussed above from Kristin Fan that was circulated to providers across the country around that same time.

50. Texas continued to rely upon that assurance in setting up its team that monitors local funds used as the non-federal share in the Medicaid program, including funds that are transferred to HHSC from a LPPF. Unfortunately, since the withdrawal of the 2019 proposed rule, CMS has reneged on its word and twice unsuccessfully sought to force HHSC to police private agreements.

51. During negotiations over the extension of the State's demonstration project (which was set to expire in September 2022), CMS attempted to insert special terms and conditions imposing many of the same requirements from the withdrawn proposed rule. Because those terms would have been inconsistent with the Social Security Act, Texas refused to agree to the requested terms and conditions.

52. On January 15, 2021, CMS informed Texas that its extension application was approved for a ten-year period ending on September 30, 2030. Just

three months later, on April 16, 2021, CMS reversed course and rescinded that approval. Texas challenged CMS's decision, and this Court issued a preliminary injunction obligating "defendants to treat Texas's demonstration project (Waiver Number 11-W-00278/6) as currently remaining in effect as it existed on April 15, 2021." *Brooks-LaSure*, 2021 WL 5154219, at *15.

53.     As a result of that preliminary injunction, defendants were prohibited from implementing the rescission letter. The Court's orders made clear that CMS was required to treat the demonstration project as remaining in effect and to cooperate with Texas in negotiating various terms, including negotiating the approval of Texas's SDPs. *Brooks-LaSure*, 2022 WL 741065, at *10; *see also, e.g.*, *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2021 WL 5154086, at *1-2 (E.D. Tex. Aug. 12, 2021).

54.     Despite the Court's instructions, CMS attempted to impose the rejected LPPF-related terms by holding approval of five SDPs hostage until Texas would agree to CMS's terms to police private arrangements. That effort failed, too, but only after Texas returned to this Court to compel CMS to promptly issue a final decision on those SDPs. *Brooks-LaSure*, 2022 WL 741065, at *10. Even then, CMS would not withdraw its demand until this Court threatened to impose sanctions. *See id.*; Notice of Compliance with Order, *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, (E.D. Tex. Mar. 25, 2022), ECF No. 100 (confirming that CMS approved the SDPs).

55.     Ultimately, under threat of sanction by this Court, CMS approved the state directed payment programs, which was the only remaining issue in the prior lawsuit, and the case was dismissed.

## IV. OIG Audits and the February 17 Bulletin

56. On November 29, 2021, the HHS Office of the Inspector General (OIG) announced an audit workplan of "States' Use of Local Provider Participation Funds as the State Share of Medicaid Payments." The choice of wording was unusual: OIG did not announce a review of provider taxes categorically, or even provider taxes operated by units of local government. Instead, OIG specifically identified a review of "Local Provider Participation Funds," which is the term that Texas (and a limited number of other States) uses in state statutes authorizing this method of finance for units of local government.

57. On March 25, 2022, at approximately the same time that CMS finally agreed to the state directed payment programs contemplated by the 2021 waiver extension, OIG notified Texas that the State was selected for OIG's audit of LPPFs and held an entrance conference with Texas on April 14, 2022. After collecting information from Texas about the operation of LPPFs in this State, OIG selected Smith County, the home county for this Court, for a detailed review. OIG officials contacted Smith County and asked for information regarding private business agreements to which Smith County is not a party. The officials informed Texas that the audit would take approximately 12 months to complete, and that OIG would issue its report, including any findings, in the summer of 2023.

58. On February 17, 2023, the Deputy Administrator and Director of the Center for Medicaid and CHIP Services at CMS issued a bulletin announcing a retroactive change in CMS's definition of a hold harmless arrangement. *See* Ex. A. Without the notice and comment that CMS acknowledged was necessary when it

issued the 2019 proposed rule change, the bulletin pronounced that an agreement between private providers to redistribute Medicaid payments constitutes "a hold harmless arrangement involving Medicaid payment redistribution" if there is a "reasonable expectation" that the taxpaying providers will receive a portion of their provider tax costs returned as part of a private agreement. *Id.* at 3.

59.   CMS described how, in its view, "taxpayers appear to have entered into oral or written agreements" to redirect or redistribute their Medicaid payments "to ensure that all taxpayers receive all or a portion of their tax back." *Id.* at 3. Notwithstanding the acknowledged absence of state participation in such agreements, CMS concluded they were impermissible because "[t]he redistributions occur so that taxpaying providers are held harmless for all or a portion of the health care-related tax." *Id.*

60.   Without pointing to any statutory authority, the bulletin further stated CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of healthcare-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements." Ex. A at 5. Henceforth, States are expected "to make available *all requested documentation* regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments" as part of CMS's "oversight activities and review of state payment proposals[.]" *Id.* (emphasis added).

