# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | |
| *Plaintiffs*, | |
| v. | |
| CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, | No. 6:23-cv-00191-JDK |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Contents..................................................................................................i

Table of Authorities..........................................................................................iii

Introduction ......................................................................................................1

Background ........................................................................................................4

I.     Overview of Medicaid and Hold Harmless Arrangements ....................4

     A.    The Medicaid program ...................................................................4

     B.    Statutory prohibitions barring hold harmless arrangements.......................................................................6

     C.    Subsequent regulatory developments.........................................7

II.     Texas Medicaid and Local Provider Participation Funds...................11

III.    CMS's February 17 Bulletin and Immediate Threats of Enforcement ...............................................................................14

Argument ........................................................................................................16

I.     Texas Is Likely to Succeed on the Merits. ..........................................16

     A.    The February 17 bulletin exceeds CMS's statutory and regulatory authority. ..............................................................17

         1.    The February 17 bulletin's definition of hold harmless arrangements conflicts with the Social Security Act. ...18

         2.    CMS's agency regulations do not encompass the bulletin's definition of a prohibited hold harmless arrangement. ...............................................................22

     B.    The February 17 bulletin is procedurally invalid because it did not go through notice-and-comment rulemaking. ...........23

     C.    The bulletin is arbitrary and capricious because it departed from past practice and did not consider the States' substantial reliance interests. .......................................26

II.     Texas Will Suffer Irreparable Harm Absent a Preliminary Injunction...................................................................................29

     A.    The bulletin imposes compliance burdens that Texas will never be able to recover........................................................30

     B.    The bulletin also appears to require HHSC to violate the rights of private parties........................................................32

III.    The Balance of the Equities and the Public Interest Favor Temporary and Preliminary Injunctive Relief.....................................33

Conclusion ........................................................................................................ 34

Certificate of Conference ............................................................................... 35

Certificate of Service...................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abraham Lincoln Mem. Hosp. v. Sebelius,*
  698 F.3d 536 (7th Cir. 2012) ................................................. 5

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021) ........................................................ 32

*Ark. Dep't of Health & Hum. Servs. v. Ahlborn,*
  547 U.S. 268 (2006) ......................................................... 4, 5

*Azar v. Allina Health Servs.,*
  139 S. Ct. 1804 (2019) ........................................................ 24

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ............................................................ 5

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ............................................. 28, 29

*Cameron v. EMW Women's Surgical Ctr., P.S.C.,*
  142 S. Ct. 1002 (2022) ........................................................ 30

*City of Sherman v. Pub. Util. Comm'n of Tex.,*
  643 S.W.2d 681 (Tex. 1983) ................................................. 30

*Commonwealth v. Biden,*
  57 F.4th 545 (6th Cir. 2023) ............................................. 30, 32

*Corley v. United States,*
  556 U.S. 303 (2009) ........................................................... 21

*DHS v. Regents of the University of California,*
  140 S. Ct. 1891 (2020) ........................................................ 27

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.,*
  901 F.2d 1267 (5th Cir. 1990) .............................................. 30

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,*
  565 U.S. 606 (2012) ............................................................ 5

*Easom v. US Well Servs., Inc.,*
  37 F.4th 238 (5th Cir. 2022) ................................................ 19

*Entergy Servs., Inc. v. FERC,*
  375 F.3d 1204 (D.C. Cir. 2004) ............................................ 22

*Environmental, LLC v. FCC,*
  661 F.3d 80 (D.C. Cir. 2011) ............................................... 21

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................... 26, 27

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) ........................................................ 26

*Harris v. McRae,*
  448 U.S. 297 (1980) ............................................................ 5

iii

*Hibbs v. Winn,*
   542 U.S. 88 (2004) .................................................................................. 21

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ................................................................... 32

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................................ 25

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ................................................................................ 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................................................................. 26

*NFIB v. OSHA,*
   142 S. Ct. 661 (2022) ............................................................................. 30

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................ 29

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ........................................................................... 23, 24

*Physicians for Soc. Resp. v. Wheeler,*
   956 F.3d 634 (D.C. Cir. 2020) ............................................................... 27

*Protestant Mem. Med. Ctr., Inc. v. Maram,*
   471 F.3d 724 (7th Cir. 2006) ....................................................... 6, 13, 19

*Roho, Inc. v. Marquis,*
   902 F.2d 356 (5th Cir. 1990) ................................................................. 16

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
   467 U.S. 947 (1984) ................................................................................ 32

*Shell Offshore Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) ................................................................. 25

*Sw. Airlines Co. v. FERC,*
   926 F.3d 851 (D.C. Cir. 2019) ............................................................... 27

*Tex. Oil & Gas Ass'n v. EPA,*
   161 F.3d 923 (5th Cir. 1998) ................................................................. 26

*Texas v. Brooks-LaSure,*
   No. 6:21-cv-00191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ..................... 1, 11

*Texas v. Brooks-LaSure,*
   No. 6:21-cv-00191, 2022 WL 741065
   (E.D. Tex. Mar. 11, 2022) ........................................... 1, 3, 7, 8, 9, 14, 19

*Texas v. United States,*
   524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................... 24

*Texas v. United States,*
   787 F.3d 733 (5th Cir. 2015) ................................................................. 32

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................................. 24

*Thomas v. Reeves,*
    961 F.3d 800 (5th Cir. 2020) (en banc) ............................................ 19

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ....................................................................... 29

*U.S. Dep't of Lab. v. Kast Metals Corp.,*
    744 F.2d 1145 (5th Cir. 1984) ........................................................ 24

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
    985 F.3d 472 (5th Cir. 2021) ......................................................... 26

*Valley v. Rapides Par. Sch. Bd.,*
    118 F.3d 1047 (5th Cir. 1997) ........................................................ 16

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ........................................................ 27

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ............................................................ 20, 25

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. I ................................................................... 29, 32

5 U.S.C.:
    § 551(4) ........................................................................................ 23
    § 553(b) ........................................................................................ 23
    § 553(b)(A) .................................................................................. 24
    § 553(c) ........................................................................................ 23
    § 706(2)(A) ............................................................................ 17, 21
    § 706(2)(C) .................................................................................. 17
    § 706(2)(D) .................................................................................. 23

42 U.S.C.:
    § 1315 ........................................................................................... 11
    § 1396b(a)(1) .................................................................................. 5
    § 1396b(w) ...................................................................................... 6
    § 1396b(w)(1)(A)(iii) ............................................................... 1, 9, 6
    § 1396b(w)(3)(A) ............................................................................ 2
    § 1396b(w)(4)(A) ...................................................................... 6, 26
    § 1396b(w)(4)(B) ............................................................................ 6
    § 1396b(w)(4)(C) ............................................................................ 7
    § 1396b(w)(4)(C)(i) ...................................................................... 28
    § 1396b(d) .................................................................................... 12
    § 1396b(w)(1)(A) ............................................................................ 6
    § 1396b(w)(4) ................................................................... 17, 18, 27
    § 1396b(w)(4)(A) .......................................................................... 19
    § 1396b(w)(4)(C) .......................................................................... 18
    § 1396b(w)(4)(C)(i) ................................................................. 20, 21
    § 1396b(w)(4)(C)(ii) ..................................................................... 18

§ 1903(w) ............................................................................................ 6
§ 1903(w)(4) ...................................................................................... 17
§ 1936b(w)(4)(C)(i) .......................................................................... 27
§ 1936b(w)(4)(C)(ii) ......................................................................... 27
§ 1983 ................................................................................................ 32
§ 1988 ................................................................................................ 32

Texas Constitution art. IX ........................................................................... 2

Pub. L. No. 102-234:
  § 2, 105 Stat. 1793 (1991) .................................................................. 6
  § 2, 105 Stat. 1793 (1991) .................................................................. 6

Tex. Health & Safety Code:
  ch. 288 ............................................................................................. 12
  chs. 288-300A ................................................................................. 12
  § 300.0001 ....................................................................................... 12
  § 300.0103(b)(1) .............................................................................. 12
  § 300.0151 ....................................................................................... 12
  § 300.0151(b) ......................................................................... 2, 12, 20

