# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | |
| *Plaintiffs*, | |
| v. | |
| CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, | No. 6:23-cv-00161-JDK |
| *Defendants*. | |

# PLAINTIFFS' REPLY IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................. ii

Introduction ........................................................................................................... 1

Argument ................................................................................................................. 2

    I.   This Court Has Jurisdiction ....................................................................... 2

        A.    Texas has standing ....................................................................... 2

        B.    Texas's suit is ripe because the bulletin is final agency action ....................................................................................................... 4

        C.    Texas does not have an adequate alternative remedy and *Thunder Basin* does not bar consideration of Texas's claims ............................................................................................... 5

    II. Texas Is Likely to Succeed on the Merits ........................................... 7

        A.    The bulletin exceeds CMS's statutory authority ...................... 7

        B.    The bulletin is procedurally invalid .......................................... 10

        C.    The bulletin is arbitrary and capricious ................................... 11

    III. Texas Is Suffering Irreparable Harm Absent an Injunction ................... 14

    IV. The Equities and the Public Interest Favor Injunctive Relief ................ 17

Conclusion… ......................................................................................................... 17

Certificate of Service ........................................................................................... 19

i

TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Ashley Cnty. Med. Ctr. v. Thompson,*
  205 F. Supp. 2d 1026 (E.D. Ark. 2002) ................................................. 9

*Brown Express, Inc. v. United States,*
  607 F.2d 695 (5th Cir. 1979) ............................................................. 10

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ............................................................. 11

*Chamber of Comm. of Am. v. Dep't of Labor,*
  885 F.3d 360 (5th Cir. 2018) .............................................................. 8

*DHS v. Regents of Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ................................................................. 6, 11

*Elec. Privacy Info. Ctr. v. DHS,*
  653 F.3d 1 (D.C. Cir. 2011) .............................................................. 11

*Entergy Servs., Inc. v. FERC,*
  375 F.3d 1204 (D.C. Cir. 2004) .......................................................... 12

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U. S. 120 (2000) ...................................................................... 10

*Garcia v. Vilsack,*
  563 F.3d 519 (D.C. Cir. 2009) ............................................................ 6

*In re: Haw. Dep't of Hum. Servs. Bd.,*
  Docket No. A-01-40 (lead), Decision No. 1981, 2005 WL 1540188
  (Dep't Appeals Bd., Appellate Div. June 24, 2005) ...................................... 12

*Kindred Hosps. E., LLC v. Sebelius,*
  694 F.3d 924 (8th Cir. 2012) ............................................................ 13

*Marsh v. J. Alexander's LLC,*
  905 F.3d 610 (9th Cir. 2018) (en banc) .................................................. 13

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) ....................................................................... 4

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
  656 F.3d 580 (7th Cir. 2011) ............................................................. 3

*Protestant Mem'l Med. Ctr., Inc. v. Maram,*
  471 F.3d 724 (7th Cir. 2006) ............................................................. 9

*R.J. Reynolds Vapor Co. v. FDA,*
  65 F.4th 182 (5th Cir. 2023) ......................................................... 13, 14

*Rest. L. Ctr. v. Dep't of Labor,*
  66 F.4th 593 (5th Cir. 2023) ..................................................... 2, 15, 16

*Sabre, Inc. v. Dep't of Transp.,*
  429 F.3d 1113 (D.C. Cir. 2005) ........................................................... 5

*Tex. Office of Pub. Util. Counsel v. FCC*,
  183 F.3d 393 (5th Cir. 1999) ................................................................ 4

*Texas v. Brooks-LaSure*,
  No. 6:21-cv-00191, 2022 WL 741065 (E.D. Tex. Mar. 11, 2022) ............................ 9

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) .......................................................... 3, 4, 5

*Texas v. Rettig*,
  987 F.3d 518 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1308 (2022) ........................ 4

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ................................................................ 5

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .............................................................. 10

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) ........................................................................ 6

*Thorpe v. Hous. Auth. of Durham*,
  393 U.S. 268 (1969) ....................................................................... 13

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ........................................................................ 6

*United States v. Williams*,
  993 F.3d 976 (5th Cir. 2021) ................................................................ 8

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ..................................................................... 9

*W. Va. Univ. Hosp. v. Casey*,
  499 U.S. 83 (1991) ......................................................................... 2

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ............................................................. 15

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................... 16

*Yarls v. Bunton*,
  905 F.3d 905 (5th Cir. 2018) ............................................................. 14

