IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:23-cv-161-JDK |
| CHIQUITA BROOKS-LASURE, et al., | § § § | |
| Defendants. | § § | |

**MEMORANDUM OPINION AND ORDER GRANTING
TEXAS'S MOTION FOR PRELIMINARY INJUNCTION**

The State of Texas seeks to enjoin the Centers for Medicare and Medicaid Services ("CMS") from enforcing a recent bulletin addressing Medicaid funding and the redistribution of Medicaid payments.

Medicaid is a jointly funded program, under which the federal government matches state contributions for medical care for low-income patients. The Social Security Act permits states to fund their share through assessing a "broad-based" tax on health-care providers. States, however, may not fund their share through taxes that "hold harmless" providers—i.e., states may not guarantee that providers will recoup their tax contributions. A February 2023 bulletin from CMS clarifies that the agency considers certain private agreements between providers to constitute hold-harmless arrangements.

Texas argues that the bulletin exceeds CMS's statutory and regulatory authority, did not go through notice-and-comment rulemaking, and is arbitrary and

1

capricious because it departs from past practice and fails to consider the State's substantial reliance interests. Texas thus contends that the bulletin violates the Administrative Procedure Act and asks the Court to preliminarily enjoin its enforcement during this litigation.

As explained below, the Court finds that Texas is entitled to a preliminary injunction and therefore **GRANTS** the State's motion (Docket No. 10).

## I. BACKGROUND

This case continues an ongoing dispute between Texas and the U.S. Department of Health and Human Services ("HHS") regarding the hold-harmless prohibition.

In a prior lawsuit, Texas obtained a preliminary injunction requiring CMS to follow certain agreed-to procedures for review of the State's Medicaid programs. *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021) (Barker, J.). Texas later sought to enforce the injunction, arguing CMS ignored those procedures, among which was the requirement to work "collaborative[ly]" with Texas. *Texas v. Brooks-LaSure*, 2022 WL 741065, at *1 (E.D. Tex. Mar. 11, 2022) (Barker, J.). CMS attempted to justify its delay by asserting that it believed arrangements among Texas hospitals created prohibited "hold-harmless" guarantees. *Id.* The Court in that case explained the statutory and regulatory background of the hold-harmless issue, *id.* at *2–9, but did not "need to resolve that interpretive dispute" to grant Texas's motion to enforce the injunction, *id.* at *9–10.

Then, on February 17, 2023, CMS published an "Informational Bulletin" squarely addressing the hold-harmless prohibition as it relates to private agreements

among providers.  Docket No. 1, Ex. 1 at 1.[1]  In the Bulletin, the agency stated it "intends to inquire about" these arrangements and "reduce a state's medical assistance expenditures"—i.e., disallow state funds eligible for federal Medicaid matching—"by the amount of health care-related tax collections that include" these arrangements.  *Id.* at 5.

Before addressing the February Bulletin, the Court explains the relevant features of Medicaid, hold-harmless provisions, and Texas's Medicaid-funding scheme.

### A. The Medicaid Program

"Medicaid, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, is a 'cooperative federal-state program that provides federal funding for state medical services to the poor.'"  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 35 (D.C. Cir. 2015) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004)); Social Security Amendments of 1965, Pub L. No. 89-97, 79 Stat. 286.  To qualify for federal funding, states must submit a Medicaid plan detailing how they will meet the Social Security Act's requirements.  § 1396a(a).

If a state's plan satisfies the requirements of the Social Security Act, the federal government acting through HHS helps fund the program according to a matching formula.  *Id.* § 1396b(a).  The rate at which HHS matches a state's Medicaid expenditures for covered services ranges from 50% to 83%.  *Id.* § 1396d(b).  HHS

---

[1] Ctr. for Medicare & Medicaid Servs., Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments (2023), https://www.medicaid.gov/federal-policy-guidance/downloads/cib021723.pdf.

reimburses approximately 60% of Texas's medical expenditures under its state plan. Docket No. 10, Ex. 2 ¶ 6 [hereinafter Grady Declaration] (declaration of Victoria Grady, Director of Provider Finance for the Texas Health and Human Services Commission).  Texas covers the remaining share.

Not all state funding qualifies for matching federal dollars, however.  "In the late 1980s and early 1990s, states began to take advantage of a 'loophole' in the Medicaid program that allowed states to gain extra federal matching funds without spending more state money." *Protestant Mem. Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006).  States took advantage of this loophole in several ways. Medicaid Program; Medicaid Fiscal Accountability Regulation, 84 Fed. Reg. 63,722, 63,730 (Nov. 18, 2019) (proposed rule).  In one common scheme, states imposed taxes on hospitals, while simultaneously agreeing to repay hospitals the amount of their tax payment.  *Id.*  As a result, a state could draw additional federal matching funds without having to contribute additional state money towards its Medicaid contribution.  *Id.*  Taxpaying hospitals too came out "harmless" in these agreements, recouping their increased tax burden through state payments.  *Id.*

In response, Congress amended the Social Security Act by passing the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, 105 Stat. 1,793 (codified as amended at 42 U.S.C. § 1396b(w)). There, Congress clarified that states may fund their share of Medicaid by assessing taxes on health-care-related items, services, or providers, but they may do so *only if* the tax is (1) "broad-based," and (2) contains no "hold harmless provision."

