**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, *Plaintiffs*, <br><br> v. <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as Administrator for the Centers for Medicare and Medicaid Services; THE CENTERS FOR MEDICARE AND MEDICAID SERVICES; XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and the UNITED STATES OF AMERICA, *Defendants*. | Civ. Action No. 6:23-CV-161-JDK |

## SUPPLEMENTAL COMPLAINT

1.      On April 5, 2023, Texas and the Texas Health and Human Services Commission (collectively, "Texas") brought this suit challenging the Defendants' use of a February 17, 2023 informational bulletin to change the ways by which a State may fund the non-federal share of Medicaid expenditures. ECF No. 1. Generally speaking, because Medicaid depends on the federal government matching state spending, Congress has prohibited States from artificially inflating the amount of federal funds they claim by purporting to tax health-care providers for Medicaid services while guaranteeing—directly or indirectly—that a taxpaying healthcare provider will receive its total tax payment back through Medicaid payments. 42 U.S.C. § 1396b(w)(1)(A)(iii). These "hold harmless" agreements are prohibited when a State or local government provides the guarantee.

The 2023 Informational Bulletin purported to expand that definition to prohibit arrangements in which private providers agree to redistribute Medicaid payments amongst themselves. ECF No. 1; *see also* Ex. A (administrative record excerpt, 2023 Bulletin).[1] The mechanics of this process are described in more detail in the Original Complaint, ECF No. 1, which is incorporated as if fully restated herein.

2.      As Texas has already explained, the 2023 Bulletin was the fourth time in as many years that CMS had tried to force its views about what constitutes a "hold-harmless" agreement on Texas.

3.      Perhaps hoping the *fifth* time would be the charm, CMS formally proposed a new rule to address "States' monitoring and enforcement efforts," Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality, 88 Fed. Reg. 28,092 (proposed May 3, 2023) ("Proposed Rule"), while Texas's motion for a Preliminary Injunction was pending. Among other things, the Proposed Rule adopted a view of what constitutes a hold harmless agreement that substantively tracked the earlier bulletin. 88 Fed. Reg. at 28,130-31. It also purported to strip this Court of jurisdiction to review the application of that rule through the state-directed payment process. 88 Fed. Reg. at 28,149-51, 28,233. Texas raised this development in its reply in support of its motion for a preliminary injunction, ECF No. 22 at 8, 11, and again at this Court's hearing, ECF No. 29 at 53-54.

4.      Following extensive briefing and a lengthy hearing, this Court agreed with Texas that both the 2023 Bulletin and the "interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i)

---

[1] Consistent with the supplemental nature of this pleading, unless otherwise specified, all terms are given the same meaning as those assigned in the Complaint, and all references to "Ex." are to documents attached hereto.

found therein" exceed CMS's statutory authority under the Social Security Act. ECF No. 31 at 29. And it forbade Defendants from "implementing or enforcing the Bulletin" or that "interpretation" pending trial. *Id.* at 29. Months of delays preparing the administrative record followed.

5.     On May 10, 2024—without appealing this Court's ruling or even addressing the concerns it raised—the Biden Administration promulgated a final rule ("Final Rule") that adopted, without material change, the 2023 Bulletin and Proposed Rule. *See* Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality, 89 Fed. Reg. 41,002 (May 10, 2024) (to be codified at 42 C.F.R. parts 430, 438, and 457); Ex. B (CMS Informational Bulletin, Apr. 22, 2024).

6.     Texas is therefore entitled to full relief against the implementation of CMS's unlawful Final Rule, which should be permanently enjoined and vacated as either "in excess of [CMS's] statutory … authority" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Because the Final Rule purports to "enforc[e] an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found" in the 2023 Bulletin, it falls within the scope of Texas's existing lawsuit and the Court's existing injunction. ECF No. 31 at 29. But to the extent that the Court disagrees, Texas is entitled to preliminary relief as well.

## PARTIES

7.     The parties have not changed since the filing of the original complaint. *See* ECF No. 1 ¶¶ 7-13.

## JURISDICTION AND VENUE

8. For the reasons this Court has already explained, it has subject-matter jurisdiction under 28 U.S.C. § 1331 to address the legality of actions taken by federal agencies and federal officers in their official capacities. ECF No. 31 at 10-21.

9. The supplemental claims asserted herein are ripe for review given that they involve "pure question[s] of law that need[] no further factual development," and the immediate effects of CMS's Final Rule—which, by its own terms, implements CMS's enjoined legal theory no later than July 9, 2024, 89 Fed. Reg. at 41,269, 41,272, and will impose immediate compliance costs—suffice to demonstrate an impending injury to Texas's sovereign and financial interests. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930-32 (5th Cir. 2023) (citation omitted); *see also, e.g.*, ECF No. 31 at 15 (concluding that Texas's similar challenges to the prior bulletin were ripe). *See generally* Ex. E (Grady Supp. Decl., May 21, 2024). "Thus, '[i]t is unnecessary to wait for the [Final Rule] to be applied in order to determine its legality.'" *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 267 (5th Cir. 2015) (quoting *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1008 (D.C. Cir. 2014)).

10. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 706; 28 U.S.C. §§ 1361, 2201-02; Federal Rules of Civil Procedure 57 and 65; and by the Court's general legal and equitable powers.

11. Defendants have not objected to venue in this district, which is in any event proper. *See* ECF No. 1 ¶ 16.

# BACKGROUND

## A. The Social Security Act.

12.     To briefly summarize the facts discussed in detail elsewhere, Texas finances a large share of its contributions to Medicaid through the collection of broad-based healthcare taxes, which is expressly permitted under the Social Security Act. *See* 42 U.S.C. § 1396b(w)(3)(B). It does so, however, subject to a condition: States may not subsidize these taxes by way of "hold harmless provision[s]." *Id.* § 1396b(w)(1)(A). As relevant here, the Act defines hold harmless provisions to include where "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i). Congress also provided that "a determination of the existence of an *indirect* guarantee shall be made under paragraph (3)(i) of section 433.68(f) of Title 42, Code of Federal Regulations, as in effect on November 1, 2006," which generally looked to the size of the relevant tax. *Id.* § 1936b(w)(4)(C)(ii) (emphasis added).