61. CMS threatened to "take enforcement action as necessary" if an audit uncovers "impermissible financing practices." *Id.* And without regard to whether the requested documentation exists, CMS ominously warned that a State's failure to supply requested documentation regarding redistribution arrangements "may result in a deferral or disallowance of federal financial participation." *Id.*

62. After the bulletin was issued, OIG moved up the expected timeframe for completion of its report on Smith County to May 2023. On March 1, 2023, OIG sent a letter to HHSC indicating its intent to conduct new audits of local provider participation funds in Amarillo, Tarrant, and Webb counties. The "objective" of the second audit "is to determine whether the State agency adhered to the hold-harmless provisions in Federal regulations."

63. On March 9, 2023, OIG notified Texas that it had changed the original audit objective of the Smith County LPPF audit (referenced in paragraph 57) from the broad examination of whether LPPF funds were permissible and in accordance with state and federal law to the much narrower objective utilized in the new audit of the three additional local government entities.

## V.  Immediate and Long-Term Effects of the Bulletin on Texas

64. This bulletin, if allowed to be implemented, will have an immediate impact on not just HHSC's ability to provide vitally needed healthcare services to Texans but also on Texas's sovereign interest in enforcing its laws.

65. Relying on the text of both the Social Security Act and CMS's existing regulations, the Texas Legislature has never deemed it necessary to create a

regulatory body with authority to examine contractual agreements that might exist between two private businesses. Nor has the Legislature ever seen fit to provide HHSC with such authority. As a result, to comply with the bulletin, HHSC will have to arrogate power to itself that it lacks under state law.

66.     Beyond that injury to its sovereignty, Texas faces significant monetary costs to comply with the bulletin: it would be required to establish and operate a regulatory entity with sufficient resources to examine the contractual arrangements and financial management of every private hospital that exists in a jurisdiction with a LPPF. Ex. A at 5 (States are expected "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."). That is the only way Texas could accurately determine what private contractual relationships exist and whether those contracts are related to their provider tax payments. Texas would then need to take decisive action to halt private contractual agreements that fall within the scope of the bulletin's definition of a hold harmless arrangement. Ex. A at 5 (States must "take steps to curtail these practices if they exist.").

67.     HHSC estimates that to achieve compliance, it will need to expend tens of millions of dollars and hire many new staff. There are 304 privately-owned hospitals located in jurisdictions that currently have a LPPF, 27% of which are not-for-profit organizations. Texas hospitals are extremely complex organizations, which have innumerable private contracts with various types of entities that Texas would

be required to examine to determine whether each contract constituted hold harmless arrangements under the bulletin's vague definitions.

68.     Because current law only requires HHSC to monitor agreements involving local government entities, HHSC currently employs only about a dozen compliance staff aimed at ensuring no impermissible hold harmless provisions exist. HHSC would need to hire hundreds of additional staff to "curtail" any actions that might be inconsistent with the bulletin: those staff would include professionals like auditors, financial examiners, financial analysts, and attorneys who could competently interpret the thousands (potentially millions) of contracts or other business arrangements at each hospital and the billions of dollars of revenues and expenditures that are associated with the running of those hospitals.

69.     HHSC would also need to investigate private associations or individual citizens who may have financial or other contractual relationships with any Medicaid provider that is assessed a mandatory payment as part of a LPPF. And at that juncture, HHSC would risk transgressing the First Amendment, which protects the free-association rights of individuals and nonprofit organizations—including nonprofit hospital associations.

70.     The last several years have been challenging for Texas Medicaid: the pandemic, combined with CMS's past conduct that precipitated Texas's earlier lawsuit, have put providers and patients on edge. CMS's latest salvo threatens to undermine the work that HHSC has done to restore confidence in the Texas Medicaid Program and is destabilizing to the safety net that Texans enrolled in the Medicaid

program rely on to provide them life-saving care. LPPFs fund nearly a fifth of Texas's state share of Medicaid expenditures. Moreover, LPPFs are typically operated by hospital districts and other local government entities—meaning that CMS's current effort to shut off Medicaid funding is aimed at the very local government entities that are charged with creating an aspect of the entire social-safety net that serves emergent or acute medical needs. In Texas, most hospital associations are non-profits and, to comply with the bulletin, HHSC would be compelled to examine them to evaluate any financial relationship they might have with hospitals located in jurisdictions that operate LPPFs. Texas hospitals cannot afford, and the Texans they serve cannot afford, the type of uncertainty in future funding that has resulted from the bulletin.