42 C.F.R.:
  § 433.10(b) ........................................................................................ 5
  § 433.55 ............................................................................................. 2
  § 433.62(f) ....................................................................................... 25
  § 433.68(d)(2)(i) .............................................................................. 21
  § 433.68(f) ............................................................................ 7, 18, 20
  § 433.68(f)(3) ......................................................... 17, 10, 17, 22

Limitations on Payments to Disproportionate Share Hospitals,
  57 Fed. Reg. 55,118 (Nov. 24, 1992) .................................................. 7
  at 55,129-30 ..................................................................................... 7
  at 55,142-43 ..................................................................................... 8

Limitations on Payments to Disproportionate Share Hospitals, 58 Fed.
  Reg. 43,156 (Aug. 13, 1993) ....................................................... 7, 25

Health Care-Related Taxes, 73 Fed. Reg. 9,685 (Feb. 22, 2008) ................ 8
  at 9,694 ................................................................................ 9, 22, 30
  at 9,694-95 ................................................................................ 9, 22

Act of May 24, 2013, 83d Leg., R.S., ch. 1369, 2013
  Tex. Gen. Laws 3630 ...................................................................... 12

Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63,722
  (Nov. 18, 2019) ............................................................................. 6, 9
  at 63,734 ......................................................................................... 10
  at 63,735 ................................................................................. 10, 26

Medicaid Fiscal Accountability Regulation,
  86 Fed. Reg. 5,105 (Jan. 19, 2021) .................................................. 11

**Other Authorities:**

Amended Complaint, *Texas v. Brooks-LaSure*,
    No. 6:21-cv-00191, (E.D. Tex. Aug. 31, 2021), ECF No. 54 .................................... 4

*Guarantee*, Black's Law Dictionary (10th ed. 2014) .................................................. 19

*In re: Hawaii Dept. of Human Servs.*, Docket No. A-01-40 (lead),
    Decision No. 1981, 2005 WL 1540188 (Dep't Appeals Bd., Appellate
    Div. June 24, 2005),
    https://www.hhs.gov/sites/default/files/static/dab/decisions/board-
    decisions/2005/dab1981.htm) .............................................................. 8, 19, 21, 27

Sidney Greenbaum, The Oxford English Grammar § 3.14-15 (1996) ...................... 18

Tex. Health & Human Servs. Comm'n., *Texas Medicaid and CHIP
    Reference Guide* (14th ed. 2022), http://hhs.texas.gov/sites/
    default/files/documents/texas-medicaid-chip-reference-guide-14th-
    edition.pdf ............................................................................................................ 4

Tex. House Bill 1, tit. 2, 88th Leg. (2023) .................................................................. 25

## Introduction

Medicaid is designed as a cooperative endeavor between the federal and state governments to fulfill a vital need: the delivery of healthcare services to low-income Americans. But for the second time in three years, the Centers for Medicare and Medicaid Services (CMS) has disregarded Congress's cooperative-federalism design, reversed its prior position regarding what States must do to fund their share of Medicaid, ignored the Administrative Procedure Act's requirements, and attempted to force Texas to adopt a cumbersome regulatory regime entirely foreign to the Social Security Act.

"Turmoil in the State's Medicaid program resulted" the last time that CMS tried to arbitrarily revoke its approval of Texas's request to extend and amend the State's long-running, managed-care system for the delivery of most Medicaid services. *See Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021). That turmoil only relented when this Court threatened to sanction CMS for the litany of pretexts it offered to justify its actions. *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2022 WL 741065, at *1, *10 (E.D. Tex. Mar. 11, 2022). That turmoil has returned because CMS now threatens to retroactively disallow funds based on one of those same pretexts: Texas's refusal to police private contracts that are entirely legal under the text of the Social Security Act and CMS's existing regulations. *See id.* at *8-10.

This dispute turns on a statutory provision that the parties raised, but the Court did not need to definitively interpret, in the prior litigation: the Social Security Act's prohibition on government guarantees that healthcare providers will be held harmless for certain taxes they pay to fund Medicaid. 42 U.S.C. § 1396b(w)(1)(A)(iii). Because Medicaid depends on the federal government matching state spending, Congress has prohibited States from artificially inflating the amount of federal funds

1

they claim by purporting to tax health-care providers for Medicaid services while guaranteeing—directly or indirectly—that a taxpaying healthcare provider will receive its total tax payment back through Medicaid payments. *Id.* These "hold harmless" agreements are prohibited when a State or local government provides the guarantee. Consistent with federal law, Texas law bars such arrangements. *See, e.g.*, Tex. Health & Safety Code § 300.0151(b). And as Texas's Medicaid agency, the Texas Health and Human Services Commission (HHSC) has promulgated rules and established processes to ensure that no such arrangements occur.

With CMS's encouragement, Texas has authorized local governments to tax healthcare providers[1] to provide one source of the state contribution to financing Medicaid. Those funds are placed in a local government's dedicated account known as a Local Provider Payment Fund (LPPF). The State has always understood that because Texas does not guarantee that it will directly or indirectly hold taxpaying providers harmless for such a healthcare tax, the State may use those LPPF funds to finance a substantial portion of the 40% of Medicaid costs for which it is responsible. Just four years ago, CMS reassured state officials that those understandings were correct. Texas has made substantial investments and structured its compliance regime based on that assurance.

This case arises because CMS has, through sub-regulatory guidance, attempted to require Texas to put an end to any purely private agreements that may exist by which Medicaid providers whose taxes are paid into LPPFs may have financial-risk-mitigation agreements amongst themselves. CMS tried to impose such

---

[1] The Texas statutes which authorize hospital districts to collect and deposit mandatory payments into LPPFs explicitly state that such mandatory payments are not taxes for the purposes of Article IX of the Texas Constitution. However, these payments are considered healthcare-related taxes for purposes of federal law. *See, e.g.*, 42 U.S.C. § 1396b(w)(3)(A); 42 C.F.R. § 433.55.

a requirement by rule in 2019. That failed. CMS tried to impose such a requirement as a special term and condition (STC) of renewing Texas's section 1115 waiver program in 2021. That was rejected—and properly identified by this Court as a pretext as well. *Brooks-Lasure*, 2022 WL 741065, at *10 (denying a request for sanctions "without prejudice to its reassertion in the future"). In 2022, CMS tried to demand it as a condition of approving the State's directed payments during litigation before this Court. Again, to no avail.

Apparently hoping that the fourth time will be the charm, on February 17, 2023, CMS published an "informational bulletin" with neither prior notice nor opportunity for comment. Ex. A, Dep't of Health & Hum. Servs., *CMCS Informational Bulletin* (Feb. 17, 2023). In that bulletin, CMS declared that it intends to include— and has supposedly always included—private arrangements among providers within the scope of prohibited hold harmless arrangements even though such arrangements do not involve the government. And the bulletin announced that CMS is requiring state governments to seek out and eliminate those arrangements on pain of the loss of billions of dollars in federal funding. Because CMS insists that this has been its longstanding position, it has made clear that it intends to apply this guidance retroactively to payments already made. To that end, the Health and Human Services Office of the Inspector General (OIG) has begun auditing four Texas jurisdictions for compliance with the bulletin's pronouncements—starting with the county in which this Court is located.

CMS's departures from the text of the Social Security Act, its regulations, and its prior dealings with Texas are unlawful. HHSC lacks the authority to investigate business arrangements between private providers of healthcare services—much less to prohibit them. HHSC has thus been put to an impossible choice: either (a) arrogate power found nowhere in state (or even federal) law and immediately invest millions of dollars (that have never been appropriated) in a comprehensive auditing and

enforcement program or (b) decline to comply with the bulletin and risk a level of sudden financial loss that would undoubtedly result in significant negative impacts to Medicaid providers and the Medicaid safety net in Texas. Neither option is tenable. Because of this irreparable and ongoing injury, Texas requests that the Court preliminarily enjoin the federal defendants from enforcing or relying on the bulletin pending resolution of its legality.