**Statutes and Regulations:**

5 U.S.C.:
  § 553(b) .................................................................................. 10
  § 553(c) .................................................................................. 10
  § 704 ...................................................................................... 6
  § 704(2) ................................................................................... 6
  § 706(2)(D) ................................................................................ 4

42 U.S.C.:
  § 433.68(f)(3) ........................................................................... 7, 10
  § 1316(a) .................................................................................. 6
  § 1316(e) .................................................................................. 6

iii

§ 1395oo(f)(1)...................................................................................... 6

§ 1396b .................................................................................... 1, 4, 10

§ 1396b(w) ................................................................................. 8, 13

§ 1396b(w)(4) ..................................................................................... 7

§ 1396b(w)(4)(C) ................................................................... 2, 8, 10

§ 1396b(w)(4)(C)(i) .......................................................................... 7

73 Fed. Reg. 9685 (Feb. 22, 2008) ............................................... 12

84 Fed. Reg. 63,772 (Nov. 18, 2019) ........................................... 10

86 Fed. Reg. 5,105 (Jan. 19, 2021) .............................................. 14

88 Fed. Reg. 28,092 (May 3, 2023) ......................................... 8, 11

**Other Authorities:**

11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2944
    (3d ed. 2023)................................................................................. 16

# INTRODUCTION

CMS's bulletin compels States to "make clear to their providers that [private reimbursement] arrangements are not permissible under federal requirements" and to "take steps to curtail these practices if they exist." Docket Entry No. 10-1 at 6. CMS does not try to hide the cost of noncompliance: "CMS will take enforcement action as necessary," and disallowances of federal matching funds may follow. *Id.* CMS tried to impose a similar regime in 2019 (through formal rulemaking) and 2021 (through negotiations over Texas's section 1115 waiver program). Those efforts failed.

CMS suggests that the State's concerns about CMS's most recent salvo are overblown—that the bulletin is just an "affirmation" of the agency's longstanding policy as reflected in those failed efforts. Resp. 2. To the contrary: CMS's actions during this litigation only amplify the harms from its latest efforts to rewrite section 1396b of the Social Security Act by fiat. Specifically, relying on a professed interpretation of section 1396b that currently exists only in the bulletin, HHS officials have conveyed the agency's intent to enforce the position announced in the bulletin in July by starting the process to disallow $35 million in federal matching funds based on alleged private reimbursement arrangements among Medicaid providers in Smith County. Ex. A, Supplemental Declaration of Victoria Grady, ¶¶ 5-6. Even apart from the potential loss of funding, that process will cause disruption in the Medicaid market. *Id.* ¶¶ 9, 13. CMS's view seems to be that because it announced its rule in a bulletin instead of through notice and comment, Texas cannot sue, and this Court cannot redress, this imminent and massive upheaval to Texas's Medicaid program.

CMS is wrong. Rule challenges are appropriate under the APA. Texas has standing to bring this action and seek to set aside the rule improperly promulgated by bulletin. Texas is the object of that rule and must comply with it or lose federal funding. That confers standing. On the merits, the rule is inconsistent with the text

1

of section 1396b(w)(4)(C), existing rules, and CMS's past reassurances. The rule was also unlawfully promulgated by informational bulletin without notice or comment. CMS barely engages with Texas's textual arguments, instead insisting that Texas's interpretation would contradict the purpose of the statute. But the "best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President." *W. Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 98 (1991). And Congress has decided what financial relationships are barred: state guarantees to providers—not private arrangements among providers. 42 U.S.C. § 1396b(w)(4)(C).

Texas can obtain an injunction preventing CMS from relying on the bulletin (and the rule it contains) because "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023). Here, CMS does not even try to deny those costs are "more than de minimis," *id.* at 600; Docket No. 10-2 ¶¶ 43, 47. And the public interest and the weight of the equities favor the stability of Texas's Medicaid program upon which nearly five million Texans depend for affordable, high-quality health care. Because Texas has met its burden on each preliminary-injunction factor, CMS and the other defendants should be enjoined from enforcing or relying on the bulletin—and rule it announces—for the pendency of this litigation.

ARGUMENT

## I.   This Court Has Jurisdiction.

At the outset, CMS tries to erect several hurdles to the Court's exercise of jurisdiction: standing, failure to identify a final agency action ripe for review, and available alternative remedies. Resp. 21-27. None poses any impediment to the Court's consideration of the merits.

### A.   Texas has standing.

CMS asserts that Texas lacks standing because "Texas is free to resist any

2

unlawful agency demands for information" and then defend itself later if CMS disallows federal funding. Resp. 22. Fifth Circuit precedent holds the opposite. Indeed, under that precedent, Texas is suffering at least three concrete and particularized injuries traceable to, and redressable by an injunction prohibiting the enforcement of, the bulletin (and the rule it contains).