§ 1396b(w)(1)(A)(iii).  The statute defined "hold harmless provision" in three ways, only the third of which is relevant here.[2]  Under that definition—which has not changed[3]—a hold-harmless provision exists if:

(C)

(i) The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

*Id.* § 1396b(w)(4).  Congress instructed HHS to reduce matchable state funds by the amount of any revenue received from a health-care-related tax "if there is in effect a hold harmless provision (described in paragraph (4)) with respect to the tax."  *Id.* § 1396b(w)(1)(A)(iii).

After the statute took effect, CMS issued rules implementing the statutory "hold harmless provision" definition found at § 1396b(w)(4).  Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993).  In 2008, the agency updated the regulations, seeking to "clarify" the

---

[2]  The Bulletin references only the third definition.  *See* Docket No. 10, Ex. 1 (citing § 1903(w)(4)(C)(i) of the Social Security Act, which is codified at 42 U.S.C. § 1396b(w)(4)(C)(i)).  At oral argument, counsel for CMS conceded that only the third definition applies here. Hearing Tr. 6/8/2023 at 32:25–33:9.

[3]  The text of paragraph (C)(i) originally constituted the entirety of paragraph (C), and has remained unchanged since the 1991 amendments.  *See* § 2, 105 Stat. at 1,797 (original text of 42 U.S.C. § 1396b(w)(4)(C)(i)).  Congress later incorporated by reference a test for "indirect guarantees" from an agency rulemaking.  *See Tax Relief and Health Care Act of 2006*, Pub. L. No. 109-432, § 403, 120 Stat. 2,922.  When Congress made this change, it relocated the text of paragraph (C) to paragraph (C)(i), without changing its substance or text.  And the adopted agency rulemaking for "indirect guarantees" became paragraph (C)(ii).  CMS concedes that paragraph (C)(ii) does not apply here, and instead relies only on the definition codified at § 1396b(w)(4)(C)(i).  Docket No. 17 at 30 n.12 ("CMS does not contend that this arrangement presents an indirect guarantee"); Hearing Tr. 6/8/2023 at 32:25–33:11.

regulatory tests for hold-harmless provisions.  *See* Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9,685, 9,686 (Feb. 22, 2008).   Under the 2008 regulations—which are still in force today—a hold harmless provision exists under the third definition if:

> The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

*Id.* at 9,699 (codified at 42 C.F.R. § 433.68(f)(3) (2008)).

### B.  Texas Local Provider Participation Fund

In 2013, the Texas legislature authorized certain hospital districts, counties, and municipalities to collect "mandatory payments from each of those [entities] to be used to provide the nonfederal share of a Medicaid supplemental payment program." TEX. HEALTH & SAFETY CODE § 300.0001; *accord* Act of May 24, 2013, 83d Leg., R.S., ch. 1369, § 18, 2013 Tex. Gen. Laws 3,630, 3,640 (codified at HEALTH & SAFETY Ch. 288).

If the taxing entity authorizes a "mandatory payment[]" (which both parties here call a "tax"), it must assess the tax based "on the net patient revenue of each" hospital.  HEALTH & SAFETY § 300.0151(a).  This money is then deposited into a "local provider participation fund" and may be used for limited purposes, including intergovernmental transfers to the State to pay the "nonfederal share of Medicaid." *Id.* § 300.0103(a)–(b).  Authorized taxes must be "uniform[]."  *Id.* § 300.0151(b).  And Texas law prohibits these programs from "hold[ing] harmless any institutional health care provider, as required under 42 U.S.C. Section 1396b(w)."  *Id.*

6

Texas's methodologies for issuing Medicaid payments "are not correlated in any way to the amount paid by a taxpayer to a local government that has authority to operate a [local provider participation fund]."  Grady Declaration at 5.

### C. Proposed Changes

In 2019, CMS proposed a rule to amend its regulations on hold-harmless arrangements.  84 Fed. Reg. at 63,730.  There, CMS explained it had

> become aware of impermissible arrangements that exist where a state or other unit of government imposes a health-care related tax, then uses the tax revenue to fund the non-federal share of the Medicaid payments back to the taxpayers. The taxpayers enter into an agreement, which may or may not be written, to ensure that taxpayers . . . receive all or any portion of their tax amount back.

84 Fed. Reg. at 63,734.  In the preamble to the proposed changes, CMS clarified that it considered such arrangements to violate the ban on hold-harmless provisions, even if "a private entity makes the redistribution" to another private entity.  *Id.* at 63,735. The agency contended that a purely private arrangement still "constitutes an indirect payment from the state or unit of government to the entity being taxed that holds it harmless for the cost of the tax."  *Id.*

CMS thus proposed to amend the third regulatory hold-harmless definition to specify that the agency would consider the "net effect" of a particular arrangement, described elsewhere as a "totality of the circumstances" analysis.  *Id.* at 63,735.  This analysis would specifically include the "reasonable expectations of the participating entities" and their "reciprocal actions."  *Id.* at 63,777.