13.     Read in its context, this definition is relatively straightforward (for Medicaid at least): An arrangement constitutes a prohibited hold harmless provision only when *the State or other government unit* provides a payment, offset, or waiver. Even HHS's own adjudicative system recognized nearly two decades ago that it is "unreasonable" to read CMS's regulations to encompass "the use of a payment … where there is no explicit guarantee" by the State. *In re: Hawaii Dep't of Human Servs.*, No. A-01-40, 2005 WL 1540188, at *23 (Dep't Appeals Bd., Appellate Div. June 24, 2005); *see also, e.g.*, ECF No. 31 at 22-27 (emphasizing the same). Nevertheless, in recent years, CMS has repeatedly sought to expand the definition of hold harmless agreements to include any agreement between private parties so long as it "produce[s] a

reasonable expectation that taxpaying providers will be held harmless for all or a portion of their cost of a healthcare-related tax." 89 Fed. Reg. at 41,077.

**B. Procedural History.**

14. Part of a larger dispute between Texas and CMS regarding who is empowered to make healthcare policy decisions in Texas, this lawsuit originally arose based on CMS's fourth such attempt when, on February 17, 2023, the Deputy Administrator and Director of CMS issued a bulletin announcing a retroactive change in CMS's definition of a hold harmless arrangement. *See* Ex. A at 1-6. In that bulletin, CMS described how, in its view, entirely private "oral or written agreements" to redirect or redistribute Medicaid payments constitute impermissible hold harmless agreements—notwithstanding the acknowledged absence of state participation therein. *Id.* at 3. Moreover, CMS stated that it "intend[ed] to inquire about potential redistribution arrangements" and expected States "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments" as part of CMS's "oversight activities and review of state payment proposals." *Id.* at 5. CMS warned that a State's failure to supply requested documentation regarding redistribution arrangements "may result in a deferral or disallowance of federal financial participation." *Id.*

15. Texas sued within two months of the 2023 Bulletin's issuance. *See* ECF No. 1. Texas asserted three primary claims regarding the 2023 Bulletin: that it violated the Administrative Procedure Act ("APA") because it was (1) inconsistent with the plain language of the Social Security Act and CMS's own regulations, *id.* at ¶¶ 71-76; (2) issued without an opportunity for notice and comment, *id.* ¶¶ 77-84; and (3) arbitrary and capricious because it contradicted CMS's prior position that private arrangements do not fall within the ambit of a prohibited hold harmless

agreement, *id.* ¶¶ 85-91. Based on positions that CMS took in prior litigation, Texas anticipated that CMS would attempt to defend its rule as longstanding policy based on an ambiguous statement in a 2008 rule. Therefore, Texas alternatively asserted the 2008 rule, 73 Fed. Reg. 9,685, is equally contrary to CMS's statutory authority. ECF No. 1 ¶¶ 92-96.

16.     Texas also moved for a preliminary injunction. ECF No. 10. As Texas explained, the 2023 Bulletin threatened to uproot the social safety net that Texans enrolled in the Medicaid program rely on to provide them life-saving care. *Id.* at 33; *see also* ECF No. 22 at 16-17 (summarizing steps the federal government has taken to enforce the bulletin and disallow millions of dollars in funding). And it imposed irrecoverable costs both to Texas's public fisc and to its sovereignty. ECF No. 10 at 29-31.

17.     This Court agreed with Texas and enjoined CMS from "implementing or enforcing" the 2023 Bulletin or "otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein." ECF No. 31 at 29. In the process, the Court rejected a grab-bag of jurisdictional arguments that CMS leveled at Texas's complaint. *Id.* at 10-21. The Court also concluded that "[i]n disallowing funds where the state makes no guarantee, CMS decouples the 'grammatical link' found in the statute, and conditions a state's Medicaid funding on private agreements over which states have no knowledge or control." *Id.* at 23. CMS did not appeal from the Court's order.

### C. CMS's most recent effort to rewrite the Social Security Act.

18.     Before this Court could issue an injunction, however, CMS undertook the very notice-and-comment process that it had previously disclaimed as unnecessary. Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and

Quality, 88 Fed. Reg. 28,092 (proposed May 3, 2023). As in the 2023 Bulletin, CMS sought to penalize States for wholly private arrangements in which providers agree to redistribute Medicaid payments amongst themselves. *Id.* at 28,130. Hundreds of commentors—including Texas—expressed concern with the far-reaching consequences of this unlawful rulemaking. *See, e.g.*, Ex. D (selected notice-and-comment letters).

19.     In April 2024, CMS released an unpublished copy of its Final Rule. 89 Fed. Reg. 41,002; Ex. B (CMS Informational Bulletin, Apr. 22, 2024). The Final Rule codified CMS's previously enjoined interpretation of 42 U.S.C. §§ 1396b(w)(4)(C)(i), 1903(w)(4)(C)(i), without addressing any of the legal faults this Court identified in its thorough order, ECF No. 31 at 22-29. To the contrary, CMS merely alluded to this Court's ruling when it explained that its rule would "strengthen [its] ability to disapprove an SDP where it appears the SDP arrangement is supported by impermissible non-Federal share financing arrangements," 89 Fed. Reg. at 41,077—*i.e.*, under the previously enjoined interpretation of 42 U.S.C. §§ 1396b(w)(4)(C)(i), 1903(w)(4)(C)(i). *See* ECF No. 31 at 22-27. And it supposedly announced its intention to "abide by" this Court's injunction as long as it "remains in effect." 89 Fed. Reg. at 41,082. *But see infra* ¶¶ 23-25 (detailing forthcoming implementation).