## CLAIMS

### *Count I*

### The February 17 Bulletin Exceeds CMS's Statutory Authority and is Not in Accordance with Law (5 U.S.C. § 706)

71.    Plaintiffs incorporate by reference all preceding paragraphs.

72.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

73.    The February 17 bulletin defines a hold harmless arrangement to reach agreements solely between private healthcare providers. Defendants lack statutory and regulatory authority to issue a definition of a hold harmless arrangement that

contradicts the plain language of the Social Security Act and CMS's own agency rules. *See* 42 U.S.C. § 1396b(w)(4); *see also* 42 C.F.R. § 433.68(f)(3).

74.     The Social Security Act's definition of a prohibited hold harmless provision does not encompass private agreements exclusively between private providers.  Instead, the Act requires that a) *the State or other unit of government* imposing the tax provide the payment, offset, or waiver, and b) the payment, offset, or waiver guarantees to hold taxpayers harmless for any portion of the tax.  42 U.S.C. § 1396b(w)(4)(C)(i). The redistribution agreements between private providers that CMS described in the February 17 bulletin are not hold harmless arrangements because they do not involve "[t]he State or other unit of government imposing the tax" acting to hold taxpayers harmless.  *Id.* § 1396b(w)(4)(C)(i).

75.     The bulletin also elevates a legally unenforceable "expectation" to the level of a guarantee, which is contrary to the plain meaning of the term "expectation." There is no indication that Congress intended for "guarantee" to have any definition other than its plain meaning.

76.     Defendants did not act in accordance with the law and exceeded their statutory and regulatory authority when promulgating and relying upon the February 17 bulletin. Accordingly, the bulletin should be set aside.

### Count II

### The February 17 Bulletin Did Not Comport with the Requirements of Notice-and-Comment Rulemaking (5 U.S.C. § 553)

77.     Plaintiffs incorporate by reference all preceding paragraphs.

78.    The February 17 bulletin is a substantive or legislative rule that required notice-and-comment rulemaking under the APA. *See* 5 U.S.C. § 553. The bulletin is not exempt from the APA's notice-and-comment requirements as the bulletin is not an interpretive rule, general statement of policy, or the rule of agency organization, procedure, or practice. *See id.* § 553(b)(A).

79.    "Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice and comment demands apply." *Id.*

80.    CMS acknowledged that defining hold harmless arrangements to include agreements to which neither the State nor local government entities were a party is a substantive rule requiring notice-and-comment rulemaking when it initiated such a process in 2019. That conclusion was proven correct by the thousands of comments submitted to CMS discussing not only its lack of statutory authority but also the real-world obligations that the proposed rule would impose on both private parties and the States.

81.    Moreover, the bulletin easily meets the definition of a legislative rule requiring notice and comment. Specifically, courts "evaluate two criteria to distinguish policy statements from substantive rules: whether the rule (1) impose[s] any rights and obligation and (2) genuinely leaves the agency and its decision-makers

free to exercise discretion." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) ("*DAPA*") (quotation marks omitted).

82.     Here, the bulletin imposes rights and obligations and does not leave CMS and its decisionmakers free to exercise discretion regarding the scope of the Social Security Act's hold harmless prohibition: because of the bulletin, "an arrangement in which providers receive Medicaid payments from the state (or from a state-contracted managed care plan), then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax, would constitute a prohibited hold harmless provision under" the Social Security Act. Ex. A at 5.

83.     CMS is *required* to "reduce a state's medical assistance expenditures by the amount of healthcare-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation." *Id.* The bulletin is therefore substantive because it imposes more than "derivative, incidental, or mechanical burdens" and it "change[s] the substantive standards by which" CMS determines how to enforce the Social Security Act and its implementing regulations. *DAPA*, 809 F.3d at 176; *Texas v. EEOC*, 933 F.3d 433, 443-46 (5th Cir. 2019).

84.     The February 17 bulletin is invalid because CMS failed to use the proper notice-and-comment procedures required by the APA.  *See* 5 U.S.C. §§ 553, 706.