**BACKGROUND**

**I.   Overview of Medicaid and Hold Harmless Arrangements**

    **A.    The Medicaid program**

"The Medicaid program, which provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs, was launched in 1965 with the enactment of Title XIX of the Social Security Act." *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). At the federal level, the Medicaid program is administered by the "Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services." *Id.* Although "States are not required to participate in Medicaid . . . all of them do," *id.*, Texas among them. At present, Texas serves roughly 4.9 million Texans through its Medicaid program.[2]

---

[2] Tex. Health & Human Servs. Comm'n., *Texas Medicaid and CHIP Reference Guide*, at 4 (14th ed. 2022), http://hhs.texas.gov/sites/default/files/documents/texas-medicaid-chip-reference-guide-14th-edition.pdf. A more fulsome background of the Texas Medicaid system is also available in Texas's First Amended Complaint from its earlier-filed lawsuit. *See* Amended Complaint, *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, (E.D. Tex. Aug. 31, 2021), ECF No. 54. This motion covers only those aspects of Texas Medicaid necessary for resolving the parties' current dispute. To avoid burdening the Court, Texas is not attaching voluminous, publicly available documents or copies of the filings in its previous lawsuit as exhibits to this Motion. It would be happy to provide them on request.

4

The administration of Medicaid is designed to be "cooperative": the federal government pays a certain percentage of the "costs that States incur for patient care, and, in return, the State pays its portion of the costs and complies with certain statutory requirements for making eligibility determinations, collecting and maintaining information, and administering the program." *Id.*

"To qualify for federal funds, States must submit" to CMS for approval "a state Medicaid plan that details the nature and scope of the State's Medicaid program." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012). And if a State's plan satisfies the requirements of the Social Security Act, "the Federal Government shares in the cost [of administering the program] by reimbursing[3] a participating State for patient care costs on the basis of a federal medical assistance percentage (FMAP)." *Abraham Lincoln Mem. Hosp. v. Sebelius*, 698 F.3d 536, 543 (7th Cir. 2012) (citing 42 U.S.C. § 1396b(a)(1) and 42 C.F.R. § 433.10(b)) (footnote added); *see also Harris v. McRae*, 448 U.S. 297, 308-09 (1980). "The FMAPs are used in determining the amount of federal matching funds, known as the federal financial participation . . . , participating States receive." *Sebelius*, 698 F.3d at 543. The FMAP can fluctuate based on a range of circumstances. *Id.* (citing 42 C.F.R. § 433.10(b)). For Texas, it is currently set at approximately 60%. Ex. B, Declaration of Victoria Grady, Director of Provider Finance and Government Relations Specialist for Finance, Texas Health and Human Services Commission ("Grady Declaration") ¶ 6.

---

[3] "Although the federal contribution to a State's Medicaid program is referred to as a 'reimbursement,' the stream of revenue is actually a series of huge quarterly advance payments that are based on the State's estimate of its anticipated future expenditures." *Bowen v. Massachusetts*, 487 U.S. 879, 883-84 & n.2 (1988) (citing 42 U.S.C. § 1396b(d)).

**B.     Statutory prohibitions barring hold harmless arrangements**

This case concerns the Social Security Act's requirements for calculating the FMAP and provisions that reduce the federal contribution to the States. "In the late 1980s and early 1990s, [S]tates began to take advantage of a 'loophole' in the Medicaid program that allowed [S]tates to gain extra federal matching funds without spending more state money." *Protestant Mem. Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006). In that scheme, a State would "make payments to hospitals and collect the federal matching funds;" the State "would then recoup a portion of the state funding from the hospital, often in the form of a 'tax.'" *Id.*; *see also* Medicaid Program; Medicaid Fiscal Accountability Regulation (MFAR), 84 Fed. Reg. 63,722, 63,730 (Nov. 18, 2019) (proposed rule) (recounting this history).

Congress responded to this problem in 1991 through the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments. Pub. L. No. 102-234, § 2, 105 Stat. 1793 (1991) (adding subsection 1903(w), codified at 42 U.S.C. § 1396b(w), to the Social Security Act). The 1991 amendments require a reduction in the amount of patient-care costs for which the States may seek reimbursement—and which are used to calculate the federal financial participation payment—when the State obtains revenues from certain sources. *See* 42 U.S.C. § 1396b(w)(1)(A). Relevant here, the amendments require the amount of the State's requested reimbursement to be "reduced by the sum of any revenues received by the State" through a "broad-based health care related tax" that operates as "a hold-harmless provision." *Id.* § 1396b(w)(1)(A)(iii).

The statute, in turn, articulates three definitions of a "hold harmless" provision. *Id.* § 1396b(w). The first is when the taxing authority "provides (directly or indirectly) for a payment . . . to taxpayers" that is "positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan." *Id.* § 1396b(w)(4)(A). The second is when "[a]ll or

any portion of the payment made under this subchapter to the taxpayer varies based *only* upon the amount of the total tax paid." *Id.* § 1396b(w)(4)(B) (emphasis added). And the third is when the State or other unit of government imposing the tax "provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C). Written in terms of actions by a taxing authority—and against the backdrop of *state* action to inflate Medicaid reimbursements—none of these provisions textually includes agreements to which no governmental actor is a party.

### C.    Subsequent regulatory developments

Since the passage of the 1991 amendments, CMS has taken several regulatory actions to implement these restrictions on hold harmless arrangements.

**1.**    CMS first promulgated implementing regulations in 1993. *See* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993) (final rule); *see also* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 57 Fed. Reg. 55,118 (Nov. 24, 1992) (interim final rule).

This regulation incorporated the statute's definition of a hold harmless provision into subsection (f) of 42 C.F.R. § 433.68 by "set[ting] out the three ways of finding a 'hold harmless provision' for a state tax program." *Brooks-LaSure*, 2022 WL 741065, at *5 (setting out this history). Relevant here, this regulation "added detail on the third hold-harmless definition" by adopting a two-part test—later formally adopted by Congress—for determining when the taxing authority's levy of an excessive amount of taxes on a healthcare provider rises to the level of a hold harmless "guarantee." *Id.* at *5-6; *see also* 57 Fed. Reg. at 55,129-30. Under that test,

"[i]f the tax on the providers' revenue was at or below 6% (selected as the national average sales tax), the tax would be assumed permissible," but if "the tax was above 6%," "a numerical test would deem a hold harmless situation to exist when Medicaid rates are used to repay (within a 12-month period) at least 75 percent of providers for at least 75 percent of their total tax cost." *Brooks-LaSure*, 2022 WL 741065, at *5 (citing 57 Fed. Reg. at 55,142-43).

**2.** The second regulatory action took place in 2008, after HHS's Departmental Appeals Board *rejected* CMS's effort to retroactively disallow years of federal funding to five States based on an overbroad interpretation of what constitutes a hold harmless arrangement. There, CMS determined that certain state programs providing grants to nursing homes or tax credits to patients impermissibly held taxpayers harmless under CMS's regulations. *See id.* at *6-7 (citing *In re: Hawaii Dept. of Human Servs.*, Docket No. A-01-40 (lead), Decision No. 1981, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005), https://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2005/dab1981.htm).   But  the Board held that the programs at issue did *not* meet either the first or third definitions of a hold harmless provision. *Id.* As to the third definition, the Board explained that no language in the States' grant or credit programs offered an explicit or direct assurance of any payment to a taxpayer-provider, and it rejected CMS's argument that the third definition was merely a "broad catch-all provision." *Id.* at *6. Ultimately, the Board explained that for a state taxing authority to guarantee a payment, offset, or waiver, the Board expected to see a "legally enforceable" promise in "these States' laws." *Id.* at *7.

Following this interpretation of its own rules by its own internal adjudicative system, CMS's enforcement arm proposed amendments to 42 C.F.R. § 433.68 to "clarify" the agency's tests for finding the existence of an impermissible hold harmless arrangement. *See, e.g.*, Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg.