*First*, "a regulatory burden on Texas to comply" with agency guidance "to avoid enforcement actions" suffices to establish standing. *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). When the "plaintiff is himself an object of the action," almost inevitably, "the action or inaction has caused him injury," and "a judgment preventing or requiring the action will redress it." *Id*. Texas is an object of the bulletin and has submitted unrebutted evidence that it has never been required by statute or rule to monitor and report on private business arrangements to comply with CMS regulations. Docket Entry No. 10-2 ¶¶ 24, 27, 39. The new obligations that compliance with the bulletin would require give Texas standing. Indeed, it is "odd that [CMS] is arguing that it must have a strict rule now to get [its objects] to be more compliant with [the agency's] rules, but at the same time it is asserting that these rules are not meant to change anyone's immediate behavior enough to confer standing to challenge that regulation." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011).

*Second*, "being pressured to change state law constitutes an injury, because states have a sovereign interest in the power to create and enforce a legal code." *EEOC*, 933 F.3d at 446-47. Here, the Legislature would need to rewrite Texas law for HHSC to lawfully monitor business arrangements among non-governmental entities. Docket Entry No. 10-2 ¶ 20.

*Third*, Texas has alleged a violation of its procedural rights under the APA, Docket Entry No. 1 ¶¶ 77-84, and a "violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right" that establishes

standing, *EEOC*, 933 F.3d at 447. Although CMS denies that it committed a notice-and-comment violation, Resp. 34, "for purposes of the standing analysis," the Court "assumes . . . that Texas is correct on the merits of its claim." *EEOC*, 933 F.3d at 447.

### B.   Texas's suit is ripe because the bulletin is final agency action.

For related reasons, Texas's challenge to the bulletin is ripe, and the bulletin itself is a final agency action. The dispute between Texas and CMS is not an "abstract disagreement[]" that depends on factual development in a subsequent enforcement action (in CMS's audit of Smith County or otherwise). Resp. 23 (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003)). Rather, it is a concrete legal dispute that turns on whether the new obligations that the bulletin has imposed are consistent with the APA and Social Security Act. Docket Entry No. 1 ¶¶ 71-76.

*First*, as to ripeness, the Fifth Circuit has rejected the notion that a court lacks jurisdiction to hear a rule challenge absent a pending enforcement action. *EEOC*, 933 F.3d at 449. Indeed, CMS's position is irreconcilable with the well-established rule that a procedural injury—such as a notice-and-comment violation—is enough on its own to set aside an agency rule. *See id.*; 5 U.S.C. § 706(2)(D); *accord Texas v. Rettig*, 987 F.3d 518, 529-30 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1308 (2022) (finding rule challenge untimely because the State waited for it to be enforced).

On CMS's view here, a rule could never be challenged unless and until a court had "detailed factual circumstances," Resp. 24, from an enforcement action following the agency rulemaking. CMS cites no authority for that novel and counterintuitive premise, and for good reason: it is inconsistent with longstanding administrative-law principles. *E.g.*, *EEOC*, 933 F.3d at 449; *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). Moreover, no additional facts are necessary to resolve the question presented: does section 1396b prohibit private agreements to which the government is not a party? That "purely legal question of statutory construction" is

ripe for review at this juncture. *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119-20 (D.C. Cir. 2005); *e.g.*, *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007).

*Second*, CMS's assertion (at 25-26) that the bulletin is not a "final agency action" is similarly fallacious. "In this circuit, whether an agency action is final is a jurisdictional issue, not a merits question." *EEOC*, 933 F.3d at 440 n.8. A "final agency action" (1) "mark[s] the consummation of the agency's decision-making process" (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 441. CMS claims that the bulletin is not a final rule because it does not create new legal obligations and "does not represent the agency's final position on any specific factual circumstances" Resp. 25.

Until now, Texas has never been under a duty to police private financing arrangements. Docket Entry No. 10-2 ¶¶ 24, 27, 39. Moreover, the question is not whether "specific factual circumstances" lurk in the background but whether "an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations." *EEOC*, 933 F.3d at 441. CMS concedes that the bulletin takes a "firm" view on the legality of private reimbursement arrangements. Resp. 25. The bulletin also previews imminent enforcement actions—including one that will likely cause significant disruption in the Texas Medicaid market in a matter of weeks, Ex. A ¶¶ 9, 13-14—and leaves no room for discretion once those actions are underway. Docket Entry No. 10-1 at 5-6. Thus, the bulletin "ha[s] practical binding effect" such that "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *EEOC*, 933 F.3d at 442 (citation omitted).