In 2021, however, CMS withdrew these proposed amendments.  Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105 (Jan. 19,

2021).   In its notice of withdrawal, CMS noted that "[n]umerous commenters indicated that CMS, in some instances, lacked statutory authority for its proposals . . . ."  *Id.*  Based on the "considerable feedback we received through the public comment process, we have determined it appropriate to withdraw the proposed provisions at this time."  *Id.*

The next year, in the above-described litigation between CMS and Texas, the agency echoed its position from the withdrawn amendments, arguing to the Court that private agreements to redistribute Medicaid reimbursements constitute hold-harmless provisions.  *Texas v. Brooks-LaSure*, 2022 WL 741065, at *1 (E.D. Tex. Mar. 11, 2022) (Barker, J.).  As stated above, the Court did not need to resolve the parties' interpretive dispute to issue a decision in that case.  *Id.* at *9.

### D. CMS Bulletin

On February 17, 2023, CMS issued the "Informational Bulletin" at issue here. The Bulletin formally adopted the agency's position from the 2019 withdrawn amendment and its 2022 litigation against Texas.  Docket No. 1, Ex. 1 at 1.  In the Bulletin, CMS again expressed concern about private arrangements:

> Recently, CMS has become aware of some health care-related tax programs that appear to contain a hold harmless arrangement that involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs back (typically ensuring that each taxpaying provider receives at least its total tax amount back).

*Id.*  The Bulletin concluded these arrangements "would constitute a prohibited hold harmless provision under" both 42 U.S.C. § 1396b(w)(4)(C)(i) and 42 C.F.R. § 433.68(f)(3).  *Id.* at 5.  Accordingly, CMS promised to "reduce a state's medical

assistance expenditures by the amount of health care-related tax collections that include" these arrangements.  *Id.*

The Bulletin also required states to collect and disclose information concerning these arrangements to CMS.  *Id.*  Specifically, CMS instructed states to:

- "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist";

- collect "detailed information available regarding their health care-related taxes"; and

- "make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."

*Id.*  Further, CMS instructed states to "condition" their providers' participation in Medicaid on the full disclosure of this information.  *Id.*  The agency warned that "a failure to comply with" these requirements "may result in a deferral or disallowance of federal financial participation."  *Id.* (citing 42 C.F.R. § 433.74(d)).

*        *        *

After CMS issued the Bulletin, Texas filed suit in this Court, arguing the Bulletin is unlawful under the Administrative Procedure Act ("APA").  Docket No. 1. Specifically, Texas argues the Bulletin exceeds CMS's statutory authority, does not comport with the APA's notice-and-comment requirement, and is arbitrary and capricious.  *Id.* at 26–31.  Alternatively, Texas argues that CMS's 2008 regulations are contrary to CMS's statutory authority.  *Id.* at 31–32.

On April 24, 2023, Texas moved for a preliminary injunction enjoining Defendants from "enforcing the February 17 bulletin or taking [any other] actions in

reliance on the bulletin." Docket No. 10 at 34. Defendants opposed the motion on the merits, and additionally argued the Court lacks jurisdiction to enter the requested relief. Docket No. 17. The Court heard oral argument on the motion on June 8, 2023.

For the following reasons, the Court finds that it has jurisdiction and that Texas is entitled to the preliminary injunction it seeks.

## II. JURISDICTION

CMS argues the Court lacks jurisdiction for five reasons: (1) Texas lacks standing, (2) Texas's claims are not ripe, (3) the Bulletin is not final agency action, (4) Texas has an adequate alternative remedy under the statute, and (5) judicial review is barred under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994). Docket No. 17 at 21–28. The Court addresses each argument in turn.

### A. Article III Standing

"The first jurisdictional question is whether the plaintiffs have standing" to challenge the Bulletin. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–41 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."). Article III of the U.S. Constitution limits federal courts to deciding only "cases" or "controversies," which ensures that the judiciary "respects the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler*, 547 U.S. at 341 (cleaned up); *see also Raines v. Byrd*, 521 U.S. 811, 829 (1997) ("Our regime contemplates a more restricted role for Article III courts . . . 'not some amorphous general supervision of the operations of government.'" (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974))).

10

"[A]n essential and unchanging part of the case-or-controversy requirement of Article III" is that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing requirement is not subject to waiver and requires strict compliance. *E.g.*, *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). As the party invoking federal jurisdiction, Texas must establish Article III standing by showing that it has suffered "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

To start, Texas is the object of the Bulletin. If a plaintiff is an object of a regulation, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015). "Whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Texas v. Equal Employment Opportunity Comm'n (Texas v. E.E.O.C.)*, 933 F.3d 433, 446 (5th Cir. 2019). The Bulletin explicitly commands the states, including Texas, to collect information about their "health care-related taxes" and "the redistribution of Medicaid payments[,]" and threatens to "disallow[] federal financial participation" for those states that fail to comply. Docket No. 1, Ex. 1 at 5. "Thus, by its own terms, the [Bulletin] covers Texas." *Texas v. E.E.O.C.*, 933 F.3d at 446 (finding Texas was the object of a "Guidance" regarding "entities covered by Title VII," which includes state employers).