20.     In relevant part, the Final Rule revised 42 C.F.R. § 438.6(c)(2)(ii) by adding "a new paragraph" that "require[s] states to ensure that providers receiving an SDP attest that they do not participate in any hold harmless arrangement for any health care-related tax as specified in 42 CFR 433.68(f)(3)." Ex. B at 2; *accord* 89 Fed. Reg. at 41,269 (to be codified at 42 C.F.R. § 438.6(c)(2)(ii)(H)). The Final Rule also added a second paragraph that explicitly requires "an SDP comply with all Federal legal requirements for the financing of the non-Federal share,

including, but not limited to, 42 CFR part 433, subpart B, as a part of the CMS SDP preprint review process." Ex. B at 2-3; *accord* 89 Fed. Reg. at 41,269 (to be codified at 42 C.F.R. § 438.6(c)(2)(ii)(G)).

21.     At the same time, the Final Rule purports to strip this Court of any practical jurisdiction to review CMS's application of its unlawful theory of hold harmless agreements by funneling disputes regarding SDPs into the Departmental Appeals Board—a Board whose average review time well exceeds the lifespan of an SDP. Specifically, the Final Rule adds a new paragraph under 42 C.F.R. § 430.3, which explains that "[d]isputes … pertain[ing] to disapproval of written approval by CMS of State directed payments under 42 CFR 438.6(c)(2)(i) are also heard by the Board." 89 Fed. Reg. at 41,267 (to be codified at 42 C.F.R. § 430.3(e)). Yet the only extent to which Congress has provided for DAB review is found in 42 U.S.C. § 1316(a)-(e), which does not pertain to the denial of state-directed payments.

22.     Indeed, by forcing SDPs to go through the DAB, CMS insulates its decisions from review by the federal courts. The vast majority of SDPs require annual approval. *See generally* 42 C.F.R. §§ 438.2, .6(c)(3). As a bi-partisan chorus of commenters pointed out, that period will likely lapse before the DAB completes its review process, let alone before a federal court can act: Though "DAB's regulations state a goal of resolving cases within 6 to 9 months," the practical reality is such that these targets "have not been achieved in many years." Ex. D at 6 (joint comments from Louisiana, Illinois, Michigan, Tennessee, and Vermont). This has been Texas's experience as well. *See, e.g.*, Ex. E ¶ 15 (explaining that "this administrative process often takes years, effectively denying judicial intervention [for] the denial of an SDP, which has to be approved on an annual basis"); *see also, e.g.*, *HHSC v. CMS*, No. A-17-51 (Dep't Appeals Bd. Aug. 7, 2018) (concluding

one year, five months, and fourteen days after appeal), *reconsideration denied* No. A-19-1 (Dep't Appeals Bd., Appellate Div. Oct. 2, 2019) (denying reconsideration two years, seven months, and eight days after initial appeal). Instead, "[a]s the DAB's jurisdiction has grown," "it is not uncommon for an appeal from a Medicaid disallowance to [remain] pending for two, three or even four years after it has been fully briefed, even without a hearing." Ex. D at 6 (noting that "in the last several years, there was only one Medicaid disallowance decision issued in 2022, two in 2021, and one in 2020; many more cases remain pending"). There is no reason to think review of SDP-based denials would operate any differently.

**D. CMS's sleight of hand regarding effective dates.**

23.     CMS claimed in its 2024 Bulletin that it would "not enforce" sections 1903(w)(1)(A)(iii), (w)(4), or 42 C.F.R sections 433.68(b)(3), (f) "with respect to health care-related tax programs with hold harmless arrangements involving provider payment redistributions that exist as of" April 22, 2024. Ex. B at 1 (incorporating the 2023 Bulletin's definition of these arrangements). Instead, CMS would allegedly defer enforcement "until January 1, 2028" and "abide by" this Court's injunction "as long as it remains in effect." *Compare* Ex. B at 1, *with* 89 Fed. Reg. at 41,082.

24.     Yet a close read of the 2024 Bulletin reveals that CMS very much expects States and private parties to begin complying with the Final Rule immediately. It explicitly states: "CMS intends to begin routinely asking questions about possible hold harmless arrangements in conjunction with reviews of health care-related tax waiver requests and state payment proposals funded, at least in part, by health care-related taxes." Ex. B at 3 (noting that "CMS … intends to … obtain additional information about where such hold harmless arrangements exist"). The

bulletin also notes that "CMS will … continue to review new health care-related taxes and any new provider payment redistribution arrangements about which [they] may learn about during the period of non-enforcement," meaning CMS plans to "disapprov[e] … state Medicaid payment proposals and/or disallow[] … Federal Financial Participation" believed to run afoul of its enjoined, atextual interpretation of 42 U.S.C. §§ 1396b(w)(4)(C)(i), 1903(w)(4)(C)(i). *Id.* CMS therefore "expect[s] states with existing hold harmless arrangements to undertake changes necessary" well "before" the claimed enforcement date in 2028. *Id.*

25. The text of the Final Rule confirms the same. The new language in 42 C.F.R. § 438.6(c)(2)(ii)(G), which is effective on July 9, 2024, predicates preapproval of a payment program on CMS's unlawful conception of hold harmless arrangements under the heading of "Federal legal requirements for the financing of the non-Federal share." 89 Fed. Reg. at 41,269, 41,272. And its provision that such denials must be pursued through the DAB effectively precludes any federal court review because in the vast majority of cases, SDPs—which typically must be approved on an annual basis—will expire before the DAB process is complete.