### Count III

### The February 17 Bulletin Is Arbitrary and Capricious (5 U.S.C. § 706)

85.     Plaintiffs incorporate by reference all preceding paragraphs.

86.     Federal administrative agencies are required to engage in reasoned decision-making. "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). And when an agency reverses "prior policy," it must provide a "detailed justification" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (plurality op.).

87.     The February 17 bulletin is arbitrary and capricious because it fails to acknowledge CMS's change in position. In 2019, CMS acknowledged the absence of statutory or regulatory authority to police, or require States to police, private provider agreements under the Social Security Act. The bulletin reaches the exact opposite conclusion, with no explanation (or even acknowledgement) of that change in position. The bulletin therefore cannot survive arbitrary-and-capricious review.

88.     "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy, particularly when the prior policy has engendered serious reliance interests." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021) (quoting *Fox*, 556 U.S. at 515); *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (applying this principle even when there were serious questions as to the legality of the rule to be rescinded). The February 17 bulletin fails to discuss the reliance interests of States like Texas that have never needed to police redistribution agreements between private providers, and which now lack the structural and financial systems necessary to comply with CMS's edict.

89.     The bulletin also fails to discuss Medicaid recipients' need for access to care that is funded by LPPFs. CMS well knows that Texas relies on $3 billion from LPPFs as part of the non-federal share of Medicaid payments. Withholding federal matching funds for this large amount of funding based on the State's inability to immediately comply with the bulletin, as CMS has threatened, Ex. A at 5-6, would devastate Texas's Medicaid finances, significantly destabilize the State's Medicaid provider network, and jeopardize the availability of options for quality healthcare for all Texans, including Medicaid recipients.

90.     Moreover, agency action may be set aside as arbitrary and capricious if the agency fails to "comply with its own regulations." *See Environmental, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011). The bulletin is inconsistent with CMS's implementing regulations, that specify that a hold harmless provision exists where "[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of the payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." *See* 42 C.F.R. § 433.68(f)(3). CMS's bulletin therefore conflicts not just with the text of the Social Security Act but with the agency's own regulations, and should be set aside on this basis, too.

91.     Based on these and other flaws, the bulletin should be set aside as arbitrary and capricious.

### *Count IV*

### Alternatively, the 2008 Rule Is Not in Accordance with Law (5 U.S.C. § 706)

92.     Plaintiffs incorporate by reference all preceding paragraphs.

93. CMS has taken the position that the February 17 bulletin was supported by the preamble to the 2008 rule. This is legally incorrect as a rule's preamble cannot impose obligations that are inconsistent with the rule's text. *See Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004). It also misreads the preamble.

94. If the Court disagrees, however, then the 2008 rule is contrary to CMS's statutory authority and should be set aside for the reasons discussed above.

95. Although any claim challenging the process by which the 2008 rule was adopted is time-barred, 28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991); *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985), Texas may still challenge the legality of the rule if it has been applied to Texas within the last six years, *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997).

96. CMS has applied or attempted to apply its (incorrect) interpretation of the 2008 Rule multiple times since 2021: when CMS demanded the interpretation be applied as a condition of the extension of Texas's section 1115 waiver in 2021, when CMS refused to approve Texas's directed payment programs until Texas agreed to the interpretation in 2022, and now when CMS demands documents based on the interpretation of the rule in 2023.

## DEMAND FOR JUDGMENT

Plaintiffs request that the Court:

a. Declare unlawful and set aside the February 17 bulletin;

b. Issue preliminary and permanent injunctive relief enjoining defendants from enforcing or implementing the February 17 bulletin against Texas;

c. Compel defendants to conduct any Medicaid audit and oversight activities against Texas in accordance with the Social Security Act and its implementing regulations and without reliance on the February 17 bulletin;

d. Award Texas the costs of this action and reasonable attorney's fees; and

e. Award such other and further relief as the Court deems equitable and just.

Dated: April 5, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

CHRISTOPHER H. HILTON
Chief, General Litigation Division
Texas Bar No. 24087727
Christopher.Hilton@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Leif.Olson@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-059)
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted.

JUDD E. STONE II
Solicitor General

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
*Lead Counsel*
Texas Bar No. 24115221
Lanora.Pettit@oag.texas.gov

MICHAEL R. ABRAMS
Assistant Solicitor General
Texas Bar No. 24087072
Michael.Abrams@oag.texas.gov

WILLIAM F. COLE*
Assistant Solicitor General
Texas Bar No. 24124187
William.Cole@oag.texas.gov

*Application for admission forthcoming

*Counsel for Plaintiffs*