9,685, 9,689-90 (Feb. 22, 2008) (final rule).[4] In turn, CMS amended the regulatory definition of the third kind of hold harmless arrangement to "cover the situation where a government provides for a certain measure '*such that*' the measure guarantees" the taxpayer will be held harmless. *Brooks-LaSure*, 2022 WL 741065, at *8 (emphasis added). This was a departure from the statutory definition in which Congress defined a hold harmless provision to include "certain financial measure[s] '*that* guarantees' indemnification." *Id.* at *7 (emphasis added). This change "deliberate[ly]" "removes the statute's tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." *Id.* at *8. As a result of the agency's "loosen[ing]" of the required link between the state taxing authority and the guarantee itself, CMS has contended that the third definition "focus[es] on the 'reasonable expectation' [of the taxpayer] about the 'result' of a state payment, as opposed to merely what *the [S]tate provided* when making a payment." *Id.* (citing 73 Fed. Reg.at  9,694-95) (emphasis in original).

**3.**    Eleven years passed before, in 2019, CMS tried—and failed—again to stretch the third definition of hold harmless agreements even farther to cover private arrangements. *See* 84 Fed. Reg. at 63,722. In the intervening years, States—and especially Texas—built their compliance regimes around CMS's existing rules and interpretations. For example, in early 2019, Kristin Fan, the Director of CMS's Financial Management Group, told counsel for concerned providers that although

---

[4] Specifically, in explaining what would constitute a hold harmless arrangement under the newly amended regulation, CMS invoked the example of a state law providing grants to a nursing-home residents who incur increased rates as a result of bed taxes on nursing homes. 73 Fed. Reg. 9,694. This comment makes clear that CMS was seeking to address not private agreements between independent third parties, but a circumstance where one of two related parties receives a grant from the State but, because of the nature of the parties' relationship, is compelled to pass that grant funding to a related party, creating a state guarantee. *Id.*

CMS is "aware that there may be arrangements" between providers that CMS may "not particularly like," CMS "do[es] not have statutory authority to address" those arrangements. Ex. C at 1, Email Exchange Between Kristin Fan and Barbara Eyman (Apr. 10, 2019). Director Fan also agreed that States should not be expected "to seek information about these agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." *Id.* CMS similarly assured HHSC officials—in direct response to a specific question—that, so long as neither the State nor a unit of local government was providing a guarantee, there was no prohibition on private business arrangements. Grady Decl. ¶ 24. Texas relied upon that assurance in setting up its compliance regime—a significant financial investment that would eventually include more than a dozen full-time employees and a custom information-technology system. *Id.* ¶ 42.

But in the proposed rule released later that year, the agency said something else entirely. The proposal explained that CMS had "become aware of impermissible arrangements that exist where a [S]tate or other unit of government imposes a health-care related tax, then uses the tax revenue to fund the non-federal share of the Medicaid payments back to the taxpayers." 84 Fed. Reg. at 63,734. Critically, CMS clarified that it considered such arrangements to violate the law even if "a private entity makes the redistribution" to another private entity. *Id.* at 63,735. It reasoned that a purely private arrangement still "constitutes an indirect payment from the [S]tate or unit of government to the entity being taxed that holds it harmless for the cost of the tax." *Id.* That is because "[t]he taxpayers have a reasonable expectation to be held harmless for all or a portion of their tax amount." *Id.* at 63,734. As a result, CMS proposed to amend 42 C.F.R. § 433.68(f)(3) to specify that CMS would consider the "net effect" of a particular arrangement—*i.e.*, whether the "net effect" is a "reasonable expectation" by the taxpayer that it will recoup all or a portion

of its tax payment through Medicaid payments—to determine whether a hold harmless arrangement exists. *Id.* at 63,735.

The proposed rule met swift backlash. After a torrent of more than 10,000 comments—many of which faulted CMS for "lack[ing] statutory authority for its proposals" and "creating regulatory provisions that were ambiguous or unclear and subject to excessive Agency discretion"—CMS ultimately opted to "withdraw the proposed provisions." Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105, 5,105 (Jan. 19, 2021). One such commenter was Daniel Tsai—CMS's current Deputy Administrator and its Director of Center for Medicaid and CHIP Services—who was then serving as the Medicaid Director for the State of Massachusetts. Ex. D, Dan Tsai Comment (Jan. 27, 2020). Tsai explained that the proposed rule—including its "'net effect[]' tests"—"introduce[d] significant new state obligations," that "[i]f implemented, . . . would represent an unprecedented federal overreach," "exceed[ed] CMS' statutory authority," contained "provisions [that] are highly susceptible to arbitrary and capricious application," was "not supported by the underlying statute," and "includ[ed] reporting on business dealings of private entities that are not available to the [S]tate." *Id.* HHSC submitted a comment letter along similar lines, as did others. Grady Decl. ¶ 17; Ex. E.

## II.    Texas Medicaid and Local Provider Participation Funds

Over the last decade, Texas has modified its Medicaid program to better serve the needs of program's enrollees as well as to comply with Congress's statutory requirements and CMS's lawful regulatory directives. Two developments are particularly relevant here. *First*, in 2011, Texas transitioned from a fee-for-service to a managed-care delivery model.[5] *Brooks-LaSure*, 2021 WL 5154219, at *1. *Second*, in

---

[5] Texas accomplished this through a demonstration project submitted pursuant to 42 U.S.C. § 1315, which CMS then approved. CMS's sudden refusal to extend the

2013, the Texas Legislature authorized designated hospital districts, counties, and municipalities to "administer a health care provider participation program to provide additional compensation to certain hospitals located in the hospital district, county, or municipality by collecting mandatory payments from each of those hospitals to be used to provide the nonfederal share of a Medicaid supplemental payment program." Tex. Health & Safety Code § 300.0001; *see* Act of May 24, 2013, 83d Leg., R.S., ch. 1369, 2013 Tex. Gen. Laws 3630 (codified at Tex. Health & Safety Code Ch. 288); Tex. Health & Safety Code chs. 288-300A. In contrast to its position now, CMS *encouraged* Texas to implement these funds, which collectively comprised approximately 17.7% of Texas's state share of Medicaid funding in the last fiscal year. Grady Decl. ¶¶ 10, 22; *see also* Compl., ECF No. 1 ¶¶ 42-46.

The funds are managed by local governments, Grady Decl. ¶¶ 7-13, and subject to a host of relevant restrictions. If the taxing authority authorizes a healthcare provider participation program, it must require an annual mandatory payment to be assessed based upon the net patient revenue of each institutional healthcare provider located in the applicable local unit of government. Tex. Health & Safety Code § 300.0151. Money deposited into a taxing authority's LPPF is authorized to be used for limited purposes, including intergovernmental transfers from the local government to the State to provide the state share of Medicaid payments for statutorily specified Medicaid programs. *See id.* § 300.0103(b)(1). The taxes imposed by the local unit of government must be broad-based and uniform, as required under federal law. *See id.* § 300.0151(b). And Texas law specifically prohibits these programs from holding harmless any institutional healthcare provider. *Id.*

---

demonstration project in 2021 precipitated Texas's 2021 lawsuit before this Court. *See Brooks-LaSure*, 2021 WL 5154219, at *2-3.

As the statewide administrator of Texas Medicaid, HHSC ensures that the authority that administers each LPPF does not provide for any payment, offset, or waiver that directly or indirectly guarantees to hold the taxpaying providers harmless for any portion of their tax costs. Grady Decl. ¶¶ 13-16. But HHSC does *not* have taxing or regulatory authority over the governmental entities that manage those funds, nor does HHSC have authority to examine or consider any contractual arrangements that might exist between private businesses whose taxes contribute to those funds. Grady Decl. ¶ 12.