## C. Texas does not have an adequate alternative remedy and *Thunder Basin* does not bar consideration of Texas's claims.

Finally, CMS insists (at 26-28) that Texas can challenge a future disallowance through CMS's Departmental Appeals Board (and then in federal court, if necessary).

5

CMS therefore posits that (1) Texas has an "adequate remedy in a court" under 5 U.S.C. § 704, and (2) the *Thunder Basin* doctrine bars judicial review because it is "'fairly discernible' that an elaborate statutory review scheme for administrative enforcement proceedings was intended to create an exclusive remedy." Resp. 26-27 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994)).

Those arguments ignore that Texas's suit targets the rule contained in the bulletin—not an enforcement action such as a disallowance. Docket Entry No. 1, Demand for Judgment. Moreover, future judicial review of a disallowance would not alleviate the costs of the bulletin's existing compliance requirements, nor would it fix the procedural flaws with the bulletin's issuance. *Contra Thunder Basin*, 510 U.S. at 218 (noting that the compliance costs in question were not "onerous"); *id.* at 216 (same). The relief available in a future challenge to a disallowance is not of the "same genre" as that sought here and thus is the kind of "doubtful and limited relief," *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009), that does not overcome the "basic presumption of judicial review" under the APA for persons suffering a legal wrong from agency action. *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

CMS's position is also inconsistent with the Social Security Act itself, which establishes a review process that culminates in judicial oversight of CMS's disapprovals of state plans and disallowances of federal matching funds. 42 U.S.C. § 1316(a), (e). Under CMS's theory, *no* rule promulgated under the Act touching on state plans or disallowances could be reviewed under the APA because a State could always instead bring challenges to specific disapprovals and disallowances through agency proceedings. Nothing in the Act insulates CMS from the general rules governing agency rulemaking in this way. To the contrary, the APA "is incorporated by the Social Security Act." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citing 42 U.S.C. § 1395oo(f)(1)).

6

## II.     Texas Is Likely to Succeed on the Merits.

Texas is also likely to show that the rule contained in the bulletin violates the Social Security Act and the APA. Docket Entry No. 1 ¶¶ 71-76, 77-84, 85-91. The bulletin's redefinition of hold harmless provisions to encompass purely private agreements exceeds CMS's statutory and regulatory authority; that rule is a substantive one requiring the agency to go through the notice-and-comment process (which CMS acknowledges (at 14) it did not even begin until after this suit was filed); and CMS's unexplained change in policy—in contravention of Texas's reliance interests—was arbitrary and capricious. CMS does not refute Texas's likelihood of success on the merits of any of those claims.

### A.     The bulletin exceeds CMS's statutory authority.

As Texas explained, Mot. 17-23, neither the Social Security Act nor its implementing regulations provides a basis for CMS to prohibit private agreements, let alone order a State to police them. *See* 42 U.S.C. § 1396b(w)(4); *see also* 42 C.F.R. § 433.68(f)(3). Such agreements lack the defining feature of a hold harmless provision: a guarantee by *the government*—not a private party—to the taxpayer. *See* 42 U.S.C. § 1396b(w)(4)(C)(i). CMS's existing regulations reflect the statutory text and likewise do not encompass private arrangements. Mot. 22-23.

In the bulletin, CMS suggests that a State has made an indirect guarantee when private parties contract among themselves. *See* Docket No. 10-1 at 4. In its response, CMS disclaims that suggestion. Resp. 30 n.12. Instead, CMS's lone textual argument is that when "taxpayers enter an agreement to indemnify each other against the burdens of a health care related tax, each taxpayer receives a direct guarantee," and when "Medicaid funds are redistributed to honor that guarantee, the state has made an indirect payment." Resp. 30. CMS's first premise is incomplete, and its second is incorrect. In the scenario that CMS describes, the taxpayer has received a direct guarantee *from a private party*. The State has not made an indirect

payment to honor that guarantee—or at all. Instead, the State has made a direct payment to the Medicaid provider. At that point, the provider can use any dollar paid as he chooses because that dollar has lost the character of a Medicaid dollar and is indistinguishable from the rest of the provider's operative revenue. CMS's argument to the contrary has no logical limit and charges the State with responsibility for tracking how money is spent well after it has left the State's hands and through potentially limitless intermediaries.