11

Texas, moreover, identifies several separate injuries in fact. "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms*, 779 F.3d at 266.   Additionally, "being pressured to change state law constitutes an injury," because "states have a sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (cleaned up).   Here, Texas has submitted unrebutted evidence that its agencies currently lack the authority to investigate the arrangements identified by CMS. Grady Declaration at 7–8 (describing the ability to investigate private agreements as "beyond [Texas's] authority" and that Texas "did not have authority to seek that type of information").   Texas would thus be required to change its laws to furnish "all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments" as required by the Bulletin. Docket No. 10, Ex. 1 at 5 (Bulletin); *see also* Grady Declaration at 7–8.  This constitutes an injury. *Texas v. E.E.O.C.*, 933 F.3d at 447 (finding an injury where the "Guidance imposes a regulatory burden on Texas to comply with the Guidance to avoid enforcement actions and, consequently, pressures it to abandon its laws and policies.").

Texas has also alleged a procedural injury, which occurs when a plaintiff shows it has been deprived of "a procedural right to protect [its] concrete interests." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Texas v. E.E.O.C.*, 933 F.3d at 447 (citing *Sierra Club v. EPA*, 699 F.3d 530,

533 (D.C. Cir. 2012). Here, Texas alleges that CMS was required to publish the Bulletin through notice and comment. Docket No. 10 at 23–26. Although CMS disputes this allegation, Docket No. 17 at 34–35, the Court "assume[s], for purposes of the standing analysis, that Texas is correct on the merits of its claim that the [Bulletin] was promulgated in violation of the APA." *Texas v. E.E.O.C.*, 933 F.3d at 447. Texas must merely show a "reasonable claim of minimal impact" in failing to adhere to proper procedure. *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020) ("A procedural injury can suffice for standing even where the plaintiff does not prove that adherence to the proper procedure would have produced a different outcome because the likelihood and extent of impact are properly addressed in connection with the merits in a harmless error analysis."), *appeal dismissed*, 2021 WL 3377978 (5th Cir. Mar. 22, 2021). Texas has done so here. *See* Grady Declaration at 7–8 (discussing impact).

CMS argues Texas's alleged injuries are not traceable to the Bulletin, which simply represents the agency's "longstanding" interpretation of existing statutory and regulatory authorities on "hold harmless" provisions. Docket No. 17 at 22. Until now, however, CMS has maintained an equivocal stance on these agreements. *Compare* Docket No. 10, Ex. 3 (2019 email exchange in which a CMS representative confirmed there were "arrangements out there among providers" that CMS "do[es] not particularly like" but *lacks* the "statutory authority to address"), *with* 84 Fed. Reg. at 63,734 (withdrawn 2019 proposed rule stating that private agreements among providers to share tax burden "are inconsistent with existing statutory . . .

13

requirements prohibiting hold harmless arrangements"). The Bulletin, by contrast, formally states CMS's position and requires Texas to amend its laws to comply with the Bulletin's requirements. Thus, there is traceability. *Texas v. E.E.O.C.*, 933 F.3d at 448 (finding traceability where a "Guidance" letter pressured Texas to change its laws). And although CMS does not argue a lack of redressability, the Court finds that an injunction prohibiting CMS from enforcing the Bulletin would redress Texas's injuries, fulfilling the third and final standing requirement. *Id.*; *see also Contender Farms*, 779 F.3d at 264 ("If a plaintiff is an object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan*, 504 U.S. at 561–62)).

Accordingly, Texas has standing.

## B. Ripeness

CMS also argues Texas's claims are "unripe." Docket No. 17 at 22–25. According to CMS, the claims will ripen only after CMS disallows funds for violating the legal interpretation expressed in the Bulletin. *Id.* at 23–24.

The ripeness and standing analyses are closely related, as ripeness inquires as to "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544–45 (5th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). "Determining whether administrative action is ripe for judicial review requires [the Court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*,

538 U.S. 803, 808 (2003); *see also Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 2023 WL 4073826, at *11 (5th Cir. June 20, 2023).

Here, Texas advances a purely legal challenge, arguing the Bulletin violates the APA in several ways. And "a claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Braidwood Mgmt., Inc.*, 2023 WL 4073826, at *12 ("[N]o further factual investigation is required to determine whether, for example, RFRA supersedes Title VII's requirements . . . ."); *Contender Farms*, 779 F.3d at 267 ("It is unnecessary to wait for the [Bulletin] to be applied in order to determine its legality.").

Texas, moreover, faces hardship because it will need to incur millions of dollars in costs to comply with the Bulletin's requirements. Grady Declaration at 14–15 (estimating annual compliance costs of "approximately $55 million"). Indeed, Texas must comply, or face fund disallowance. Docket No. 10, Ex. 1 at 5. The Bulletin may therefore "be said to be felt immediately by those subject to it in conducting their day-to-day affairs," constituting hardship. *Contender Farms*, 779 F.3d at 267 (finding hardship where a final rule required state compliance or "face decertification" from a federal program); *Braidwood Mgmt., Inc.*, 2023 WL 4073826, at *13 (same for an agency "guidance" that required compliance of regulated parties with the threat of a "costly enforcement action"); *cf. Nat'l Park Hosp. Ass'n*, 538 U.S. at 810 (no hardship where rule "does not affect [regulated parties'] primary conduct").