**E. The Final Rule's ongoing harm to Texas.**

26. As with the 2023 Bulletin before it, the Final Rule will have an immediate impact on not just HHSC's ability to provide vital healthcare services to Texans but also on Texas's sovereign interest in enforcing its laws.

27. Relying on the text of both the Social Security Act and CMS's regulations, the Texas Legislature has never deemed it necessary to create a regulatory body with authority to examine contractual agreements that might exist between two private businesses. Nor has the Legislature ever seen fit to provide HHSC with such authority. As a result, to comply with the

Final Rule—including aspects that are effective no later than July 9, 2024—HHSC will have to arrogate power to itself that it lacks under state law.

28. Beyond that injury to its sovereignty, Texas faces significant monetary costs to comply with the Final Rule: It would be required to establish and operate a regulatory entity with sufficient resources to examine the contractual arrangements and financial management of every private hospital that exists in a jurisdiction with an LPPF. Ex. A at 5 (explaining in the enjoined 2023 Bulletin that States are expected "to make available all requested documentation regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid payments."); *see also, e.g.*, 89 Fed. Reg. at 41,237-39 (implementation cost estimates). This is the only way Texas could accurately determine what private contractual relationships exist and whether those contracts are related to their provider tax payments. Texas would then need to take immediate action to halt private contractual agreements that fall within the scope of the Final Rule's atextual definition of a hold harmless arrangement. Ex. B at 3 ("During the period before January 1, 2028, we expect states with existing hold harmless arrangements to undertake changes necessary [and intend to begin routinely asking questions about such arrangements] so that by no later than January 1, 2028, the state is compliant with all non-Federal share financing requirements."); *accord* Ex. A at 5 (explaining in the enjoined 2023 Bulletin that States must "take steps to curtail these practices if they exist").

29. As before, HHSC estimates that compliance will require it to expend tens of millions of dollars and hire many new staff. There are 304 privately-owned hospitals located in jurisdictions that currently have an LPPF, approximately 27% of which are not-for-profit organizations. Texas hospitals are extremely complex organizations, which have innumerable

private contracts with various types of entities that Texas would be required to examine to determine whether each contract constituted hold harmless arrangements under the Final Rule's vague standard.

30. Because current law only requires HHSC to monitor agreements involving local government entities, HHSC currently employs roughly a dozen compliance staff aimed at ensuring no impermissible hold harmless provisions exist. *See, e.g.*, Ex. E ¶ 19 (explaining that "Texas has already undertaken, at a cost of more than $3 million annually, reporting and monitoring procedures to ensure that local governments providing non-federal share funds for Medicaid comply with all legal requirements authorized by Congress"). HHSC would need to hire hundreds of additional staff to "curtail" any actions that might be inconsistent with the Final Rule: Those staff would include professionals like auditors, financial examiners, financial analysts, and attorneys who could competently interpret the thousands (potentially millions) of contracts or other business arrangements at each hospital and the billions of dollars of revenues and expenditures that are associated with operating those hospitals. Worse yet, though Texas has already submitted its 2025 preprints—inviting an approval timeline that would escape the Final Rule's looming exercise in jurisdiction stripping—CMS appears to be taking historically unprecedented steps to slow-roll the process and "avoid[] triggering the [Special Terms and Conditions] timelines," thereby placing any forthcoming denial beyond the effective date of the unlawful DAB-review framework. Ex. E ¶¶ 16-17.

31. The last several years have been challenging for Texas Medicaid: the pandemic, combined with CMS's conduct that precipitated both Texas's earlier lawsuit and that here, have put providers and patients on edge. Ex. E ¶ 21. CMS's latest salvo threatens to undermine the

work that HHSC—not to mention this Court—has done to restore confidence in the Texas Medicaid Program and will destabilize the safety net that countless Texans rely on to provide them life-saving care. LPPFs fund nearly a fifth of Texas's state share of Medicaid expenditures. Moreover, LPPFs are typically operated by hospital districts and other local government entities— meaning that CMS's current effort to shut off Medicaid funding is aimed at the very local government entities that are charged with creating an aspect of the entire social-safety net that serves emergent or acute medical needs. In Texas, most hospital associations are non-profits and, to comply with the Final Rule—both in July of this year and in 2028—HHSC would be compelled to examine any financial relationship they might have with hospitals located in jurisdictions that operate LPPFs. Neither Texas hospitals nor the Texans they serve can afford the uncertainty in funding that has, and will imminently continue to, result from CMS's unlawful conduct. *See, e.g.*, Ex. E ¶¶ 14-21.

## CLAIMS[2]

### *Supplement to Count I*

### The Final Rule Exceeds CMS's Statutory Authority By Adopting An Interpretation of 42 U.S.C. § 1396b(w)(1)(A) That Is Not in Accordance with Law (5 U.S.C. § 706).

32.     All allegations in the preceding paragraphs of this Supplemental Complaint are incorporated herein.

---

[2] For the avoidance of doubt, Texas continues to press Count IV in the Complaint, ECF No. 1 ¶¶ 92-96. It acknowledges that the promulgation of the Final Rule likely obviates any need to resolve Count II. *Id.* ¶¶ 77-84. But given CMS's history of pretextual behavior in this and the prior 2021 litigation Texas asks the Court to defer further consideration of that Count rather than dismiss it as moot.

33. For the reasons listed in Count 1 of the Complaint, which is also incorporated herein, ECF No. 1 ¶¶ 71-76, Defendants have acted contrary to law in violation of 5 U.S.C. § 706 by promulgating the Final Rule. The Rule should thus be set aside and enjoined.

### *Supplement to Count III*

**The Final Rule Adopts an Arbitrary and Capricious Interpretation of 42 U.S.C. § 1396b(w)(1)(A) (5 U.S.C. § 706).**

34. All allegations in the preceding paragraphs of this Supplemental Complaint are incorporated herein, and all allegations in the Complaint are incorporated to the extent they are not inconsistent with the allegations contained herein.