The taxes that flow into those funds are unrelated to the methodology for calculating the Medicaid reimbursements that HHSC disburses to healthcare providers. Grady Decl. ¶ 16. The State does not make any such reimbursements based on the amount that a provider is taxed by a local government. *Id.* Instead, Medicaid payments to providers are based exclusively on programmatic methodologies that consider, among other factors, what an estimated Medicare or average commercial payer would have paid for those same services. *Id.* These provisions together ensure that Texas's "complex" hospital systems, Grady Decl. ¶ 21, comport with the Social Security Act and avoid the problems that motivated Congress's 1991 amendments, *see Maram*, 471 F.3d at 726.

Nonetheless, since the withdrawal of the MFAR, Grady Dec. ¶ 27-28, CMS has at least twice sought to force HHSC to police private agreements: *first*, during negotiations over the State's demonstration project, CMS attempted to insert special terms and conditions imposing many of the same requirements from the withdrawn proposed rule (which CMS now attempts to impose by bulletin). Grady Decl. ¶¶ 30-31. *Second*, in the middle of the prior litigation, CMS held approval of five state-directed payment programs (which used LPPF funds) hostage until Texas agreed to CMS's terms. *Id.* ¶¶ 34-37. Neither gambit worked.

### III.    CMS's February 17 Bulletin and Immediate Threats of Enforcement

On February 17, 2023, the Deputy Administrator and Director of CMS issued a bulletin announcing a retroactive change in CMS's definition of a hold harmless arrangement. *See* Ex. A. Without the notice-and-comment procedures that CMS acknowledged were necessary when it proposed the MFAR, the bulletin deemed any agreement between private providers to redistribute Medicaid payments to constitute "a hold harmless arrangement involving Medicaid payment redistribution" when there is a "reasonable expectation" that the taxpaying provider will receive a portion of their provider-tax costs returned as part of a private agreement. *Id.* at 3-4. CMS described how, in its view, "taxpayers appear to have entered into oral or written agreements" to redirect or redistribute their Medicaid payments "to ensure that all taxpayers receive all or a portion of their tax back." *Id.* at 3. Notwithstanding the acknowledged absence of state participation in such agreements, CMS concluded they were impermissible because "[t]he redistributions occur so that taxpaying providers are held harmless for all or a portion of the health care-related tax." *Id.* But, as this Court has recognized, this is circular: CMS has "noted a specific result that it thought should obtain on a certain fact pattern and justified the new approach because it would allow that result." *Brooks-LaSure*, 2022 WL 741065, at *8.

Without pointing to any statutory authority, the bulletin further states CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of healthcare-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements." Ex. A at 5. Henceforth, States are expected "to make available *all requested documentation* regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments" as part of CMS's "oversight activities and review of state payment proposals[.]" *Id.* (emphasis added). CMS threatened to "take enforcement action as necessary" if an

audit uncovers "impermissible financing practices." *Id.* And without regard to whether the requested documentation exists, CMS ominously warned that a State's failure to supply requested documentation regarding redistribution arrangements "may result in a deferral or disallowance of federal financial participation." *Id.*

CMS has made clear that it intends to enforce this bulletin retrospectively. At virtually the same time that CMS sought to avoid sanctions from this Court by agreeing to Texas's directed payment programs, OIG announced that it would conduct an audit of the LPPF in the very county in which this Court is located. Grady Decl. ¶ 40. That audit process was ongoing when the bulletin issued. OIG initially told HHSC that it would issue its report and findings during the summer of 2023, but it moved up the date to May 2023 after the bulletin was announced. *Id.* Shortly thereafter, OIG sent a new letter to HHSC, indicating its intent to conduct new audits of LPPFs in the City of Amarillo as well as Tarrant and Webb Counties.[6] *See* Ex. E, Letter to Cecile Erwin Young (Mar. 3, 2023). The "objective" of the audits "is to determine whether the State agency adhered to the hold-harmless provisions in Federal regulations." *Id.* at 1.

When CMS issued similar sub-regulatory guidance in 2014, the resulting litigation before the Department Appeals Board (DAB) left the challenged funding in limbo for approximately 9 *years*. Grady Decl. ¶ 22. Such an outcome would be devastating to the social safety net in Texas: LPPFs are used to fund nearly a fifth of Texas's state share of Medicaid expenditures. *Id.* ¶ 10. Moreover, LPPFs are frequently run by *hospital* districts—meaning that CMS's current effort to shut off Medicaid funding is aimed at the aspect of the social-safety net that serves emergent

---

[6] OIG's letter incorrectly identified the LPPFs as operated by Amarillo County (which does not exist) and Tarrant County (which does not operate an LPPF). OIG appears to be referring to LPPFs operated by the City of Amarillo and the Tarrant County Hospital District. Grady Decl. ¶ 50 n.5.

or acute medical needs. *Id.* ¶¶ 10, 50 n.5. Of the hospitals in the jurisdictions that currently operate LPPFs, more than 1 in 4 is a non-profit, and all are part of the safety net that Texans rely on for care. In Texas, most hospital associations—which are presumably the entities most likely to be a third-party intermediary for private hospitals of the sort contemplated by the bulletin—are non-profits. *Id.* ¶ 44. They simply cannot afford the type of uncertainty that will result if the bulletin were to be implemented, and the results litigated before the DAB.

To avoid the impact that removing as much as $6 billion in annual funding would visit upon its hospital system, the State of Texas and HHSC have sued CMS, CMS Administrator Chiquita Brooks-LaSure, the U.S. Department of Health and Human Services, HHS Secretary Xavier Becerra, and the United States, asserting that the bulletin is unlawful under the APA. Compl., ECF No. 1, ¶¶ 9-13. Plaintiffs now seek a preliminary injunction to halt defendants' ongoing reliance on and enforcement of the bulletin while its legality is being determined.

## ARGUMENT

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). Texas satisfies each of those requirements.

## I.   Texas Is Likely to Succeed on the Merits.

For at least three reasons, Texas is likely to succeed on its claims for relief under the APA. *First,* the bulletin's redefinition of a hold harmless provision to encompass purely private agreements exceeds CMS's statutory authority—as well as its own regulatory framework—because the Social Security Act defines a hold harmless

16

provision as a guarantee *by the government*, rather than a private party, to a taxpayer. *Second*, because the CMS bulletin is a substantive rule, the agency was required to go through the notice-and-comment process. The bulletin, which represents an about-face from not just the text but CMS's subjective understanding of the relevant law as recently as 2019, it is *not* an interpretive statement exempt from the APA's notice-and-comment procedures. *Third*, even if the agency could promulgate such a significant regulatory change by policy bulletin, CMS acted arbitrarily and capriciously by promulgating the bulletin because (a) it is an unexplained reversal of prior policy; and (b) the agency failed to consider the States' longstanding reliance interests in the understanding, which CMS endorsed, that private arrangements were not a violation of the Social Security Act or within the purview of state oversight. Any one of these reasons is sufficient to hold that the bulletin is unlawful—let alone all three.

### A.   The February 17 bulletin exceeds CMS's statutory and regulatory authority.

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Here, neither the Social Security Act nor its implementing regulations provides a basis for CMS to define a prohibited hold harmless arrangement the way that the bulletin does. *See* 42 U.S.C. § 1396b(w)(4); *see also* 42 C.F.R. § 433.68(f)(3). The bulletin therefore conflicts with the Act and its implementing regulations, and it is substantively unlawful under the APA. *See* 5 U.S.C. § 706(2)(A), (C).

### 1. The February 17 bulletin's definition of hold harmless arrangements conflicts with the Social Security Act.

CMS's sub-regulatory guidance is flatly incompatible with the Act's text. Section 1903(w)(4) of the Act provides that "there is in effect a hold harmless provision with respect to a broad-based health care related tax imposed with respect to a class of items or services if the Secretary determines" that any of the following circumstances exist:

(A) The State or other unit of government imposing the tax provides (directly or indirectly) for a payment (other than under this title) to taxpayers and the amount of such payment is positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan.

(B) All or any portion of the payment made under this title to the taxpayer varies based only upon the amount of the total tax paid.

(C)(i) The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax;

(ii) For purposes of clause (i), a determination of the existence of an indirect guarantee shall be made under paragraph (3)(i) of section 433.68(f) of title 42, Code of Federal Regulations, as in effect on November 1, 2006….