Without a textual hook for its expansive reading of section 1396b(w)(4)(C), CMS relies repeatedly (*e.g.*, at 6-9, 17, 24, 28) on section 1396b(w)'s putatively dual purposes. One of those purposes—equity to the entity putatively held harmless—appears nowhere in the statute. But even if it did, a legislative purpose cannot expand the Act's text—particularly in a complex statute like the Social Security Act. *E.g.*, *Chamber of Comm. of Am. v. Dep't of Labor*, 885 F.3d 360, 378 (5th Cir. 2018). Moreover, CMS's contention (at 28-29) that Texas's construction would "would render the statute completely ineffective" is hyperbolic. CMS offers no evidence that Texas has actual knowledge of any private reimbursement agreements among the State's hundreds of hospitals, let alone that Texas has any involvement in, or made any policy decisions based on, such agreements.[1]

CMS is transparent in its wish that Congress had given it broader authority to regulate private financing agreements. But, whatever the merits of that policy position, when interpreting the meaning of a statute, the place to "start [is] always with the text of the statute." *United States v. Williams*, 993 F.3d 976, 980 (5th Cir.

---

[1] CMS also breathlessly asserts (at 28-29) that private parties might tell Texas about these agreements, but CMS has neither proven such a disclosure ever happened nor explained why it could render an otherwise lawful agreement unlawful. In any event, CMS has admitted its rule does not hinge on state awareness. Docket Entry No. 10-1 at 5; 88 Fed. Reg. 28,092, 28,236 (May 3, 2023).

2021); *e.g.*, *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021). CMS's position is devoid of textual support, which is why this Court previously suggested that its approach is circular. *See Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2022 WL 741065, at *8 (E.D. Tex. Mar. 11, 2022). Then, as now, the agency indicated "a specific result that it thought should obtain on a certain fact pattern and justified the new approach because it would allow that result." *Id.* This Court refused to accept the position. *Id.* So did the Seventh Circuit, which agreed that a hold harmless provision requires governmental action: "if *the state* promises to hold the taxpayer harmless for a portion of the cost of the tax through a direct payment or exemption from the tax, that promise also constitutes a 'hold harmless provision.'" *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006).

Even taking CMS's purpose inquiry on its own terms, CMS's own authorities illustrate that the prohibition on hold harmless provisions does not need to outlaw private arrangements to perform meaningful work. Congress's concern that spurred the 1991 amendments was a "loophole" that States had exploited in the disproportionate share hospital (DSH) payment adjustment. *Ashley Cnty. Med. Ctr. v. Thompson*, 205 F. Supp. 2d 1026, 1031-32 (E.D. Ark. 2002). A State would pay an excessively high DSH payment to a hospital, which would fix the amount of the federal matching contribution. *Id.* at 1032. The hospital would then transfer a portion of the DSH payment back to the State through "donations," "taxes," or some type of intergovernmental transfer." *Id.* This meant that the State could draw additional federal matching funds without having to contribute additional state money towards the DSH payments. *Id.* The 1991 amendments eliminated this practice. *Id.* States can no longer deploy such a loophole to inflate their receipt of federal matching funds. The only question *today* is whether Congress has dictated what private parties can do with their own money *after* the State reimburses them for care provided to Medicaid recipients. It has not.

For years, CMS has endeavored (unsuccessfully) to broaden the Social Security Act by various tactics. "Given this history and the breadth of the authority that the [CMS] has asserted," the Court need not defer to "the agency's expansive construction of the statute." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160 (2000). Congress has never ratified CMS's broad construction of section 1396b(w)(4)(C), and there is no justification for expanding the statute's reach at CMS's behest now.

**B.    The bulletin is procedurally invalid.**

Texas is also likely to succeed on its procedural claim that CMS was required to provide a notice-and-comment period rather than promulgating a substantial change in existing regulation by informational bulletin. *See* 5 U.S.C. § 553(b), (c); Mot. 23-26. The bulletin imposes rights and obligations and does not leave CMS and its decisionmakers free to exercise discretion regarding the scope of the Social Security Act's hold harmless prohibition. Mot. 25.

CMS chides Texas for purportedly failing to consider "the possibility that the informational bulletin could be a 'statement[] as to what the [agency] thinks the statute or regulation means.'" Resp. 34-35 (quoting *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)). Texas, in fact, did address that point. Mot. 25-26. As CMS declined to respond, it should be deemed not to oppose Texas's position that the bulletin goes well beyond providing CMS's thinking on the statute. Through its bulletin, CMS has cabined the agency's discretion to construe section 1396b's hold harmless provision and "changed the substantive standards by which" CMS determines how to enforce the Social Security Act and its implementing regulations. *Texas v. United States*, 809 F.3d 134, 176-77 (5th Cir. 2015).