Accordingly, Texas's claims are ripe for review.

## C. Final Agency Action

CMS also argues Texas's claims do not fall within the scope of judicial review under the APA because the Bulletin is not "final agency action."  Docket No. 17 at 25–26; *see also* 5 U.S.C. § 704 (granting judicial review of "final agency action"). Agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process"—i.e., it is not merely of a "tentative or interlocutory nature," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016).  In evaluating whether agency action is final, the Fifth Circuit treats the finality requirement as both "flexible" and "pragmatic." *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).  Under a flexible, pragmatic reading, the Bulletin is final agency action.

First, courts have routinely held that guidance letters and bulletins can mark the "consummation" of an agency's decision-making process.  *E.g.*, *Nat'l Pork Producers Council v. U.S. E.P.A.*, 635 F.3d 738, 756 (5th Cir. 2011) (finding "guidance letters" met the first prong and collecting cases).  Here, the text of the Bulletin gives no indication that CMS considered the Bulletin to be either "tentative" or "interlocutory."  Rather, CMS states that it "intends to inquire" about private, provider-to-provider arrangements going forward and "take enforcement action as necessary," among other things.  Docket No. 10, Ex. 1 at 5.  Accordingly, the Bulletin meets the first prong. *Texas v. United States*, 86 F. Supp. 3d 591, 648 (S.D. Tex. 2015)

(finding a "Directive" met the first prong where it required the "immediate implementation of certain measures"), *aff'd*, 809 F.3d 134 (5th Cir. 2015).

The Bulletin also meets the second prong because it "bind[s]" CMS to a "legal position." *Texas v. E.E.O.C.*, 933 F.3d at 441. CMS in fact concedes that the Bulletin takes a "firm" view on the legality of private reimbursement arrangements. Docket No. 17 at 25. The Bulletin also previews imminent enforcement actions and leaves no room for discretion once those actions are underway. Docket No. 10, Ex. 1 at 5–6. The Bulletin therefore "ha[s] practical binding effect" such that "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *Texas v. E.E.O.C.*, 933 F.3d at 442.

CMS argues the Bulletin cannot be final agency action because it "simply reminds the public" of a "previously articulated" view and accordingly "create[s] no new legal obligations." Docket No. 17 at 25 (quoting *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016)). To the contrary, CMS has—on several occasions—explicitly disclaimed any intention to disallow state funding for these private arrangements. *See* Docket No. 10, Ex. 3 (2019 email exchange in which a CMS representative confirmed there were "arrangements out there among providers" that CMS "do[es] not particularly like" but lacks the "statutory authority to address"); Grady Declaration at 8 (stating CMS advised Texas's Health and Human Services Commission in 2019 that private business arrangements were lawful so long as neither "the State nor unit of local government was providing the guarantee" to hold taxpayers harmless); Opening Brief for Appellant, *Kindred Hosps. E., LLC v.*

*Sebelius*, 2012 WL 248356, at *55 (8th Cir. Jan. 9, 2012) (excerpting an interview in which an HHS representative stated private "redistribution arrangement[s]" among providers do not violate any hold harmless definition codified at § 1396b(w)(4)).  It is no surprise then that "several states" sought clarification from CMS on these arrangements, as the Bulletin itself describes.  Docket No. 10, Ex. 1 at 1.

Accordingly, the Bulletin cannot be said to "only reiterate what has been well-established," as CMS suggests.  *Cf. Nat'l Pork Producers Council*, 635 F.3d at 756 (finding guidance letter was not final action where it "only reiterate[d] what has been well established since the enactment of the [Clean Water Act of 1972]").  Rather, the Bulletin states—for the first time—a clear and "*definitive* position" that has "immediate impact on [Texas].  *Her Majesty the Queen in Right of Ont. v. Env't Prot. Agency*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (holding that the EPA's guidance letters were final agency action).

### D. Adequate Alternate Remedy

CMS insists Texas must resolve this dispute under 42 U.S.C. § 1316(e), which permits Texas to challenge any fund disallowance to the agency's Departmental Appeals Board, and only then proceed to federal court, if necessary.  Docket No. 17 at 26–27 (citing 42 U.S.C. § 1316(a), (e)).  Because this statutory remedy exists, CMS contends, Texas has an "adequate remedy in a court" under 5 U.S.C. § 704, foreclosing the present availability of judicial review.  The argument fails, however, because it ignores that Texas seeks to enjoin enforcement of the Bulletin, not overturn an enforcement decision like a disallowance.  Hearing Tr. 6/8/2023 at 9:13–19.