35. The APA's arbitrary-or-capricious standard, 5 U.S.C. § 706(2)(A), "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action qualifies as arbitrary or capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review has never been "toothless," and after *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), "it has serious bite." *Wages & White Lion Invs., LLC v. FDA*,

16 F.4th 1130, 1136 (5th Cir. 2021). The Final Rule's definition of what constitutes a "hold harmless agreement" is arbitrary and capricious in three separate ways.

36.     *First*, like the 2023 Bulletin before it, *see* ECF No. 31 at 13-18, the Final Rule reverses "prior policy" without providing a "detailed justification" for doing so, *Wages & Lion Invs., LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)); *see also* ECF No. 1 ¶¶ 87-88. As the administrative record compiled regarding the 2023 Bulletin amply demonstrates, CMS chose to "target[] the Texas Medicaid program as its test case to create a precedent for its expanded interpretation of a hold harmless arrangement." Ex. C at 1009.

37.     Yet CMS has failed to even *acknowledge* its repeated statements that it *lacks* the statutory or regulatory authority either to police or require States to police private-provider agreements under the Act. *See, e.g.*, ECF No. 10-2 ¶ 25 (Grady Decl.); Ex. C at 1010 (quoting correspondence between CMS official and private parties); *accord In re: Hawaii*, 2005 WL 1540188, at *23. To the contrary, the Final Rule continues to insist that CMS is simply making explicit what was already required by "Federal legal requirements for the financing of [State's] non-Federal share," 89 Fed. Reg. at 41,077; *accord, e.g.*, 89 Fed. Reg. at 41,075 (claiming the Final Rule resolves "ambiguity"), 41,081 (disclaiming that the Final Rule requires "anything beyond what is currently required")—notwithstanding this Court's holding to the contrary, ECF No. 31 at 13-17, 22-29 (noting that, at best, CMS "has maintained an equivocal stance on these agreements").

38.     This intransigence is fatal to the Final Rule. It is "axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). To satisfy this requirement, an agency must "at least display awareness that [the

agency] is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency may *not* "'gloss[] over or swerve[] from prior precedents without discussion.'" *Wheeler*, 956 F.3d at 645 (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)).

39.     It is no response that the prior guidance was written in broad terms: "However flexible, qualified, and hazy" any preexisting guidance was, the key question is whether the agency "acknowledge[s]" that guidance and "explain[s] its reasons for changing positions." *Wages & White Lion*, 90 F.4th at 382. As nothing in the Final Rule comes close to meeting this standard, this alone "warrants vacatur of the agency actions." *Id.* at 384.

40.     *Second*, apart from failing to acknowledge CMS's change in position, the Final Rule fails to adequately account for Texas's "'good-faith reliance' on the agency's prior positions." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012)). As Texas has already explained, courts have long "refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *accord Azar v. Allina Health Servs.*, 587 U.S. 566, 571 (2019).

41.     Texas has "operate[d] Medicaid programs that have relied (in part) on local health care-related taxes" for over a decade, Ex. C at 1010, and CMS was well aware of Texas's reliance interests. As Texas has explained elsewhere, CMS actively encouraged Texas to implement LPPFs in additional jurisdictions over a period of years and they are now used in twenty-eight local jurisdictions. ECF No. 1 ¶¶ 47-50. "Texas has repeatedly shared its progress regarding implementation of a comprehensive monitoring mechanism to review whether all local sources of

non-federal share funds meet federal requirements." Ex. C at 1011. And CMS has routinely approved SDPs that use LPPFs to fund Texas's non-federal share. In total, CMS has approved such programs at least nine times since the funds were first introduced. ECF No. 1 ¶¶ 46-47. As this Court has recognized, precisely because it relied upon CMS's prior position, the Texas Legislature has never bestowed HHSC with authority "to seek the information the [Final Rule] obligates it to collect." ECF No. 31 at 26.

42.     Nor can there be any serious claim that Texas's understanding of CMS's longstanding position was somehow "unreasonable." *Wages & White Lion*, 90 F.4th at 386. Congress has never dictated what private parties can do with their own money after the State reimburses them for care provided to Medicaid recipients, 42 U.S.C. § 1396b(w)(4)(C), and if anything reassured States that it was *not* concerned with these types of private agreements by defining what constitutes an "indirect" payment extremely narrowly. *See supra* ¶¶ 37-41. When parties sought clarification of what CMS required, its prior Director of the Medicaid Financial Management Group, Kristin Fan, "confirmed that CMS did not have the legal authority to reduce [federal financial participation] for actions exclusively among private parties." Ex. C at 1010; *see also, e.g.*, Opening Br. of Appellant at 55, *Kindred Hosps. E., LLC v. Sebelius*, 694 F.3d 924 (8th Cir. 2012) (No. 11-3555), 2012 WL 248356, at *55 (2012 testimony from the Office of Inspector General on a different piece of subsection 1396b(w), explaining that private pooling agreements do not violate the Act's hold harmless prohibition).