42 U.S.C. § 1396b(w)(4).[7]

**a.** Nothing in the plain language of these three statutory definitions, prohibits an arrangement between private parties as a hold harmless provision. Instead, the defining feature of a hold harmless provision is a guarantee by *the government*—not a private party—to the taxpayer. This is most apparent in 42 U.S.C. § 1396b(w)(4)(A) and 42 U.S.C. § 1396b(w)(4)(C), which expressly make the "State or other unit of government" the subject of the sentence. Congress is presumed to

---

[7] There is an "exception" to this provision which adjusts the percentages discussed in the cited provision of the Code of Federal Regulations based on the year. 42 U.S.C. § 1396b(w)(4)(C)(ii). That exception is not relevant here.

understand the ordinary rules of English grammar and usage. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012). And the subject of the sentence is the person or thing doing the action. *See* Sidney Greenbaum, The Oxford English Grammar § 3.14-15 (1996). Here, Congress chose to consider only the activity of the "State or other unit of government" when prohibiting hold harmless arrangements. The choice to omit private parties from the statute's ambit is presumed intentional. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir. 2022) (discussing the expressio unius canon of construction).

That presumption is further buttressed by the provision's context—both statutory and historical. After all, without involvement by the State in those agreements, the payment of Medicaid reimbursements alone cannot constitute a "guarantee[] to hold taxpayers harmless." *See* 42 U.S.C. § 1396b(w)(4)(C)(i). A guarantee denotes an obligation by the guarantor. *See Guarantee*, Black's Law Dictionary (10th ed. 2014). But as a non-party to any agreement that may or may not exist, Texas assumes no obligation regarding any reimbursements by private providers. And the statutory history of section 1396b(w)(4)(A) underscores that it was aimed at obligations assumed by Texas or one of its political subdivisions—not obligations assumed by private parties that Texas cannot control and of which the State may be entirely unaware. *See Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (en banc) (Willett, J., concurring) (explaining that while legislative history is disfavored as an interpretive aid, statutory history may give important context). After all, the "'loophole' in the Medicaid program" that Congress was trying to address, *Maram*, 471 F.3d at 726, was not that a private party might take steps to insure against losses incurred from the Medicaid program or governmental taxes, including indemnifying themselves in a way that CMS does "not particularly like." Ex. C at 1.

Given this statutory text and history, it is unsurprising that HHS's own adjudicative system (correctly) found nearly two decades ago that reading the regulations as allowing the agency "to examine the use of a payment without regard to the two-prong test where there is no explicit guarantee is unreasonable." *In re: Hawaii*, 2005 WL 1540188, at *23. Since 1991, Congress has not changed those three definitions of a disqualifying hold harmless provision. *Brooks-LaSure*, 2022 WL 741065, at *4. The Board's analysis is thus as sound today as it was when the decision issued.

**b.**    In its bulletin, CMS nevertheless tries to justify this "unreasonable" position, *id.*, by pointing to subsection 1936b(w)(4)(C)(i). *See* Ex. A at 3. But that subsection creates two clear conditions: (1) the State or other unit of government imposing the tax must provide the payment, offset, or waiver; and (2) that payment, offset, or waiver must guarantee to hold taxpayers harmless. *See* 42 U.S.C. § 1396b(w)(4)(C)(i). The private-provider agreements that CMS believes may exist satisfy neither of those. The statute requires an act by "[t]he State or other unit of government imposing the tax," *see id.*, and private agreements are not an act of the government. To the extent CMS implies that merely reimbursing private providers for qualified Medicaid expenditures satisfies the statute's requirement of state involvement in a hold harmless provision, that is wrong for the reasons discussed above.

CMS also notes that subsection (C)(i) contains the phrase "(directly or indirectly)." Ex. A at 4. But the word "indirectly" cannot salvage CMS's construction of section 1396b for at least three reasons.[8]

---

[8] The bulletin does not suggest any "direct" action by the State, nor would that make any sense. As HHSC has explained, state law *forbids* local governments from entering into hold harmless agreements. *See, e.g.*, Tex. Health & Safety Code § 300.0151(b).

*First*, Congress specifically stated that "a determination of the existence of an *indirect* guarantee shall be made under paragraph (3)(i) of section 433.68(f) of Title 42, Code of Federal Regulations, as in effect on November 1, 2006." 42 U.S.C. § 1936b(w)(4)(C)(ii) (emphasis added). This bulletin obviously was not in the Code of Federal Regulations on November 1, 2006.

*Second*, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022). Properly framed, the word "indirectly" should not be read to modify "provides"—which seems to be CMS's position (although that is unclear)—because there would have been no need to set it off by parentheses. Ordinary rules of construction would have taken care of it. Scalia & Garner, *supra*, at 152 ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent."). This is confirmed by the text of the regulations in which CMS has interpreted the "guarantee" term to mean a state program that "results, directly or indirectly," in an impermissible tax outcome. 42 C.F.R. § 433.68(d)(2)(i).

*Third*, Congress's use of the word "indirectly" cannot eliminate the two requirements subsection (C)(i) spells out: a governmental payment and governmental guarantee. 42 U.S.C. § 1396b(w)(4)(C)(i). After all, "[o]ne of the most basic interpretive canons [is] that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

In sum, as the Board recognized long ago, the "guarantee" test in subsection (C) is not "a broad catch-all provision," *see In re: Hawaii*, 2005 WL 1540188, at *3, and a private agreement that the State is not aware of, let alone responsible for, is

21

not a "direct or indirect" provision *by the State* that guarantees to hold a private party harmless.

### 2. CMS's agency regulations do not encompass the bulletin's definition of a prohibited hold harmless arrangement.

Because the bulletin is inconsistent with the Social Security Act, it is unlawful under the APA, and the Court can grant relief on that basis alone. 5 U.S.C. § 706(2)(A). But the bulletin is also inconsistent with CMS's own regulations, and an agency action may be set aside as arbitrary and capricious if the agency fails to "comply with its own regulations." *Environmental, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011).

CMS insists that "[i]mplementing regulations at 42 C.F.R. § 433.68(f)(3) specify that a hold harmless arrangement exists where '[t]he State (or other unit of government) imposing the tax provides for any direct or <u>indirect</u> payment, offset, or waiver such that the provision of the payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.'" Ex. A at 4. But CMS effectively conceded that was *not* true when it sought— unsuccessfully—to amend section 433.68(f)(3) through formal notice-and-comment rulemaking. 84 Fed. Reg. at 63,722. Moreover, the subject of the regulation still identifies "the State (or other unit of government)"—not private parties—as the one "provid[ing]" the hold harmless guarantee. In any case, this portion of the regulation merely restates the relevant provisions of the Act itself, meaning that the same two conditions regarding state action apply under the regulations, too. *Supra* 20-21.

The preamble to the 2008 final rule amending 42 C.F.R. § 433.68(f)(3)—upon which CMS previously relied—is also unhelpful. A rule's preamble cannot impose obligations that are inconsistent with the rule's text. *See Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004). Regardless, a full reading of the preamble demonstrates that it is focused on *governmental*—not private-party—guarantees. For

example, the preamble notes that a "direct guarantee will be found when a [s]tate payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." Ex. A at 4 (citing 73 Fed. Reg. at 9,694-95). But the immediately preceding sentence confirms that "[t]he clarification of the guarantee test is meant to specify that *a State*"—not the taxpayer—"can provide a direct or indirect guarantee through a direct or indirect payment." 73 Fed. Reg. at 9,694 (emphasis added). And in that preamble, CMS found that "the element necessary to constitute a direct guarantee is the provision for payment by [s]tate statute, regulation, or policy"—not a private contract to which the State is not a party and of which the State may not be aware *Id.* The language of its own regulation refutes CMS's attempt to expand the definition of a hold harmless arrangement. And in any case, the term "reasonable expectation" does not appear in section 1396b(w)(4) and cannot supplant the requirements that Congress expressly set out.