As Texas previously observed (at 26), the best evidence that the bulletin introduces a substantive rule is CMS's own attempt to amend its regulations in 2019. That proposal would have amended 42 C.F.R. § 433.68(f)(3) such that CMS would consider the "net effect" of a particular arrangement to determine the existence of a

hold harmless arrangement. 84 Fed. Reg. 63,772, 63,735 (Nov. 18, 2019). Notice-and-comment rulemaking would have been entirely unnecessary if, as CMS so strongly insists, that change would have made no substantive difference to the 2008 rule. *E.g.*, *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 6-7 (D.C. Cir. 2011) (rejecting the notion that an agency can avoid this requirement by purporting to clarify a broad rule). That observation is even more salient in the light of CMS's most recent efforts to rewrite the agency's existing regulations. Just like the bulletin, CMS's belated proposed rule would require States to "[e]nsure that each provider receiving payment under a State directed payment attests that it does not participate in any hold harmless arrangement with respect to any health care-related tax." 88 Fed. Reg. at 28,236; *accord* Docket Entry No. 10-1 at 5-6. CMS would hardly have gone through the costly exercise of notice-and-comment rulemaking *twice* if it believed that the 2008 rule already defines hold harmless provisions to include private agreements of which States might not even be aware—its current litigation posturing notwithstanding.

### C.    The bulletin is arbitrary and capricious.

Texas is also likely to succeed on its claim that even if CMS could amend its regulations by interpretive bulletin, it did so here in an arbitrary and capricious way because it neither adequately explained its departure from past practice nor considered States' substantial reliance interests of which it had actual notice. Mot. 26. CMS previously (both repeatedly and appropriately) acknowledged that it lacked the statutory or regulatory authority either to police or to require States to police private-provider agreements under the Act. Mot. 27-28. Because of the States' significant reliance interests on those representations in how they structure their Medicaid programs, *e.g.*, Docket No. 10-2 ¶¶ 12, 46-47, CMS was required to "provide a 'detailed explanation' for contradicting a prior policy." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021). The bulletin does not do so, and Texas is

11

therefore likely to show that it was issued in violation of the APA. *See Regents*, 140 S. Ct. at 1915. None of CMS's five separate responses has merit.

*First*, CMS responds (at 32) that its bulletin is fully consistent with the 2008 amendments to the agency's regulations. CMS claims that the amendments repudiated the 2005 decision of the Departmental Appeals Board, which explained that for a state taxing authority to guarantee a payment, offset, or waiver, the Board expected to see a "legally enforceable" promise in "these States' laws." *In re: Haw. Dep't of Hum. Servs. Bd.*, Docket No. A-01-40 (lead), Decision No. 1981, 2005 WL 1540188, at *7 (Dep't Appeals Bd., Appellate Div. June 24, 2005). As already discussed, if that were true, CMS would hardly have tried to formally amend its regulations—twice. *Supra* p.11.

Tellingly, the only language that CMS can even plausibly draw on comes from the 2008 amendments' *preamble*, which cannot impose obligations that are inconsistent with text of the rule as amended. *See Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004); Mot. 22-23. CMS also ignores that, read in context, the "reasonable expectation" is that of the party making the payment—*i.e.*, the State—*not* the Medicaid provider who may or may not share that payment with someone else. Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9685, 9694 (Feb. 22, 2008). Indeed, CMS specifically stated that the 2008 amendments only considered monies "'controlled or directed by the state' . . . in evaluating whether an impermissible hold harmless arrangement exists"—not the broader suggestion of all monies "influenced by the state." *Id.*[2]

*Second*, CMS asserts (at 32-33) that the Eyman-Fan email correspondence is

---

[2] In any case, Texas has alternatively claimed that the 2008 amendments are inconsistent with the statute's plain language, Docket Entry No. 1 ¶¶ 6, 92-96, so it is no defense that CMS's 2008 amendments also violate the Social Security Act.

ambiguous and that "CMS does not make policy through such private correspondence." But in that email exchange, the then-Director of the Center for Medicaid and CHIP Services Financial Management Group, agreed that CMS "do[es] not expect states to seek information about these [private] agreements or providers to disclose these agreements to the state/local government in connection with CMS' questions." Docket No. 10-3 at 2. And regardless of how CMS now says it "make[s] policy," representations by an agency's highest level of management have long been held to create policy—even when purely private. *Cf. Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 276 & nn. 22-23 (1969) (deferring to an agency's view as expressed in letters to third parties); *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 630-31 (9th Cir. 2018) (en banc) (same). Moreover, CMS has not made these representations only to private parties: in an administrative proceeding about a different piece of subsection 1396b(w), a witness for the Office of the Inspector General testified before a hearing board that pooling agreements do not violate the Act's hold harmless prohibition. *See* Opening Brief for Appellant, *Kindred Hosps. E., LLC v. Sebelius*, 2012 WL 248356, at *55 (8th Cir. Jan. 9, 2012). That testimony was also material to the subsequent litigation. *Kindred Hosps. E., LLC v. Sebelius*, 694 F.3d 924, 925-27 (8th Cir. 2012).