To preclude review under § 704, an alternative remedy must provide the "same genre of relief." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018).  And an Appeals Board ruling overturning an enforcement decision is not the same kind of relief Texas seeks here.   Rather, Texas wants an injunction to avoid spending money on compliance costs or amending state law.   Docket No. 1 at 32–33 (request for injunction); Docket No. 10 at 30–32 (explaining harm Texas faces absent an injunction).   The Appeals Board cannot award that kind of relief.   § 1316(e) (describing the Appeals Board's role as only "deciding whether to uphold a disallowance").   If Texas then seeks review of an Appeals Board ruling in a federal district court, the State may not recover compliance costs there either.  *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (noting the plaintiffs lacked "an avenue to recover costs from complying with the Order" because "federal agencies generally enjoy sovereign immunity for any monetary damages.").

Further, Texas "cannot initiate that [Appeals Board] process," and instead must "wait for [CMS] to drop the hammer" of disallowance before seeking review. *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (finding no adequate remedy where plaintiffs could not initiate review).   Review under § 1316(e) thus constitutes only "doubtful and limited relief," *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009), which is insufficient to overcome the APA's "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

19

Accordingly, the availability of administrative review under § 1316 does not bar the exercise of jurisdiction under 5 U.S.C. § 704 here.

### E. *Thunder Basin*

Finally, CMS argues the *Thunder Basin* doctrine bars judicial review because Congress intended to create an "exclusive remedy" in the Departmental Appeals Board.  Docket No. 26–28.  The existence of a parallel administrative enforcement framework may preclude district court review under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), if "Congress intended exclusivity when it established the statutory scheme." *Jarkesy v. S.E.C.*, 803 F.3d 9, 12 (D.C. Cir. 2015); *Bank of La. v. Fed. Deposit Ins. Corp.*, 919 F.3d 916, 923 (5th Cir. 2019).  To discern congressional intent, the Court asks whether the "claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Bank of La.*, 919 F.3d at 923 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)). The Court employs the "*Thunder Basin* factors" to resolve this question. *See Thunder Basin*, 510 U.S. at 212–13.  These factors ask (1) whether precluding district court jurisdiction "could foreclose all meaningful judicial review"; (2) whether Texas's "suit is wholly collateral to a statute's review provisions"; and (3) whether its claims are "outside the agency's expertise." *Elgin*, 567 U.S. at 15.

The first factor weighs against CMS.  Section 1316(e) permits judicial review *only* if CMS disallows Texas's funds.  § 1316(e)(2)(A) ("A State may appeal a *disallowance* of a claim for federal financial participation . . . ." (emphasis added)).  If Texas abides by the potentially unlawful Bulletin, it will not receive a "final adverse order," and "may thus be left unable to seek redress." *Cochran v. U.S. Sec. & Exch.*

*Comm'n*, 20 F.4th 194, 209 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter.,*
*Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890 (2023); *Burgess v. Fed. Deposit Ins. Corp.*,
2022 WL 17173893, at *7 (N.D. Tex. Nov. 6, 2022) (finding first *Thunder Basin* factor
weighed against preclusion where "the enforcement proceeding will not necessarily
result in a final adverse order"). Texas must then "bet the farm" and ignore the
Bulletin before "testing [its] validity." *Free Enter. Fund*, 561 U.S. at 490.
Consequently, finding that Congress intended an exclusive remedy in the
Departmental Appeals Board "could foreclose all meaningful judicial review" for
Texas. *Cochran*, 20 F.4th at 209. Moreover, these claims are outside CMS's expertise
under the third factor. Whether CMS unlawfully issued the Bulletin is a "standard
question[] of administrative law, which the courts are at no disadvantage in
answering." *Free Enter. Fund*, 561 U.S. at 491. No agency "expertise is required
here." *Id.* Because the first and third *Thunder Basin* factors weigh against CMS's
position, the Court need not analyze the second factor. *Id.* (addressing only the first
and third factors in determining that agency review provision "did not strip the
District Court of jurisdiction").

Accordingly, the existence of administrative review of a disallowance under
§ 1316 does not preclude the Court's jurisdiction under *Thunder Basin*.

\*     \*     \*

Having determined that its jurisdiction is proper, the Court now turns to the
merits of Texas's motion for a preliminary injunction.

## III. PRELIMINARY INJUNCTION

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam).  To obtain a preliminary injunction, Texas must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).  The Court takes each element in turn below.

### A. Likelihood of Success on the Merits

Texas argues three reasons it is likely to succeed on its claim for relief under the APA:  (1) the Bulletin exceeds CMS's statutory and regulatory authority; (2) CMS improperly bypassed the APA's notice-and-comment requirement; and (3) the Bulletin is arbitrary and capricious because it departs from past practice and fails to consider Texas's substantial reliance interests.  Because Texas is likely to succeed on its first argument, the Court need not address the remaining two.  *See Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234 (5th Cir. 2023).

Texas contends the Bulletin exceeds CMS's statutory authority by expanding the definition of "hold-harmless provision" to include guarantees by private parties in private agreements.  Docket No. 10 at 17–23.  Under the statute, "there is in effect a hold harmless provision" when:

> The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, off set, or waiver *that guarantees* to hold taxpayers harmless for any portion of the costs of the tax.