43.     The Final Rule fails to give any significant consideration to these reliance interests. The Fifth Circuit has made clear that this obligation is reviewed for substance over form. *See, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (observing that the agency's

invocation of "'unique' threats" did not substantively address the notice-and-comment concerns with "'global supply-chain risks,'" though that failure did not ultimately prove dispositive). Here, there is no indication that CMS seriously considered the fact that States have developed their Medicaid financing program around existing CMS policy—a reality that is inexorably tied to the propriety of the Final Rule. For example, it assures States that it will be available to provide guidance on implementation. Ex. B at 3 ("CMS is available to provide technical assistance that states may require while transitioning their health care-related taxes away from these types of arrangements."). But it entirely ignores Director Fan's contrary guidance—notwithstanding the fact that it was previously submitted to the Court without objection. *See* ECF No. 10-3.[3] Failure to adequately consider reliance interests is enough to set aside the rule. *E.g.*, *Regents*, 591 U.S. at 33 (highlighting that the agency "was 'not writing on a blank slate,'" and it was therefore "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

44.    *Third*, the Final Rule failed to respond to significant comments. "As Justice White famously described, agency action is arbitrary and capricious if it 'entirely failed to consider an important aspect of the problem.'" *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 954 (D.C. Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). It is with this in mind that "the failure to respond to significant comments … violates a substantive guarantee of the APA." *Id.* Although the agency need not

---

[3] If the administrative record compiled in connection with the 2023 Bulletin is anything to go by, the Agency likely did not even consider that communication, which is entirely absent from the administrative record. *Cf. Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (Higginbotham, J.) (mem. op.) (the administrative record comprises "all documents and materials directly or indirectly considered by agency decision-makers").

respond to literally every comment submitted on a major rule, it does need to take account of comments "that 'can be thought to challenge a fundamental premise underlying the proposed agency decision' or include points that 'if true … would require a change in an agency's proposed rule.'" *Chamber of Com. of the United States v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019); *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023)).

45.     Here, multiple commenters specifically invoked this Court's prior ruling in support of the concern that "the proposed regulation and the requirements of [the] final rule overstep the plain language of the statute." 89 Fed. Reg. at 41,081. Rather than substantively engage with the problems identified by this Court, however, CMS glibly invoked "section 1903(w) of the Act," repeating its tired refrain that the proposed rule would not "require … anything beyond what is currently required under statute and regulation." 89 Fed. Reg. at 41,081. This, CMS insists, was confirmed by the nursing-home hypothetical cited in its 2008 rulemaking where "'a State payment is made available to a taxpayer or a party related to the taxpayer … in the reasonable expectation that the payment would result in the taxpayer being held harmless.'" 89 Fed. Reg. at 41,082 (quoting 73 Fed. Reg. at 9,694).

46.     CMS was entirely nonresponsive: It flatly ignored the fact—raised by a broad coalition of commenters—that this Court concluded, *inter alia*, that CMS's position "decouples the 'grammatical link' found in the statute, and conditions a state's Medicaid funding on private agreements over which states have no knowledge or control." ECF No. 31 at 23. CMS further failed to acknowledge that the preamble to the 2008 final rule amending 42 C.F.R. § 433.68(f)(3) was raised to this Court as well. ECF No. 1 ¶ 93; *see also, e.g.*, ECF No. 5-1 at 22-23 (Texas's

Motion for Preliminary Injunction). The Court declined to accept the argument, and for multiple good reasons, including that a rule's preamble cannot impose obligations that are inconsistent with the rule's text. *See, e.g.*, *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004).

47.     Commentors also explained how not even the 2008 preamble supports CMS's position. Instead, as a bipartisan coalition of States noted, that preamble stated CMS was "not aware of any state tax programs that would have been permissible under the Secretary's prior interpretation … but are no longer permissible under the new rules." Ex. D at 3. This is particularly telling because, as the commenting States also observed, CMS was *aware* of private redistribution agreements in States like Missouri, *id.* (citing Office of Inspector General, Report No. A-07-02-02057, *Review of Medicaid Disproportionate Share Funds Flow in the State of Missouri* (2003)), as well as California, Illinois, Indiana, Michigan, Ohio, and Pennsylvania, *id.* at 11 (noting CMS deemed such programs "compliant because '[t]he states did not directly guarantee to hold hospitals harmless").

48.     Again, CMS failed to engage. Again, for good reason. A full reading of the preamble demonstrates that it was focused on *governmental*—not private-party—guarantees, including guarantees by proxy. 73 Fed. Reg. at 9,694 (explaining that "[t]he clarification of the guarantee test is meant to specify that a State," not the taxpayer, "can provide a direct or indirect guarantee through a direct or indirect payment"). CMS offered nary a word in response to commenters that correctly highlighted the same. *See, e.g.*, Ex. D at 11 (Texas Essential Healthcare Partnerships), 55-56 (Florida Essential Healthcare Partnerships), 101 (Sutter Health), 120-24 (Baker Donelson), 140 (America's Essential Hospitals). Nor did CMS acknowledge or respond to other comments that referenced this Court's ruling, which highlighted post-2008 statements—like agency

testimony in 2012 explaining that pooling agreements do not violate the Act's hold harmless prohibition. *See, e.g.*, *id.* at 10 & n.9, 37-38.

49.     For each of these three reasons, the Final Rule is arbitrary and capricious. It should thus be set aside and enjoined.

*Supplemental Count V*

**The Final Rule Exceeds CMS's Statutory Authority by Depriving States of Effective Judicial Review of the Denial of State Directed Payment Programs (5 U.S.C. § 706)**.

50.     All allegations in the preceding paragraphs of this Supplemental Complaint are incorporated herein.

51.     Defendants have acted contrary to law in violation of 5 U.S.C. § 706 by promulgating a Final Rule that purports to strip federal courts of any practical ability to review the denial of SDPs.

52.     Congress identified which decisions were subject to DAB review. 42 U.S.C. § 1316(a)-(e). The denial of SDPs is not among them. Congress certainly did not empower CMS to both impose extra-statutory requirements on SDPs and then shield that decision from effective judicial review by forcing any sense of scrutiny to proceed first through the DAB.

53.     Courts recognize that only Congress can overcome the strong presumption in favor of judicial review. *See, e.g.*, *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) ("Congress rarely intends to prevent courts from enforcing its directives to federal agencies."). This presumption is rebutted only where "'a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct.'" *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Mach Mining*, 575 U.S. at 486), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *accord State v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021). "Establishing unreviewability

is a 'heavy burden,' and 'where substantial doubt about the congressional intent exists, the general presumption … is controlling.'" *Texas*, 809 F.3d at 164 (quoting *Mach Mining*, 575 U.S. at 486; *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)).