* * *

CMS has no authority to override Congress's legislative judgment that hold harmless agreements must involve state action just because private parties may enter into agreements that CMS does "not particularly like." Ex. C at 1. The bulletin's attempt to do so conflicts with the Social Security Act and CMS's own regulations. Texas is therefore likely to succeed on its claim that the bulletin is unlawful and should be set aside under the APA.

## B.  The February 17 bulletin is procedurally invalid because it did not go through notice-and-comment rulemaking.

Even if CMS *could* direct Texas to ban private contracts because CMS finds them uncongenial, CMS was required go through notice-and-comment rulemaking to issue the challenged bulletin. *See* 5 U.S.C. § 553(b), (c). It did not, and the bulletin

should therefore be "held unlawful and set aside" as issued "without observance of procedure required by law[.]" *Id.* § 706(2)(D).

The APA establishes a three-step "notice-and-comment" procedure that governs administrative-agency rulemaking. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015). The "rules" that are subject to this procedure "include 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Id.* (quoting 5 U.S.C. § 551(4)). But "[n]ot all 'rules' must be issued through the notice-and-comment process": the APA exempts "'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice'" from notice-and-comment procedures. *Id.* at 96 (quoting 5 U.S.C. § 553(b)(A)). These exceptions, however, "must be narrowly construed." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (*DAPA*).

Moreover, a rule adopted through notice-and-comment rulemaking may be amended or abandoned only through the same notice-and-comment procedures; agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez*, 575 U.S. at 101.  These rules of construction "protect[] the vital interests notice and comment is intended to protect," such as "ensur[ing] those affected by a proposed rule have a voice in the rule-making process and assist[ing] the agency in crafting rules that better account for the costs and benefits of agency action." *Texas v. United States*, 524 F. Supp. 3d 598, 657 (S.D. Tex. 2021); *see also U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (same).

"Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). "On the contrary, courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice and comment demands apply." *Id.* Courts must be "mindful but

24

suspicious of the agency's own characterization." *DAPA*, 809 F.3d at 171. Accordingly, courts "evaluate two criteria to distinguish policy statements from substantive rules: whether the rule (1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Id.* (quotations omitted). A court should "focus[] primarily on whether the rule had binding effect on agency discretion or severely restricts it." *Id.* (quotations omitted). And "an agency's pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* (cleaned up).

In this case, the bulletin is subject to notice-and-comment rulemaking because it is a substantive rule:[9] it purports to change a rule adopted by notice-and-comment rulemaking after that construction was definitely rejected by the DAB. 58 Fed. Reg. at 43,156. Moreover, it imposes rights and obligations and does not leave CMS and its decisionmakers free to exercise discretion regarding the scope of the Social Security Act's hold harmless prohibition: because of the bulletin, "an arrangement in which providers receive Medicaid payments from the state (or from a state-contracted managed care plan), then redistribute those payments such that taxed providers are held harmless for all or any portion of their cost of the tax, would constitute a prohibited hold harmless provision under" the Social Security Act. Ex. A at 5. CMS is *required* to "reduce a state's medical assistance expenditures by the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation." *Id.* The bulletin is substantive because it

---

[9] Some cases describe "substantive rules" as "legislative rules" in contrast to "non-legislative" or "interpretive" rules. *E.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993). Texas is unaware of any distinction between the concepts—let alone one that is relevant here. *Cf. Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (equating "legislative" and "substantive rules").

imposes more than "derivative, incidental, or mechanical burdens" on Texas. *DAPA*, 809 F.3d at 176-77. Indeed, it directly affects billions of dollars in funding, Grady Decl. ¶ 19, and it threatens the stability of a program that is consistently the largest expenditure in Texas's budget, *compare id.* ¶ 19, *with, e.g.*, *see also* Tex. House Bill 1, tit. 2, 88th Leg. (2023). Moreover, it "change[s] the *substantive standards* by which" CMS determines how to enforce the Social Security Act and its implementing regulations, *DAPA*, 809 F.3d at 176-77—standards that arguably can only be set by Congress, *see West Virginia*, 142 S. Ct. at 2607-08.

Perhaps the best evidence that the bulletin introduces a substantive rule is CMS's own attempt to amend its regulations in 2019. That proposal would have amended 42 C.F.R. § 433.68(f)(3) such that CMS would consider the "net effect" of a particular arrangement to determine the existence of a hold harmless arrangement. 84 Fed. Reg. at 63,735. That CMS brought its 2019 proposal through the formal rulemaking process is more than ample evidence that it was required to do so here. Texas is therefore likely to show that the bulletin is invalid for failure to follow proper procedure under the APA.

## C. The bulletin is arbitrary and capricious because it departed from past practice and did not consider the States' substantial reliance interests.

Finally, even if CMS could amend the Code of Federal Regulations by interpretive bulletin, it could not do so here because it neither adequately explained its departure from past practice nor considered States' substantial reliance interests of which it had actual notice—not just through comment letters in prior rulemakings but through actual communications between the parties both before and during the prior lawsuit. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency action qualifies as arbitrary and capricious "'if

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review has never been "toothless," and "after [*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020)], it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

1.      "It is axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Id.* Consequently, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Id.* (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). In other words, when an agency reverses "prior policy," it must provide a "detailed justification" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (plurality op.).

The bulletin fails to acknowledge CMS's change in position—let alone explain it—and thus cannot survive arbitrary-and-capricious review. CMS previously (both repeatedly and appropriately) acknowledged that it lacked the statutory or regulatory authority either to police or to require States to police private-provider agreements

under the Act. Grady Decl. ¶ 24; Ex. C at 1; *accord In re: Hawaii*, 2005 WL 1540188, at *23. Without even hinting at those prior representations, CMS now claims that it is merely "reiterating the federal requirements concerning hold harmless arrangements with respect to health care-related taxes." Ex. A at 2.

Not so. This position is consistent only with the *failed* regulations that CMS withdrew in 2019 after a fulsome notice-and-comment process in which CMS's own current deputy administrator then decried as "unprecedented federal overreach" which "introduce significant new state obligations" that "exceed[] CMS' statutory authority. Ex. D at 1, 2. Section 1396b(w)(4) has not been amended since this rule was withdrawn. And CMS provides no reasons for changing its view that this rule needs to go through notice-and-comment rulemaking—let alone a "detailed justification" for this substantive shift from past practice. *Fox*, 556 U.S. at 515-16 (plurality op.).

**2.**     Even if CMS could overcome that deficiency (and it cannot), the bulletin also ignores the States' tremendous reliance interests in the enforcement regime that existed for decades until the bulletin upended it—interests of which the agency had *actual notice*. "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy, particularly when the prior policy has engendered serious reliance interests." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021). For three decades, States complied with the plain language of the Act and its regulations. But States have never been subject to a mandate that purports to compel them to police redistribution agreements between private providers. States have adjusted their own regulatory framework accordingly. In Texas, for example, HHSC has no statutory authority, and thus, no administrative apparatus, to demand that private parties turn over contractual arrangements that do not involve a governmental unit. Grady Decl. ¶ 12. The State cannot instantaneously build up the

kind of monitoring regime that CMS has unreasonably insisted upon. *Id.* ¶¶ 46-47.[10] Unlike some APA claims, the agency cannot even claim ignorance of these reliance interests: HHSC raised them in a comment letter in response to the MFAR in 2020, Ex. E; during the negotiations that led to the extension of the section 1115 waiver beginning in 2021, *id.* ¶ 30; and again during court-ordered negotiations regarding the state directed payments beginning in late 2021 and into 2022, *id.* ¶¶ 36, 39,

The bulletin also fails to identify, let alone to justify, its potential effects on the States' healthcare markets. CMS well knows that Texas relies on $3 billion local provider participation funds as part of the non-federal share of Medicaid payments. *Id.* ¶ 19. Withholding federal matching funds for this large amount of funding based on the State's inability to immediately comply with the bulletin, as CMS has threatened, Ex. A at 5-6, would undoubtedly result in significant negative impacts to Medicaid providers individually and the Medicaid safety net. Grady Decl. ¶ 19.