At minimum, CMS cannot make representations through its leadership and then claim surprise when stakeholders rely on those representations. After all, "[d]ealing with administrative agencies is all too often a complicated and expensive game, and players like [Texas] 'are entitled to know the rules.'" *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023). The Fifth Circuit recently held that direct representations between an agency and an affected entity can engender reliance interests—especially when the entity has structured its operations based on the agency's assurances. *Id.* at 189-90.

*Third*, CMS complains (at 33) that Victoria Grady's declaration does not

13

identify who at CMS told HHSC that there is "not a prohibition on . . . private business arrangements" absent state involvement Docket No. 10-2 ¶ 24. The individual was Kristin Fan, who made similar assurances to industry stakeholders. *Compare id.*, *with* Ex. A ¶ 17. Texas should not be penalized "for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds*, 65 F.4th at 189. Courts presume that government actors behave in good faith, *Yarls v. Bunton*, 905 F.3d 905, 910-11 (5th Cir. 2018), and affected stakeholders behave on that bedrock presumption.

*Fourth*, throughout its response, CMS intimates that Texas merely disagrees with it on a matter of policy. Texas was hardly unique in its understanding of the status quo. CMS's own current deputy administrator lambasted the withdrawn 2019 proposed rule as an "unprecedented federal overreach" which "introduces significant new state obligations" that "exceeds CMS' statutory authority." Docket No. 10-4 at 1, 2. So did the current Secretary of Health and Human Services, Ex. B, State of Cal. Comment Letter (Jan. 31, 2020), as well as other commentators—including multiple States with whom Texas is not typically aligned in the development of Medicaid policy decision. Ex. C, State of N.M. Comment Letter (Feb. 1, 2020); Ex. D, State of Mich. Comment Letter (Jan. 31, 2020).

*Finally*, CMS expresses surprise (at 33) that States would not anticipate the agency's about-face given the 2019 proposed rulemaking. That proposal was withdrawn after a robust notice-and-comment process, *see* Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105, 5,105 (Jan. 19, 2021), likely in part due to the vociferous objections of numerous commentators of which Texas is providing only a sample. CMS does not explain why a State would follow an abandoned attempt at rulemaking—or a rejected legal brief, Resp. 11-12, for that matter—rather than CMS's explicit representations and the text of the statute.

## III.    Texas Is Suffering Irreparable Harm Absent an Injunction.

When it filed its preliminary injunction motion, Texas identified two

irreparable harms flowing from the bulletin: *First*, Texas will incur significant monetary and sovereignty costs for complying that it will never be able to recover even if it eventually prevails in this suit. Mot. 30-31. *Second*, the requirement to inquire about the donors of private entities likely requires Texas to violate those entities' First Amendment rights, thus subjecting Texas to civil liability. Mot. 32. As CMS acknowledges (at 18), but does not address Texas's First Amendment harm, CMS should be deemed to concede that it will likely follow. Its responses to Texas's compliance-based harms are without merit. Moreover, since the motion was filed, a third type of irreparable harm has manifested: the threatened loss of millions of dollars in federal funding and the effect that will have on providers who may curtail crucial health care services or even leave the Medicaid program altogether.

**A.**  Victoria Grady's declaration painstakingly explained why Texas would need to expend upwards of $50 million to comply with the bulletin's demands. Docket Entry No. 10-2 ¶¶ 46-47. CMS's response is to regurgitate its view that the bulletin "is merely an expression of CMS' view of what the law requires." Resp. 21. For the reasons identified above, the bulletin is far more than that.