22

§ 1396b(w)(4)(C)(i) (emphasis added).  As noted in the parties' previous dispute, the statute includes a "tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." *Texas v. Brooks-LaSure*, 2022 WL 741065, at *8 (E.D. Tex. Mar. 11, 2022) (Barker, J.).

The Bulletin, however, announces CMS will disallow funds where *private providers* "enter into oral or written agreements . . . to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back"—i.e., where the *providers themselves* guarantee to hold one another harmless. Docket No. 10, Ex. 1 at 3.  CMS will thus disallow funds even where a state provides no "guarantee[]" at all.  Indeed, all a state "provides for" in the Bulletin's scenario is its Medicaid payment, which makes no "guarantee" to hold anyone harmless.  Docket No. 10, Ex. 1 at 2–3.

In disallowing funds where the state makes no guarantee, CMS decouples the "grammatical link" found in the statute, and conditions a state's Medicaid funding on private agreements over which states have no knowledge or control.  This is undoubtedly why HHS's own Departmental Appeals Board previously held that no hold-harmless arrangement existed where CMS could not point to "any wording in the States' programs that could reasonably constitute an explicit or direct assurance of any payment to the provider taxpayer."  *In re Haw. Dep't of Hum. Servs. Bd.*, DAB 1981 (June 24, 2005) (emphasis added); *see also Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006) ("[I]f the *state promises* to hold the taxpayer harmless for a portion of the cost of the tax through a direct payment or exemption

from the tax, that promise also constitutes a 'hold harmless provision.'" (emphasis added) (citing § 1396b(w)(4)(C))).

Courts routinely hold that rules like the CMS Bulletin exceed the agency's congressionally delegated authority—e.g.:

- The Supreme Court invalidated an Environmental Protection Agency rule requiring licensing of emitters under a definition of "air pollutant" that improperly expanded the Clean Air Act's definition of that term. *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 315–20 (2014).

- The Fifth Circuit set aside a Department of Labor rule that improperly expanded the statutory term "investment advice fiduciary" where the rule regulated a broader slate of financial advisors than the statute allowed. *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Labor*, 885 F.3d 360, 369 (5th Cir. 2018).

- The Seventh Circuit affirmed a preliminary injunction against the Department of Homeland Security enjoining the agency from enforcing a rule that "penalizes disabled persons in contravention of the Rehabilitation Act." *Cook Cnty. v. Wolf*, 962 F.3d 208, 228 (7th Cir. 2020).

So too here. CMS "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *In re Benjamin*, 932 F.3d 293, 300 (5th Cir. 2019); *accord* Docket No. 10, Ex. 3 (2019 email from CMS representative confirming the agency "do[es] not particularly like" private arrangements among providers).

CMS argues the Bulletin accords with the statute because a state's "associated payment" can be "indirect[]." Docket No. 17 at 30 (citing § 1396b(w)(4)(C)(i)). CMS elaborates: when "taxpayers enter an agreement to indemnify each other against the burdens of a health care related tax, each taxpayer receives a direct guarantee," and when "Medicaid funds are redistributed to honor that guarantee, the state has made an indirect payment." *Id.*; *accord* Docket No. 10, Ex. 1 at 3–4. But the statute still

24

requires that the *state*, not a private party, provide the "payment" that "guarantees" to hold taxpayers harmless.   § 1396b(w)(4)(C)(i) ("The State . . . provides . . . indirectly[] for any payment . . . that guarantees to hold taxpayers harmless . . . ."). In fact, in its 2008 rule, CMS provided an example demonstrating it shared this interpretation.   There, CMS explained that an "indirect payment providing a direct guarantee would be found" where a state taxes nursing facilities and simultaneously provides grants or tax credits "*designed by the States to compensate*" the nursing residents to whom the tax had been passed along.   73 Fed. Reg. at 9,686 (emphasis added).   In this scenario, the state provides the guarantee to hold harmless nursing homes by way of indirect payments through their patients—an impermissible scheme under the statute because of the state guarantee.   *See* § 1396b(w)(4)(C)(i).   That is very different from the purely private arrangements the Bulletin seeks to prohibit.

The Court thus concludes that the Bulletin conflicts with the statutory definition of "hold harmless provision" found in § 1396b(w)(4)(C)(i).   Because courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C), the Bulletin will likely be set aside.   Texas has thus shown a "substantial likelihood of success on the merits."   *Jordan*, 823 F.3d at 809.

### B. Irreparable Harm

Next, Texas must demonstrate "a substantial threat of irreparable injury if the injunction is not issued."   *Texas v. United States*, 809 F.3d at 150.   For its threat of injury to be sufficiently "substantial," Texas must show that it is "likely to suffer irreparable harm in the absence of preliminary relief."   *Winter*, 555 U.S. at 20.   For

its injury to be sufficiently "irreparable," Texas need only show it "cannot be undone through monetary remedies."  *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017). Texas has met its burden.

Texas argues it faces an irreparable injury through "substantial compliance costs."  Docket No. 10 at 29.[4]  In an unrebutted affidavit, an official with the Texas Health and Human Services Commission attests the agency lacks authority over the local entities that tax providers under Section 300.0001 of the Texas Health and Safety Code, Grady Declaration at 4, and otherwise lacks the authority to seek the information the Bulletin obligates it to collect, *id.* at 8.  To comply with the Bulletin, she attests Texas must first change its laws to be able to investigate private agreements, and must then spend an estimated $55 million annually to review them. *Id.* at 14.