54.     By forcing States to appeal these limited-duration programs to the DAB, CMS has effectively deprived States of their ability to seek judicial review—both of the unlawful attestation mandate and the coordinate denials of SDPs that will follow, threatening billions of dollars in funding. Directed payment programs are complex, and Texas must have its directed-payment-program proposals, called "preprints," approved annually to process payments the following year. *See generally* 42 C.F.R. §§ 438.2, .6(c)(3). Those programs have included:

- The Comprehensive Hospital Increase Reimbursement Program (CHIRP), which began on September 1, 2021, (but was not approved by CMS until March 25, 2022) and replaced a prior directed payment program no longer in effect. CHIRP provides increased Medicaid payments to hospitals for inpatient and outpatient services to eligible recipients. CMS first renewed its year-long approval for CHIRP on August 1, 2022, and the last preprint was approved on July 31, 2023.

- The Texas Incentives for Physicians and Professional Services (TIPPS) program, which began on September 1, 2021 (but was not approved by CMS until March 25, 2022), provides increased Medicaid payments to certain physician groups providing healthcare services to eligible Medicaid recipients. CMS first renewed its year-long approval for TIPPS on August 1, 2022, and the last preprint was approved on July 31, 2023.

- The Rural Access to Primary and Preventive Services (RAPPS) program, which began on September 1, 2021 (but was not approved by CMS until March 25, 2022), is designed to incentivize rural health clinics that provide primary and preventive care services to eligible Medicaid recipients in rural areas of Texas. CMS first renewed its year-long approval for RAPPS on August 1, 2022, and the last preprint was approved on July 31, 2023.[4]

---

[4] Although Texas has additional SDPs, they do not relate to care provided in a hospital setting and are not funded through LPPFs, which provide the non-federal share for Texas's hospitals.

55.    States that typically are far from aligned have echoed the practical flaws in forcing DAB review of limited-duration programs. For example, Jacey Cooper, the Medicaid Director for California, pointed out that "the length of the appeal process could render moot, in many cases, the subsequent approval—especially for SDPs that involve performance-based payments." Ex. D at 156; *see also, e.g.*, *id.* at 6 (noting claims can go years without even a hearing).

56.    Other commenters also highlighted that even prevailing before the DAB would prove pyrrhic. Given that "Medicaid managed care is a prospective payment system," it remains unclear what relief the DAB could grant in situations not only where "the contract year ends and the appeal is not resolved," 89 Fed. Reg. at 41,116, but in cases involving "performance-based payments," Ex. D at 156. Both prospective and retroactive approval would do little (if anything) to address the immediate, devastating consequences that come with disapproval—particularly where the DAB cannot award compliance costs associated with CMS's unlawful attestation mandate. *See* ECF No. 31 at 19 (observing the same).

57.    To be sure, CMS has claimed that "[t]he administrative process finalized at § 430.3(e) is at the option of the appellant, and States may seek redress in the courts at any time." 89 Fed. Reg. at 41,115 (explaining "[i]t was never our intent to imply that use of an administrative appeals process was a barrier or deterrent for States electing to utilize the courts"). But CMS has argued *in this very case* that Texas could not bring its claims because "Congress intended to create an 'exclusive remedy' in the [DAB]," and this Court correctly rejected that position because it invited the intolerable possibility of "'foreclos[ing] all meaningful judicial review'" for States (Texas included) who reject the atextual notion that a private hold harmless agreement violates the *States'* federal obligations. ECF No. 31 at 20.

58.     There is little reason to believe that CMS will treat § 430.3(e) any differently in practice, particularly where States are disinclined to "bet the farm" by ignoring the unlawful attestation mandate—along with the hefty, otherwise-unredressable costs of compliance associated therewith—to test its validity before the DAB. ECF No. 31 at 21 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)). To the contrary, as Texas set out in its motion for preliminary injunction, ECF No. 10 at 13, CMS has proven that it is not above using its approval powers over these SDPs to force States to comply with its atextual reading of the hold harmless prohibition. That is precisely what CMS did in 2021 when it withheld approval of five SDPs (which used LPPF funds and threatened billions in critical funding) because Texas would not agree to CMS's terms. *See* ECF No. 10-2 ¶¶ 30-39. It was not until threatened with contempt that CMS ultimately relented and complied with its statutory obligations. *See id.*

59.     These actions are highly detrimental. Programs like these are crucial to Medicaid's operation in Texas, and Texas communities would face dire consequences if CMS were to fail to approve SDPs in a timely fashion. At present, CMS's unlawful venture risks more than $10 billion in funding that Texas is seeking in the coming months. Ex. E ¶¶ 16-17. The mere release of the 2024 Bulletin and the Final Rule has placed providers on edge—reasonably fearing that Texans "may again be deprived of federal funds that are pivotal to ensure the access and quality of Medicaid services." *Id.* ¶ 21. Texas therefore faces, once again, a choice between "enforcing [CMS's] erroneous policy" or compromising its "provider safety net." *Id.* This cannot stand.

60.     And CMS's conduct is likewise illegal. The Supreme Court has recognized that Congress intended an exception to administrative channeling requirements "where [those mandates] would not simply channel review through the agency, but would mean no review at all."

*See, e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000) (construing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)). Because Congress has neither required SDP denials to be reviewed by the DAB nor permitted CMS to effectively deny States a remedy in federal courts, the Final Rule exceeds CMS's statutory authority and should be set aside.

### *Supplemental Count VI*

### The Final Rule Violates the Major-Questions Doctrine (5 U.S.C. § 706)

61.     All allegations in the preceding paragraphs of this Supplemental Complaint are incorporated herein.

62.     Even if the Social Security Act could be read to allow CMS to define the jurisdiction of the federal courts, it violates the major-questions doctrine, which recognizes that there are instances where "there may be reason to hesitate before accepting a reading of a statute" that the Court acknowledges is "plausible" and thus "that would, under more ordinary circumstances, be upheld." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (cleaned up). In those cases, an administrative agency must "point to clear congressional authorization for the power it claims." *Id.* at 723 (cleaned up). Although the outer limits of this doctrine are far from clear, the hallmark of a so-called major question is that the issue has such an unusually high level of economic or political significance that courts must presume Congress would have reserved the question for itself. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Whether CMS can shield its decisions to deny multi-billion-dollar SDPs from federal-court review has both.

63.     *First*, whether the presumption of judicial review is overcome in the context of Medicaid is of enormous economic significance. "States have developed intricate statutory and administrative regimes over the course of many decades to implement their objectives under existing Medicaid," which is why "economic dragooning" to the sum of billions of dollars places

a fiscal "gun to the head" of States. *NFIB v. Sebelius*, 567 U.S. 519, 581-82 (2012). And the Final Rule makes clear that SDPs "represent a substantial amount of State and Federal spending," accounting for "$52.2 billion" in 2022 and "$78.1 billion in 2023." 89 Fed. Reg. at 41,257-58 (detailing year-over-year rise in SDPs, which "were a significant factor in Medicaid expenditure growth"). That dollar figure alone puts grid reliability in "major question" territory. *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (rule with approximate "$50 billion" cost was a major question because it had "vast 'economic and political significance'" (citation omitted)).

64. *Second*, decisions regarding how and to what extent Medicaid will be funded are also among the most contentious of our time.[5] The Supreme Court has recognized how deeply entrenched federal funding has become within state budgets, observing that "Medicaid spending accounts for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *NFIB*, 567 U.S. at 581. This funding has increasingly been used as a sword to force States to adopt politically sensitive healthcare policies. *See, e.g.*, *Biden v. Missouri*, 595 U.S. 87, 89 (2022) (per curiam) (suit involving CMS's omnibus rule mandate tying Medicaid funding to a nationwide vaccination mandate); *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 794 F. Supp. 2d 892, 913 (S.D. Ind. 2011) (suit involving "threatened

---

[5] There is even some indication in the public record that the Biden Administration may be using CMS's broad discretion to approve or disapprove billions in Medicaid funding to punish certain States for their outspoken, sometimes-litigious criticism of the Administration's actions. *See, e.g.*, Ex. E ¶ 17 & nn.7-9. If true, that is entirely inappropriate—eviscerating States' "status … as independent sovereigns," *Sebelius*, 567 U.S. at 577—and subject to a separate challenge. *See, e.g.*, *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023) (allowing *ultra vires* claim to proceed against the FDA). To date, this Court's injunction appears to have prevented CMS from denying SDPs based on such pretexts. But the State reserves the right to seek further relief if that changes.

partial or total withholding of federal Medicaid dollars to the State of Indiana," which risked "pit[ting] the federal government against the State of Indiana in a high-stakes political impasse"), *aff'd in part, rev'd in part*, 699 F.3d 962 (7th Cir. 2012). Whether CMS can simultaneously use its power to define programmatic rules to shield itself from judicial review presents a question of political significance that falls in the heartland of the major-questions doctrine.

65.    CMS's glib invocation of section 1902 of the Act does nothing to change the analysis. CMS repeatedly emphasized during notice and comment that its authority under section 1902(a)(4) and (w) confers the ability to regulate *anything* believed to implicate "the proper and efficient operation of … Medicaid State Plan[s]," like wholly private hold harmless arrangements. *See, e.g.*, 89 Fed. Reg. at 41,075-77. But this is *precisely* the type of reasoning that the major-questions doctrine was designed to avoid: CMS has "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia*, 597 U.S. at 724 (citations omitted). If the ability to define a federal court's jurisdiction falls within this power, the limit, it seems, is the extent of CMS's imagination. Because such a conception of "proper and efficient operation" represents a blank regulatory check of "vast 'economic and political significance,'" courts greet it with "skepticism." *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (rejecting a similarly "unheralded" claim of regulatory authority). And because nothing in section 1902 overcomes that skepticism, this Court should "hesitate before concluding that Congress" intended to confer the authority now claimed by CMS. *See West Virginia*, 597 U.S. at 725 (citation and internal quotations omitted).

66.    This Court should hold that Congress has not spoken with the exceptional clarity that would be necessary to grant CMS the unprecedented authority to govern private hold

harmless arrangements and, at the same time, deny States a federal judicial forum to review the results of that atextual venture. The Final Rule is thus unlawful and should be set aside.

## DEMAND FOR JUDGMENT

In addition to the relief sought in the original Complaint, Plaintiffs respectfully request that the Court issue the following relief regarding the Final Rule:

A. Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the Final Rule;

B. Compel Defendants to cease any Medicaid audit and oversight activities against Texas that are inconsistent with the Social Security Act and its implementing regulations, which do not govern private-party agreements;

C. Vacate the Final Rule on the grounds that it is either substantively unlawful or arbitrary and capricious under the APA;

D. Issue a declaratory judgment that the Final Rule is either substantively unlawful or arbitrary and capricious under the APA;

E. Award Texas the costs of this action and reasonable attorney's fees; and

F. Award such other and further relief as the Court deems equitable and just.

Dated: May 22, 2024.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
munera.al-fuhaid@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-059)
Austin, Texas 78711-2548
(512) 936-1700

Respectfully submitted.

AARON L. NIELSON
Solicitor General

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
*Lead Counsel*
Texas Bar No. 24115221
Lanora.Pettit@oag.texas.gov

JOSHUA C. FIVESON
Assistant Solicitor General
Texas Bar No. 24093438
Joshua.Fiveson@oag.texas.gov

*Counsel for Plaintiffs*