CMS was required to engage in a far more searching inquiry before it disregarded the States' settled interests in how hold harmless arrangements are monitored. Texas is therefore likely to succeed on its claim that the bulletin should be set aside under the APA because it is arbitrary and capricious.

## II.    Texas Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Texas faces at least two separate, but related, irreparable injuries absent a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). *First*, the bulletin imposes substantial compliance costs—both monetary and sovereignty-based—that the State will never be able to recover even if it eventually prevails in

---

[10] This too is confirmed by Mr. Tsai's letter on behalf of Massachusetts, which described the MFAR as "operational[ly] impracticable" because it "creates the potential for substantial new ad hoc demands for information by CMS as each potential program, arrangement, fee, assessment, or donation is considered under . . . vague and broad standards of review." Ex. D at 4.

this suit. And *second*, the bulletin will require HHSC to inquire about the donors of private entities, thereby violating those entities' First Amendment rights and subjecting the State to liability from those entities.

## A. The bulletin imposes compliance burdens that Texas will never be able to recover.

The Fifth Circuit recently held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *BST Holdings, LLC*, 17 F.4th at 618; *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part); *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); *see also NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) (factoring "billions of dollars in unrecoverable compliance costs" into assessment of the equities). This is particularly problematic where the party whose compliance is compelled is a sovereign with a sovereign's rights to set its own policies and enforce its own laws. Both harms are present here.

**1.** To start with the latter, Texas is a sovereign. "Paramount among the States' retained sovereign powers is the power to enact and enforce any laws that do not conflict with federal law." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022). The loss of that prerogative is, by definition, an irreparable harm because it cannot compensated through monetary damages. *Cf. id.*; *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (defining "irreparable harm" for the purposes of a preliminary injunction). Here, there is no Texas statute that creates or permits HHSC to act in the manner demanded by the bulletin: neither CMS nor Texas has statutorily conferred authority to examine or consider any contractual agreements or arrangements that might exist between two private businesses.  Grady Decl. ¶¶ 12, 26, 27, 46. As a result, to comply with the bulletin, HHSC will have to arrogate power to itself in a way that is irreconcilable with bedrock principles of Texas administrative law. *See, e.g., City of Sherman v. Pub. Util.*

*Comm'n of Tex.*, 643 S.W.2d 681, 686 (Tex. 1983) ("Agencies may only exercise those powers granted by statute, together with those necessarily implied from the statutory authority conferred or duties imposed.").

**2.** Apart from its status as a sovereign, Texas faces significant irrecoverable monetary costs to comply with CMS's whims: it would be required to create and operate a regulatory entity with sufficient resources to examine the contractual arrangements and financial management of every private hospital that exists in a jurisdiction with a LPPF. Ex. A at 5 (States are expected "to make available *all requested documentation* regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments." (emphasis added)). That is the only way HHSC could accurately determine what private contractual relationships exist and whether those contracts are related to their provider tax payments. Grady Decl. ¶¶ 44-45. HHSC would then need to take decisive action to halt private contractual agreements that fell within the scope of the bulletin's definition of a hold harmless arrangement. Ex. A at 5 (States must "take steps to curtail these practices if they exist.").

The financial and labor costs of compliance would be massive. Texas hospitals are complex and sophisticated business entities with potentially thousands of contractual agreements. Grady Decl. ¶ 21. It is not uncommon for a hospital to have a contractual agreement with other healthcare providers or entities—in fact it is this interwoven fabric of cooperation amongst the more than 600 hospitals on which Texas relies to create a safety net for Medicaid patients. *Id.*

Conservatively, HHSC estimates expenditures of upwards of $50 million annually to achieve compliance. *Id.* ¶ 27. There are 304 privately-owned hospitals located in jurisdictions that currently have a LPPF, 27% of which are not-for-profit organizations. *Id.* HHSC would need hundreds of additional staff to "curtail" any actions that might be inconsistent with the bulletin; those staff would include

professionals like auditors, financial examiners, financial analysts, and attorneys who could competently interpret the thousands (potentially millions) of contracts or other business documents at each hospital and the billions of dollars of revenues and expenditures that are associated with the running of those hospitals. *Id.*

**B.     The bulletin also appears to require HHSC to violate the rights of private parties.**

HHSC would also need to investigate private associations or individual citizens who may have financial or other contractual relationships with any Medicaid provider. *Id.* ¶ 24. And at that juncture, HHSC would risk transgressing the First Amendment, which protects the free-association rights of individuals and nonprofit organizations—including nonprofit hospital associations. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021). Indeed, HHSC would likely violate the First Amendment by demanding that nonprofit organizations disclose the identities of their donors. *See id.* at 2385-89. A governmental mandate that "creates an unnecessary risk of chilling" that could deter free association violates the First Amendment and would subject the State to liability. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984). If Texas demanded this information from these entities and individuals, the State could be liable to them; those entities might bring suits that could subject the State to injunctive relief, subject individual defendants to personal liability, and subject multiple parties to attorney's fees awards. *See* 42 U.S.C. §§ 1983, 1988. As with the State's compliance costs, the State would never be able to recover those costs because of the federal government's sovereign immunity. *Commonwealth*, 57 F.4th at 556. All these harms are irreparable and warrant immediate injunctive relief.

### III.    The Balance of the Equities and the Public Interest Favor Temporary and Preliminary Injunctive Relief.

The two final elements of the inquiry for entry of preliminary-injunctive relief also tilt in Texas's favor. CMS has no legitimate interest in the implementation or enforcement of an unlawful agency action. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Federal courts regularly enjoin federal agencies from implementing and enforcing challenged new regulations pending litigation to preserve the relative positions of the parties until a trial on the merits. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 769 (5th Cir. 2015).

An injunction also protects and promotes the public interest. Texas has a strong interest in the continued stability of its Medicaid program. The last several years have been challenging for Texas Medicaid: the pandemic, combined with CMS's past conduct that precipitated Texas's earlier lawsuit, have put providers and patients on edge. Grady Decl. ¶ 51. CMS's latest salvo threatens to undermine the work that HHSC has done to restore confidence in the Texas Medicaid Program and is "destabilizing to the safety net that Texans enrolled in the Medicaid program rely on to provide them life-saving care." *Id.* On the other side of the ledger, CMS has not demonstrated any harm arising from LPPFs or private agreements that might tangentially have something to do with those funds. The balance of the equities and the public interest strongly favor preservation of the status quo.

## Conclusion

Texas respectfully requests that the Court preliminarily enjoin defendants from enforcing the February 17 bulletin or taking other any actions in reliance on the bulletin.

Dated: April 24, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727
Christopher.Hilton@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
Tex. State Bar No. 24032801
Leif.Olson@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-2100

Respectfully submitted.

JUDD E. STONE II
Solicitor General

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
*Lead Counsel*
Texas Bar No. 24115221
Lanora.Pettit@oag.texas.gov

MICHAEL R. ABRAMS
Assistant Solicitor General
Texas Bar No. 24087072
Michael.Abrams@oag.texas.gov

WILLIAM F. COLE
Assistant Solicitor General
Texas Bar No. 24124187
William.Cole@oag.texas.gov

*Counsel for Plaintiffs*

## CERTIFICATE OF CONFERENCE

1.

On April 14, 2023, counsel for plaintiffs, Lanora Pettit and Michael Abrams, conferred by telephone with James Bickford, counsel for defendants, regarding plaintiffs' intention to file this motion. No agreement could be reached by the parties because defendants disagree with plaintiffs' contention that a preliminary injunction is warranted. The discussions conclusively ended in an impasse, leaving the issue of whether a preliminary injunction should be issued in this case for the Court to resolve.

*/s/ Lanora C. Pettit*
Lanora C. Pettit
Principal Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on April 24, 2023.

*/s/ Lanora C. Pettit*
Lanora C. Pettit
Principal Deputy Solicitor General