Beyond that, CMS's only response is to say—with no explanation or evidence of its own—that Texas "substantially overstates" those costs. Resp. 19. But the unrebutted evidence is that Texas made "conservative" estimations on staffing and thus, if anything, *understated* its costs. *E.g.*, Docket Entry No. 10-2 ¶ 47. But even if Texas did overstate its costs, that is irrelevant: in "determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Rest. L. Ctr.*, 2023 WL 3139900, at *2. CMS does not quibble that "federal agencies generally enjoy sovereign immunity for any monetary damages" and that Texas thus cannot recover compliance costs from the federal government if the State wins in this litigation. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Texas was not required to "convert each allegation of harm into a specific dollar

15

amount"—instead, Texas needed to show "only that alleged compliance costs" would be "'more than de minimis.'" *Rest. L. Ctr.*, 66 F.4th at 600. CMS cannot claim that Texas's compliance costs would be de minimis because the bulletin expressly requires States to ensure "detailed information [is] available regarding their health care-related taxes." Docket Entry No. 10-1 at 5.

**B.** Moreover, events post-dating the motion demonstrate that the bulletin is an indispensable part of enforcement efforts that are on the verge of wrenching millions of dollars of federal matching funds from—and causing enormous disruption to—Texas's Medicaid program. Ex. A ¶ 9. Specifically, on May 1, officials within HHS's Office of Inspector General notified Texas of a forthcoming recommendation to disallow over $35 million in federal financial participation based on purported hold harmless provisions among providers in Smith County in 2019. Ex. A ¶¶ 5-6.  The officials further stated their intent to issue a draft audit report containing this recommendation by July 2023. Ex. A ¶ 2.  CMS acknowledges (at 23) that such a disallowance is a harmful effect of the rule described in the bulletin.

The very threat of such a massive abandonment of financial support represented by that draft audit report causes harm. Medicaid providers will now be forced to consider whether to incur the costs of providing medical care to Medicaid patients without the certainty of reimbursement for those costs.  Ex. A ¶¶ 9, 13. This uncertainty will invariably induce some providers to limit their participation in the Medicaid program. Ex. A ¶¶ 9, 12-13. Those harms, which without embellishment can fairly be called devastating, are not just possible but "likely in the absence of an injunction," *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21-22 (2008), and there is no way for Texas to remedy them with a future damages award, *Rest. L. Ctr.*, 66 F.4th at 597; *see* 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2944 (3d ed. 2023). Because Texas faces no choice but to comply or risk more disruption and financial losses, both of which are irreparable, it has satisfied this

16

element of the preliminary-injunction test.

## IV.    The Equities and the Public Interest Favor Injunctive Relief.

The remaining preliminary injunction factors also tilt in Texas's favor. An injunction is in the public interest because the bulletin is "destabilizing to the . . . safety net that Texans enrolled in the Medicaid program rely on to provide them life-saving care." Docket Entry No. 10-2 ¶ 51. It is in the public interest to preserve the status quo to prevent "a rapid loss in available funding to providers" that will cause "a market contraction that is severe and long-lasting."  Ex. A ¶ 15. And the balance of equities supports Texas, which relied in good faith on CMS's direct assurances.

CMS claims (at 35) that an injunction would upset the status quo. Just the opposite: CMS withdrew its 2019 proposed rule; accepted, if grudgingly, Texas's terms for state directed payments in 2022; and has proposed new rules regarding hold harmless provisions that have not even gone through the full notice-and-comment process, let alone taken effect. An injunction is necessary to preserve the integrity of Texas's Medicaid program and the status quo as everyone has long understood it.

## Conclusion

Texas respectfully requests that, by no later than June 30, 2023, the Court preliminarily enjoin defendants from enforcing the bulletin or the rule announced therein—namely that private arrangements to which the government is not a party can constitute prohibited hold harmless provisions under the Social Security Act or its accompanying regulations. Such a broad injunction is necessary because CMS candidly admits (at 16) it would not change its conduct based on an injunction barring enforcement of or reliance on just the bulletin itself. An expeditious ruling is necessary because CMS has stated it will begin to enforce the rule as soon as July 2023 as part of its Smith County audit, which will have ripple effects across the State for the reasons explained in Victoria Grady's supplemental declaration.

17

Dated: May 19, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727
Christopher.Hilton@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
Tex. State Bar No. 24032801
Leif.Olson@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-2100

Respectfully submitted.

JUDD E. STONE II
Solicitor General

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
*Lead Counsel*
Texas Bar No. 24115221
Lanora.Pettit@oag.texas.gov

MICHAEL R. ABRAMS
Assistant Solicitor General
Texas Bar No. 24087072
Michael.Abrams@oag.texas.gov

WILLIAM F. COLE
Assistant Solicitor General
Texas Bar No. 24124187
William.Cole@oag.texas.gov

*Counsel for Plaintiffs*

18

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on May 19, 2023.

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General

19