In determining whether costs are irreparable, the key inquiry is "not so much the magnitude but the irreparability."  *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023).  Here, Texas's compliance costs are irreparable because CMS is immune from monetary damages.  *See Wages & White Lion Invs., LLC*, 16 F.4th at 1142 (observing that the costs to comply with agency action are almost always irreparable "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *Burgess*, 871 F.3d at 304.  Accordingly, Texas cannot "recover

---

[4] Texas also argues it will also suffer an irreparable injury because the Bulletin requires it to investigate the financial relationships of private associations, which risks "transgressing the First Amendment."  Docket No. 10 at 32 (citing *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021)). Because the Court finds Texas will suffer an injury vis-à-vis compliance costs, it need not address this alternative injury.

the compliance costs [it] will incur if the [Bulletin] is invalidated on the merits." *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 434 & n.41 (5th Cir. 2016) (finding irreparable injury where Texas could not recover monetary compliance costs from federal agency); *id.* at 433 ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." (quoting *Thunder Basin Coal*, 510 U.S. at 220–21 (Scalia, J., concurring in part and in the judgment))).

CMS argues the Bulletin threatens no injury because the agency, "[f]or years," has expressed its "clear" position on these arrangements. Docket No. 17 at 18. As addressed above, however, CMS's stance has been far from "clear." *See supra* Section II.C. In contrast to the 2019 proposed rule (later withdrawn) and 2022 litigation position, the Bulletin declares that Texas and other states *will* face disallowance if they fail to comply. *Rest. Law Ctr.*, 66 F.4th at 599 (finding irreparable harm where rule constituted a "new constraint" on regulated parties). CMS also argues that Texas exaggerates the imminence of any harm, because "enforcement"—and not the Bulletin—"is the ultimate injury that Texas" seeks to avoid. Docket No. 17 at 19. But the Bulletin makes clear that Texas must collect information it currently doesn't have—or face "disallowance of federal financial participation." Docket No. 10, Ex. 1 at 5. And Texas alleges it will spend millions of dollars per year to do so. Grady Declaration at 14. The Fifth Circuit "requires only that *alleged* compliance costs must be 'more than de minimis.'" *Rest. Law Ctr.*, 66 F.4th at 600 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)). Texas's allegations are sufficient to

show that it will suffer irreparable harm absent an injunction.  *Id.* at 599–600 (finding sufficient allegations of harm where plaintiff offered "estimates" of potential harm).

### C. Balance of the Equities and Public Interest

The third and fourth factors ask whether the absence of a stay will injure other parties and whether the public interest favors or disfavors a stay.  "Federal courts have considered the balance of equities and public interest factors together as they overlap considerably."  *Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021) (citing cases).

Texas argues it faces irreparable compliance costs while CMS faces no harm from the requested injunction because the agency "has no legitimate interest in the implementation or enforcement of an unlawful agency action."  Docket No. 10 at 33 (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  CMS argues only that it faces harm because the Bulletin *is* lawful agency action.  Docket No. 17 at 35.  The Court finds Texas's threatened injury if the injunction is denied outweighs any harm that will result to CMS if the injunction is granted.  *E.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (finding alleged compliance costs outweighed agency's interest in perpetuating "unlawful agency action").

Similarly, the public will not face disservice from an injunction.  By contrast, an injunction will maintain the status quo for states (like Texas) that will otherwise face immediate compliance costs and funding disallowances that may jeopardize their state Medicaid programs.  Grady Declaration at 14 (noting Texas faces "disallowance of [funds]" and even "complete exclusion from the Medicaid program").  The Court

finds the public will not face disservice from an injunction.  *See Texas v. United States*, 809 F.3d at 187 (finding public interest favored an injunction "given the difficulty of restoring the *status quo ante*").

Accordingly, the third and fourth factors weigh in favor of an injunction.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Texas's motion for preliminary injunction.  Docket No. 10.

The Court hereby **ORDERS** that, as of the date of this Order, Defendants and their agents are **ENJOINED** from implementing or enforcing the Bulletin dated February 17, 2023, entitled "CMCS Informational Bulletin: Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments," or from otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein.   Defendants, anyone acting in concert with Defendants, and their respective agents are enjoined and prohibited from relying on the Bulletin for any purpose during the pendency of this litigation.  This includes, but is not limited to, enforcing the Bulletin through any ongoing or future Medicaid-related audits, oversight activities related to the Medicaid program, or review of state payment proposals in the State of Texas.  The Bulletin also may not be used as a basis to defer or disallow any reimbursement payments made during the period this injunction remains in place.

The Court finds that Defendants will not sustain costs and damages should this injunction be found to have issued wrongfully, and, therefore, the Court

29

dispenses with the requirement of a bond.  This injunction shall remain in force and effect until final judgment is entered in this case or as otherwise ordered by the Court.

So **ORDERED** and **SIGNED** this **30th** day of **June, 2023.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE