UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

STATE OF TEXAS; TEXAS HEALTH AND
HUMAN SERVICES COMMISSION,
     *Plaintiffs*,

v.

CHIQUITA BROOKS-LASURE, in her official
capacity as Administrator of the Centers for
Medicare and Medicaid Services; THE
CENTERS FOR MEDICARE AND MEDICAID
SERVICES; XAVIER BECERRA, in his official
capacity as Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES; and the UNITED
STATES OF AMERICA,
     *Defendants*.

No. 6:23-cv-00161-JDK

## TEXAS'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Introduction .......................................................................................................... 1

Statement of the Issues ......................................................................................... 2

Statement of Undisputed Material Facts ............................................................... 3

    I. Congress's Bar on Hold Harmless Agreements ...................................... 3

    II. Early Implementation of the Hold-Harmless Bar .................................... 4

    III. Texas's Implementation of the Hold-Harmless Ban .............................. 5

    IV. CMS's Prior Efforts to Redefine Congress's Statutory "Hold-Harmless" Ban......... 7

    V. Texas's Lawsuit and the Court's Preliminary Injunction......................... 9

    VI. CMS's Subsequent Rulemaking ........................................................ 10

Standard of Review ............................................................................................. 13

Jurisdiction ......................................................................................................... 13

Argument ............................................................................................................ 16

    I. CMS Has Again Exceeded Its Statutory Authority. ............................. 16

        A.    CMS's conception of hold-harmless arrangements is inconsistent with the Social Security Act. ......................................... 17

        B.    The Final Rule's attempt to strip jurisdiction from federal courts is equally inconsistent with the Social Security Act. ................ 21

        C.    CMS's effort to redefine what constitutes a "hold-harmless" provision violates the major-questions doctrine. .................................. 24

    II. CMS's Definition of What Constitutes a Hold-Harmless Provision Is Arbitrary and Capricious. ............................................................................. 27

        A.    Like the 2023 Bulletin, the Final Rule failed to acknowledge, let alone adequately explain, CMS's change in position regarding the definition of a "hold harmless agreement." ........................................ 27

        B.    CMS has still failed to adequately address States' good-faith reliance on its prior position. ......................................................... 29

        C.    The Final Rule was unlawfully promulgated without response to significant comments. ...................................................... 31

Conclusion and Request for Relief ..................................................................... 34

Certificate of Service.......................................................................................... 36

TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)...................................................................................... 25

*Amin v. Mayorkas,*
24 F.4th 383 (5th Cir. 2022).................................................................. 13, 16

*Amoco Prod. Co. v. Village of Gambell,*
480 U.S. 531 (1987) ........................................................................................ 2

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021)...................................................................................... 25

*Ark. Dep't of Health & Hum. Servs. v. Ahlborn,*
547 U.S. 268 (2006) ........................................................................................ 3

*Azar v. Allina Health Servs.,*
587 U.S.Ct. 566 (2019) ................................................................................ 29

*Biden v. Missouri,*
595 U.S. 87 (2022) ........................................................................................ 26

*Biden v. Nebraska,*
600 U.S. 482 (2023) ...................................................................................... 16

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984)...................................................................................... 21

*Bowen v. Massachusetts,*
487 U.S. 879 (1988)........................................................................................ 3

*Bowen v. Mich. Acad. of Family Physicians,*
476 U.S. 667 (1986) ...................................................................................... 24

*Calmes v. United States,*
926 F.Supp 582 (N.D. Tex. 1996) .................................................................. 2

*Carlson v. Postal Regul. Comm'n,*
938 F.3d 337 (D.C. Cir. 2019)...................................................................... 32

*Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau,*
691 F. Supp.3d 730 (E.D. Tex. 2023) .......................................................... 14

*Chamber of Com. of the U.S. v. SEC,*
85 F.4th 760 (5th Cir. 2023) ..................................................................32, 34

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ................................................................................ 29, 30

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)......................................................................................13

*Corley v. United States,*
556 U.S. 303 (2009)...................................................................................... 19

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
45 F.4th 846 (5th Cir. 2022).......................................................................... 27

*DHS v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) .................................................................................. 30

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ........................................................................ 27, 31

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
    565 U.S. 606 (2012) ........................................................................ 3

*Easom v. US Well Servs., Inc.*,
    37 F.4th 238 (5th Cir. 2022) ........................................................ 18

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................................... 29

*Entergy Servs., Inc. v. FERC*,
    375 F.3d 1204 (D.C. Cir. 2004) .................................................. 32

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) .................................................... 29

*Exxon Corp. v. Dep't of Energy*,
    91 F.R.D. 26 (N.D. Tex. 1981) ................................................... 30

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................. 28, 29

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...................................................................... 27

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................16, 24

*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ........................................................ 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ...................................................................... 23

*In re: Hawaii*,
    2005 WL 1540188 (Dep't Appeals Bd. June 24, 2005) ............19, 20, 28

*HHSC v. CMS*,
    No. A-17-51 (Dep't Appeals Bd. Aug. 7, 2018) ........................11

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ........................................................31

*James Madison Ltd. v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) .................................................... 16

*Kindred Hosps. E., LLC v. Sebelius*,
    694 F.3d 924 (8th Cir. 2012) ................................................28, 31

*King v. Burwell*,
    576 U.S. 473 (2015) ...................................................................... 16

*King v. Smith*,
    392 U.S. 309 (1968) ........................................................................ 1

*Kovac v. Wray*,
    660 F. Supp. 3d 555 (N.D. Tex. 2023) ...................................... 16

*Linkous v. United States*,
    142 F.3d 271 (5th Cir. 1998) ...................................................... 23

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................................... 13, 18, 27

*Mach Mining, LLC v. E.E.O.C.*,
  575 U.S. 480 (2015) ............................................................................. 21
*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ............................................................................. 27
*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ............................................................... 32
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................... 27, 31
*Nat'l Federation of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ............................................................ 1, 16, 24, 25
*Ohio v. Env't Prot. Agency*, 603 U.S. 279 (2024) ................................... 34
*Peabody Twentymile Mining, LLC v. Sec'y of Lab.*,
  931 F.3d 992 (10th Cir. 2019) ............................................................ 23
*Physicians for Soc. Resp. v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) ...................................................... 28, 29
*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*,
  794 F. Supp. 2d 892 (S.D. Ind. 2011) ................................................ 26
*Protestant Mem. Med. Ctr., Inc. v. Maram*,
  471 F.3d 724 (7th Cir. 2006) .................................................... 3, 4, 19
*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd.*,
  53 S.W.3d 310 (Tex. 2001) ................................................................. 14
*R.J. Reynolds*, 65 F.4th 182 (5th Cir. 2023) ................................... 29, 30
*Sec'y of State of Md. v. Joseph H. Munson Co.*,
  *Inc.*, 467 U.S. 947 (1984) ................................................................... 25
*Shalala v. Ill. Council on Long Term Care, Inc.*,
  529 U.S. 1 (2000) ................................................................................ 24
*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ......................................................... 16, 21
*Sw. Airlines Co. v. FERC*,
  926 F.3d 851 (D.C. Cir. 2019) ...................................................... 28, 29
*Tex. Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) ............................................................. 27
*Texas v. Brooks-LaSure*,
  680 F.Supp.3d 791 (N.D. Tex. 2023) ........................................... 18, 19
*Texas v. Brooks-LaSure*,
  2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ................................. 6, 8
*Texas v. Brooks-LaSure*,
  (E.D. Tex. Mar. 11, 2022) .............................................. 3, 4, 5, 18, 20
*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................. 21
*Thomas v. Reeves*,
  961 F.3d 800 (5th Cir. 2020) ............................................................. 19
*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) ............................................................. 27

*Util. Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ............................................................................ 26
W. *Coal Traffic League v. Surface Transp. Bd.,*
    998 F.3d 945 (D.C. Cir. 2021) ...........................................................31
*Wages &White Lion Invs. V. FDA,*
    90 F.4th 357 (5th Cir. 2024) ..................................... 28, 29, 30, 31
*West Virginia v. EPA,*
    597 U.S. 697 (2022)..........................................16, 19, 24, 26, 27

**Constitutional Provisions, Statutes, and Rules:**

42 C.F.R.:
    § 430.3 ................................................................................... 1, 11
    § 430.3(e) ............................................................. 2, 11, 22, 23
    § 431.10 ..................................................................................... 3
    § 433.68 ..................................................................................... 5
    § 433.68(b)(3) .................................................................... 10, 12
    § 433.68(f) .......................................................................... 12, 18
    § 433.68(f)(3) ............................................................. 7, 10, 32
    § 433.68(f)(3)(i) .................................................................... 17
    § 438.2 .................................................................................... 21
    § 438.6(c)(2)(i) ....................................................................... 11
    § 438.6(c)(2)(ii) ................................................................. 2, 10
    § 438.6(c)(2)(ii)(G) ......................................................... 2, 10, 11
    § 438.6(c)(2)(ii)(G)-(H) .......................................................... 2
    § 438.6(c)(2)(ii)(H) ................................................................. 2
    § 438.6(c)(3) ..................................................................... 11, 21

5 U.S.C.:
    § 706(2)(A) ............................................................................. 16
    § 706(2)(C) ............................................................................. 16

28 U.S.C.
    § 1292(a)(1) ........................................................................... 32

42 U.S.C.:
    § 1396b(w) ........................................................................... 4, 6
    § 1396b(w)(1)(A)(iii) ............................................................... 4
    § 1902 .................................................................................... 26
    § 1902(a)(4) ........................................................................... 26
    § 1902(w) ............................................................................... 26
    § 1903(w) ............................................................................... 32
    § 1903(w)(1)(A)(iii) ............................................................... 12
    § 1903(w)(4) ..................................................................... 12, 17
    § 1316(a)-(e) .................................................................... 11, 21

§ 1396(w)(4)(C)(i) ........................................................................... 2, 22, 34
§ 1396b(d) ..................................................................................................... 3
§ 1396b(w)(1)(A) ......................................................................................... 4
§ 1396b(w)(1)(A)(iii) ................................................................................... 1
§ 1396b(w)(4) ..................................................................................... 17, 19
§ 1396b(w)(4)(C) ........................................................................ 4, 18, 31
§ 1396b(w)(4)(C)(i) ..........................................................1, 9, 13, 17, 19, 20
§ 1396b(w)(4)(C)(ii) ............................................................................ 17, 18
§ 1903(w)(4)(C)(i) ....................................................................................13
57 Fed. Reg. 55,118 (Nov. 24, 1992) ...................................................... 4, 5
58 Fed. Reg. 43,156 (Aug. 13, 1993) ........................................................... 4
88 Fed. Reg. 28,092 (May 3, 2023) ............................................................ 10
89 Fed. Reg. 41,002 (May 10, 2024) ............................... 10, 11, 12, 14, 22, 23, 25, 26, 28, 29, 32
Tex. Health & Safety Code:
§ 300.0001 .................................................................................................. 6
§ 300.0103(b)(1) ......................................................................................... 6
§ 300.0151 ............................................................................................ 6, 30
§ 300.0151(b) ......................................................................................... 1, 6

**Other Authorities:**

Act of May 24, 2013, 83d Leg., R.S., 2013 Tex. Gen. Laws 3630 ................ 6
Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
140 (2012) ................................................................................................ 18
Black's Law Dictionary (10th ed. 2014) ....................................................17
Health Care-Related Taxes, 73 Fed. Reg. 9,685 (Feb. 22, 2008) ............. 5, 33
*In re: Hawaii Dept. of Human Servs.*, Docket No. A-01-40 (lead), Decision No.
1981, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005),
https://tinyurl.com/HawaiiDAB) ............................................................. 5
Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105 (Jan. 19, 2021)............................ 8
Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP)
Managed Care Access, Finance, and Quality, 89 Fed. Reg. 41,002 (May 10,
2024)........................................................................................................ 1
Medicaid Program; Medicaid Fiscal Accountability Regulation (MFAR), (84 Fed.
Reg. 63,722 (Nov. 18, 2019)(proposed rule)(recounting this history) ...................... 4
Pub. L. No. 102-234, § 2, 105 Stat. 1793 (1991) ........................................ 4
Pub. L. No. 109-432, § 403, 120 Stat. 2922 (2006)................................... 18
Report No. A-07-02-02057, Review of Medicaid Disproportionate Share Funds
Flow in the State of Missouri (2003) .................................................... 33
Sidney Greenbaum, *The Oxford English Grammar* § 3.14-15 (1996) ................. 18, 19
Tex. Health & Human Servs. Comm'n, *Texas Medicaid and CHIP Reference Guide*,
(14th ed. 2022). ........................................................................................ 3

## Introduction

Since 1965, Medicaid has been the preeminent example of the growth of "cooperative federalism," under which programs are "financed largely by the federal government," but "administered by the States." *King v. Smith*, 392 U.S. 309, 316 (1968). "[T]he States have developed intricate statutory and administrative regimes over the [ensuing] decades to implement their objectives" within the carefully delineated standards set by Congress. *Nat'l Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) ("*NFIB*"). Relevant here, the carefully delineated standards set forth by Congress prohibit a State from artificially inflating the amount of federal reimbursement by guaranteeing that healthcare providers will be held harmless for certain taxes those providers pay to help fund the State's share of Medicaid expenditures. 42 U.S.C. § 1396b(w)(1)(A)(iii), (4)(C)(i). Consistent with its federal-law obligations, Texas bars such arrangements. *See, e.g.,* Tex. Health & Safety Code § 300.0151(b). During this litigation, CMS has never identified an instance in which Texas (or a local governmental entity in Texas) has violated that ban.

Seeking a problem to solve, CMS has sought repeatedly to "rewrite clear statutory terms to suit its own sense of how the [Social Security Act] should operate"—namely, to prohibit purely private contracts that allegedly share Medicaid reimbursements among private providers. *See* ECF 31 at 24. As this Court has already explained, however, the statute "requires that the *state*, not a private party, provide the 'payment' that 'guarantees' to hold taxpayers harmless." *Id.* at 25.

Notwithstanding this Court's unequivocal statement that the February 2023 Bulletin (the "2023 Bulletin") exceeded CMS's statutory authority, the agency has doubled down and promulgated a nearly identical Final Rule that codifies its preferred conception of Medicaid financing.[1] The Final Rule also seeks to insulate CMS's decision from any further judicial review

---

[1] The Final Rule addresses multiple topics and spans nearly 300 in the Federal Register. *See* Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality, 89 Fed. Reg. 41,002 (May 10, 2024) (codified at 42 C.F.R. parts

by channeling disputes into an administrative process that is unworkable under timelines set by Congress. Nearly simultaneous with the adoption of the Final Rule, CMS issued another bulletin (the "2024 Bulletin") which continues to reiterate anticipated punitive actions by CMS based upon the same legal theories as the 2023 Bulletin and the Final Rule.

For largely the same reasons this Court already explained in its preliminary injunction order, CMS's conduct is arbitrary, capricious, and in direct defiance of Congress's chosen statutory scheme. The Court should apply those principles to grant Texas summary judgment, vacate 42 CFR §§ 438.6(c)(2)(ii)(G), 438.6(c)(2)(ii)(H), and 430.3(e) as adopted in the Final Rule, and declare CMS's interpretations as set forth in the 2023 Bulletin and the 2024 Bulletin as unlawful and exceeding their statutory authority. Further, the Court should convert its preliminary injunction, which prevents Defendants from implementing, enforcing or relying on the interpretation of 42 U.S.C. § 1396(w)(4)(C)(i) found in the February 2023 Bulletin—now extended to the 2024 Bulletin, and the challenged portions of the Final Rule—into a permanent injunction. *Cf. Calmes v. United States*, 926 F.Supp 582, 591 (N.D. Tex. 1996) (noting that apart from requiring actual success on the merits rather than a likelihood of success, the standards are "essentially the same") (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12 (1987)).

## STATEMENT OF THE ISSUES

1.    Whether the Final Rule, the 2023 Bulletin, and the 2024 Bulletin exceed CMS's authority under the Social Security Act.

2.    Whether the Final Rule, the 2023 Bulletin, and the 2024 Bulletin are arbitrary and capricious.

---

430, 438, and 457). The only provisions of the Final Rule at issue in this case are 42 CFR §§ 438.6(c)(2)(ii)(G)-(H), and 430.3(e).

Statement of Undisputed Material Facts

## I.    Congress's Bar on Hold Harmless Agreements

1.    "The Medicaid program, which provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs, was launched in 1965." *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). At the federal level, the Medicaid program is administered by the "Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services." *Id.* Although "States are not required to participate in Medicaid . . . all of them do." *Id.* The Texas Health and Human Services Commission ("HHSC") is the state agency designated under 42 C.F.R. § 431.10 to administer Texas's Medicaid program. ECF 1 ¶ 8. At present, roughly 4.9 million Texans depend on Medicaid. Tex. Health & Human Servs. Comm'n, *Texas Medicaid and CHIP Reference Guide*, at 4 (14th ed. 2022).

2.    "[T]he Medicaid program is jointly financed by the federal and state governments." *Texas v. Brooks-LaSure*, No. 6:21-CV-00191, 2022 WL 741065, at *2 (E.D. Tex. Mar. 11, 2022) (providing additional background, which Texas incorporates herein). To qualify for federal funds, "States must submit" to CMS "a state Medicaid plan that details the nature and scope of the State's Medicaid program." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012). If CMS approves the plan, the federal government pays part of the cost according to a formula set forth in the Social Security Act. *Brooks-Lasure*, 2022 WL 741065, at *2.[2]

3.    "In the late 1980s and early 1990s, [certain S]tates began to take advantage of a 'loophole' in the Medicaid program that allowed [S]tates to gain extra federal matching funds without spending more state money." *Protestant Mem. Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 726 (7th Cir. 2006). The State would "make payments to hospitals and collect the federal matching funds;" the

---

[2] Although commonly "referred to as a 'reimbursement,'" federal matching funds are paid in "a series of huge quarterly advance payments that are based on the State's estimate of its anticipated future expenditures." *Bowen v. Massachusetts*, 487 U.S. 879, 883-84 & n.2 (1988) (citing 42 U.S.C. § 1396b(d)). The technical name is "federal financial participation" or "FFP." *See, e.g.*, Ex. A at ¶ 19.

State "would then recoup a portion of the state funding from the hospital, often in the form of a 'tax.'" *Id.*; *see also* Medicaid Program; Medicaid Fiscal Accountability Regulation (MFAR), (84 Fed. Reg. 63,722, 63,730 (Nov. 18, 2019)proposed rule) (recounting this history).

4.  In 1991, Congress responded by enacting the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments, Pub. L. No. 102-234, § 2, 105 Stat. 1793 (1991) (codified at 42 U.S.C. § 1396b(w)), which limits the amount of federal matching funds when the State obtains revenues from prohibited sources. *See* 42 U.S.C. § 1396b(w)(1)(A). Relevant here, the amendments require the amount of the State's claim for such federal matching funds be "reduced by the sum of any revenues received by the State" through a "broad-based health care related tax" if "a hold-harmless provision" is in effect. *Id.* § 1396b(w)(1)(A)(iii).

5.  Congress, in turn, articulated three definitions of a "hold harmless" provision. *Id.* § 1396b(w). As this Court has noted, only the third is relevant here. ECF 31 at 5. Specifically, an impermissible hold-harmless agreement exists when "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C).

## II.    Early Implementation of the Hold-Harmless Bar

6.  CMS first promulgated implementing regulations in 1993,[3] "set[ting] out the three ways of finding a 'hold harmless provision' for a state tax program." *Brooks-LaSure*, 2022 WL 741065, at *5 (setting out this history). In the process, CMS "added detail on the third hold-harmless definition" by adopting a two-part test that Congress later incorporated into the statute itself. *Id.* at *5-6. Under that test, "[i]f the tax on the providers' revenue was at or below 6% (selected as the national average sales tax), the tax would be assumed permissible," but if "the tax was above 6%," a hold harmless situation would be deemed "to exist when Medicaid rates are used to repay (within

---

[3] *See* Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 58 Fed. Reg. 43,156 (Aug. 13, 1993); Medicaid Program; Limitations on Provider-Related Donations and Health Care-Related Taxes; Limitations on Payments to Disproportionate Share Hospitals, 57 Fed. Reg. 55,118 (Nov. 24, 1992).

a 12-month period) at least 75 percent of providers for at least 75 percent of their total tax cost." *Id.* at *5 (citing 57 Fed. Reg. at 55,142-43).

7.    In 2008, HHS's Departmental Appeals Board *rejected* CMS's effort to expand this definition and thereby retroactively disallow years of federal funding to five States. There, CMS had determined that state programs had held providers harmless by providing grants to affiliated nursing homes or tax credits to patients. *See id.* at *6-7 (citing *In re: Hawaii Dept. of Human Servs.*, Docket No. A-01-40 (lead), Decision No. 1981, 2005 WL 1540188 (Dep't Appeals Bd., Appellate Div. June 24, 2005), https://tinyurl.com/HawaiiDAB). But the Board disagreed, explaining that the programs at issue did *not* meet the definition of a hold-harmless agreement because neither the grant nor the credit programs included a "legally enforceable" promise in "these States' laws." *Id.* at *7. The Board further rejected CMS's argument that the definition of hold harmless contained a "broad catch-all provision," as CMS argued. *Id.* at *6.

8.    Thwarted by its own internal adjudicative system, CMS's enforcement arm proposed amendments to 42 C.F.R. § 433.68 to "clarify" that (among other things) a hold harmless arrangement extends to "the situation where a government provides for a certain financial measure '*such that*' the measure guarantees" the taxpayer will be held harmless. *Id.* at *8 (emphasis added) (citing Medicaid Program; Health Care-Related Taxes, 73 Fed. Reg. 9,685 (Feb. 22, 2008)). In so doing, CMS "deliberate[ly]" "remove[d] the statute's tight grammatical link between *the government*, as the actor providing for something, and *a guarantee*, as the thing provided for." *Id.* at *8. As a result of the agency's "loosen[ing]" of the required link between the state taxing authority and the guarantee itself, CMS has contended that the third definition "focus[es] on the 'reasonable expectation' [of the taxpayer] about the 'result' of a state payment, as opposed to merely what *the [S]tate provided* when making a payment." *Id.*

## III.   Texas's Implementation of the Hold-Harmless Ban

9.    Over the next eleven years, CMS assured States that Congress's bar on hold-harmless requirements did not require them to police around CMS's existing rules and interpretations. In

early 2019, for example, consistent with the plain language of the statute, the Director of CMS's Financial Management Group, told counsel for concerned providers that although CMS is "aware that there may be arrangements" between providers that CMS may "not particularly like," "[CMS does] not have statutory authority to address" those arrangements. Ex. B at 1010. States built their compliance regimes accordingly.

10. Two interrelated developments in Texas are particularly relevant. *First*, in 2011, Texas began transitioning from a fee-for-service to a managed-care delivery model. *Texas v. Brooks-LaSure*, No. 6:21-cv-00191, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021). *Second*, in 2013, the Texas Legislature explicitly authorized certain hospital districts, counties, and municipalities to "collect[] mandatory payments from each of th[e] hospitals [in their jurisdiction]to be used to provide the nonfederal share of a Medicaid supplemental payment program." Tex. Health & Safety Code § 300.0001; *see* Act of May 24, 2013, 83d Leg., R.S., ch. 1369, 2013 Tex. Gen. Laws 3630. *See also* Tex. Health & Safety Code Chs. 288-300A. Consistent with the terms set by Congress, a local governmental entity must assess the mandatory payment on the net patient revenue of each institutional healthcare provider located in its jurisdiction. *See, e.g.*, Tex. Health & Safety Code § 300.0151. The local governmental entity must deposit the funds in a designated account known as a local provider participation fund ("LPPF"), which may be used for limited purposes, including intergovernmental transfers from the local government to the State to provide the non-federal share of Medicaid payments. *See, e.g., id.* § 300.0103(b)(1). The mandatory payments assessed by the local unit of government must be broad-based and uniform, as required under federal law. *See, e.g., id.* § 300.0151(b). And Texas law specifically prohibits these programs from holding harmless any institutional healthcare provider, in accordance with 42 U.S.C. § 1396b(w). *Id.*

11. "CMS has coordinated with Texas to operate Medicaid programs that have relied (in part) on [these] taxes for nearly a decade," and Texas has "been transparent in the operation of all local tax structures" and provided CMS "with all the information available to HHSC." Ex. B at 1010. From the state level, HHSC ensures that no local governmental entity administering a LPPF

provides for any payment, offset, or waiver that directly or indirectly guarantees to hold the taxpaying providers harmless for any portion of their tax costs. Ex. A at ¶ 18. But HHSC does *not* have taxing or regulatory authority over the governmental entities that manage those funds, nor does HHSC have authority under state or federal law to examine or consider any contractual arrangements that might exist between private businesses whose taxes contribute to those funds. Ex. A at ¶ 18. Indeed, HHSC "has been unable to identify an instance in which a state has provided an attestation addressing agreements or arrangements between private entities." Ex. B at 1011.

## IV.    CMS's Prior Efforts to Redefine Congress's Statutory "Hold-Harmless" Ban

12.  Notwithstanding its earlier failure to take precisely the same action, CMS again proposed to extend the definition of hold-harmless agreements to cover purely private contracts in 2019. Claiming to have "become aware of impermissible arrangements that exist where a [S]tate or other unit of government imposes a health-care related tax, then uses the tax revenue to fund the non-federal share of Medicaid payments back to the taxpayers," 84 Fed. Reg. at 63,734, CMS insisted that such arrangements are illegal, even if "a private entity makes the redistribution" to another private entity. *Id.* at 63,735. CMS reasoned that a purely private arrangement still "constitutes an indirect payment from the [S]tate or unit of government to the entity being taxed that holds it harmless for the cost of the tax" so long as "[t]he taxpayers have a reasonable expectation to be held harmless for all or a portion of their tax amount." *Id.* at 63,734. As a result, CMS proposed to amend 42 C.F.R. § 433.68(f)(3) to specify that it would deem a financial relationship to be an impermissible hold-harmless agreement if the "net effect" of that arrangement led taxpayers to have a "reasonable expectation" that they will recoup some or all of their tax payments through Medicaid reimbursements. *Id.* at 63,735.

13.  In response to the proposed rule amendment, CMS received more than 10,000 mostly critical comments. Many of the comments faulted CMS for "lack[ing] statutory authority for its proposals" and "creating regulatory provisions that were ambiguous or unclear and subject to

excessive Agency discretion." Medicaid Program; Medicaid Fiscal Accountability Regulation, 86 Fed. Reg. 5,105, 5,105 (Jan. 19, 2021).

14. Although CMS ultimately "determined it appropriate to withdraw the proposed provisions" in 2019, *id.*, its efforts to compel HHSC to police private arrangements were far from over. As Judge Barker noted in 2021, CMS tried to impose its view of what constitutes a hold-harmless agreement as a condition to extending Texas's section 1115 waiver program and in negotiating approval of Texas' state directed payments ("SDPs") without any statutory or regulatory authority. *Brooks-LaSure*, 2021 WL 5154219, at *4, *9. Faced with the possibility of contempt, CMS again withdrew its assertions and, approved Texas' SDPs in 2022. *See* ECF 10-2 ¶¶ 30-31, 34-37 (recounting this history in connection with Texas's request for a preliminary injunction).

15. On February 17, 2023, CMS tried to assert its will again—this time without notice and comment—when it issued a bulletin purporting to deem any agreement between private providers to redistribute Medicaid payments "a hold harmless arrangement involving Medicaid payment redistribution" when there is a "reasonable expectation" that the taxpaying provider will receive a portion of their provider-tax costs returned as a result of the private agreement. Ex. C at 3-4. CMS described how, in its view, "taxpayers appear to have entered into oral or written agreements" to redirect or redistribute their Medicaid payments "to ensure that all taxpayers receive all or a portion of their tax back." *Id.* at 3. Notwithstanding the acknowledged absence of state participation in such agreements, CMS concluded they were impermissible as "taxpaying providers are held harmless for all or a portion" of their taxes. *Id.*

16. Without pointing to any statutory authority, the bulletin declared that CMS "intends to inquire about potential redistribution arrangements and may conduct detailed financial management reviews of healthcare-related tax programs that appear to include redistribution arrangements or that CMS has information that may include redistribution arrangements." Ex. C at 5. States were informed that they must "make available *all requested documentation* regarding arrangements involving possible hold harmless arrangements and the redistribution of Medicaid

payments" as part of CMS's "oversight activities and review of state payment proposals." *Id.* (emphasis added). Failure to supply such documents, CMS warned States, "may result in a deferral or disallowance of federal financial participation." *Id.*

## V.    Texas's Lawsuit and the Court's Preliminary Injunction

17. The State of Texas and HHSC (collectively, Texas) brought this lawsuit and sought a preliminary injunction. Texas' complaint asserts the bulletin (1) is inconsistent with the plain language of the Social Security Act and CMS's own regulations, (2) was not issued with an opportunity for notice and comment, and (3) is arbitrary and capricious because it contradicts CMS's prior position—that private arrangements do not fall within the ambit of a prohibited hold harmless provision—without even attempting to explain why that position was incorrect.[4] ECF 1 ¶ 6. Texas' request for interim relief demonstrated the substantial monetary costs imposed by the bulletin, ECF 10 at 29-30, which threatened to uproot the social safety net that Texans enrolled in the Medicaid program rely on to provide them life-saving care. *Id.* at 33; *see* ECF 22 at 16-17.

18. The Court agreed with Texas and issued a preliminary injunction. ECF 31. After assuring itself of jurisdiction, *id.* at 10-21, the Court concluded that Texas is likely to demonstrate that CMS exceeded its authority, *id.* at 2, when (among other things) it "condition[ed] a [S]tate's Medicaid funding on private agreements over which states have no knowledge or control." *Id.* at 23. Finding that equities also favored Texas, *id.* at 25-29, the Court enjoined the Defendants from "implementing or enforcing" the bulletin or "otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein," *id.* at 29. The Defendants did not appeal the Court's order.

---

[4] Alternatively, Texas asserted the 2008 rule, 73 Fed. Reg. 9,685, is contrary to CMS's statutory authority. ECF 1 ¶¶ 92-96. Given the Court's prior ruling, Texas does not request summary judgment on this alternative claim at the present time.

## VI.  CMS's Subsequent Rulemaking

19.  In May 2023—after Texas sought but before the Court granted a preliminary injunction—CMS proposed a new rule to address "States' monitoring and enforcement efforts." Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality, 88 Fed. Reg. 28,092, 28,092 (May 3, 2023). Containing substantively identical reasoning to the February 2023 bulletin, the proposed rule, in relevant part, required States "to ensure that each participating provider in [a state directed payment arrangement] [to] attest[] that it does not participate in any hold harmless arrangement with respect to any health care-related tax." *Id.* at 28, 132.[5] Again, CMS included purely private arrangements within its definition of hold-harmless agreements. *Id.* at 28,130. As with CMS's earlier effort to impose the same definition, hundreds of commenters—including Texas—expressed concern with the far-reaching consequences of this unlawful rulemaking. *See generally, e.g.*, Ex. D.

20. Undeterred either by the concerns of commenters or the ruling and skepticism of this Court, CMS adopted its final rule in April 2024. Medicaid Program; Medicaid and Children's Health Insurance Program (CHIP) Managed Care Access, Finance, and Quality, 89 Fed. Reg. 41,002 (May 10, 2024); Ex. E. In relevant part, the Final Rule revised 42 C.F.R. § 438.6(c)(2)(ii) by adding "a new paragraph" that "require[s] states to ensure that providers receiving an SDP attest that they do not participate in any hold harmless arrangement for any health care-related tax as specified in 42 CFR 433.68(f)(3)." Ex. E at 2-3. Such hold harmless arrangements are defined to include purely private agreements. *Id.* at 2. The Final Rule also added a second paragraph that explicitly requires "an SDP comply with all Federal legal requirements for the financing of the non-Federal share, including, but not limited to, 42 CFR part 433, subpart B, as part of the CMS SDP preprint review process." Ex. E at 2; *accord* 89 Fed. Reg. at 41,269 (codified at 42 C.F.R. § 438.6(c)(2)(ii)(G)).

---

[5] The applicability of the Final Rule is admittedly somewhat narrower than the 2023 Bulletin. Specifically, though the bulletin affects the financing of any Medicaid program that uses health care related taxes, the Final Rule is limited to SDPs. Ex. A at ¶ 5.

21. CMS alluded to this Court's ruling, stating that its new rule would "strengthen [its] ability to disapprove an SDP where it appears the SDP arrangement is supported by impermissible non-Federal share financing arrangements." 89 Fed. Reg. at 41,077. But CMS did not substantively address any of the legal faults previously identified by the Court, *id.* at 41,082, and it has become questionable whether CMS intends to continue abiding by this Court's injunction. *See infra* ¶¶ 25-26 (detailing forthcoming implementation).

22. The new language in 42 C.F.R. § 438.6(c)(2)(ii)(G) became effective on July 9, 2024, and contemplates immediate compliance. Specifically, it incorporates CMS's unlawful conception of hold harmless arrangements into the requirements for approval of this year's SDPs under the heading of "Federal legal requirements for the financing of the non-Federal share." 89 Fed. Reg. at 41,269, 41,272.

23. At the same time, on its face, the Final Rule funnels disputes regarding SDPs into the Departmental Appeals Board (DAB). Specifically, the Final Rule adds a new paragraph under 42 C.F.R. § 430.3, which explains that "[d]isputes ... pertain[ing] to disapproval of written approval by CMS of State directed payments under 42 CFR 438.6(c)(2)(i) are also heard by the Board." 89 Fed. Reg. at 41,267 (to be codified at 42 C.F.R. § 430.3(e)). Yet the only extent to which Congress has provided for DAB review is found in 42 U.S.C. § 1316(a)-(e), which does not pertain to the denial of state-directed payments.

24. This new rule disregards concerns from a bi-partisan chorus of commenters that, by forcing SDPs to go through the DAB, CMS insulates its decisions regarding financing of the non-federal share of Medicaid payments from review by the federal courts. The vast majority of SDPs require annual approval. *See generally* 42 C.F.R. §438.6(c)(3). Though "DAB's regulations state a goal of resolving cases within 6 to 9 months," the practical reality is such that these targets "have not been achieved in many years." Ex. D at 6. This has been Texas's experience as well. *See, e.g.*, Ex. A at ¶¶ 14-15; *see also, e.g.*, *HHSC v. CMS*, No. A-17-51 (Dep't Appeals Bd. Aug. 7, 2018) (concluding one year, five months, and fourteen days after appeal), *reconsideration denied* No. A-19-1 (Dep't Appeals Bd., Appellate Div. Oct. 2, 2019) (denying reconsideration two years, seven

months, and eight days after initial appeal). Instead, as the DAB's jurisdiction has grown, "it is not uncommon for an appeal from a Medicaid disallowance to [remain] pending for two, three or even four years after it has been fully briefed, even without a hearing." Ex. D at 6 (noting that "in the last several years, there was only one Medicaid disallowance decision issued in 2022, two in 2021, and one in 2020; many more cases remain pending"). Nothing in the rule gives Texas reason to believe that review of SDP-based denials would operate any differently.

25. In a bulletin issued contemporaneous with the rule, CMS asserted that it would "not enforce" sections 1903(w)(1)(A)(iii), (w)(4), or 42 C.F.R 433.68(b)(3) and (f) "with respect to health care-related tax programs with hold harmless arrangements involving provider payment redistributions that exist as of" April 22, 2024. Ex. E at 1. This bulletin incorporated the 2023 Bulletin's definition of these arrangements, apparently leaving it in effect for at least some applications. The 2024 Bulletin purports to defer enforcement of these provisions "until January 1, 2028" and "abide by" this Court's injunction "as long as it remains in effect," *compare* Ex. E at 1, *with* 89 Fed. Reg. at 41,082. Nevertheless, the 2024 Bulletin makes clear that CMS intends to apply that enforcement retroactively, including (it appears) to LPPF payments that have occurred during the time that the preliminary injunction remains in place. Whether that enforcement would be pursuant to the 2023 Bulletin, the 2024 Bulletin, or the Final Rule itself is unclear.

26. This is inconsistent with other parts of the 2024 Bulletin itself, which reflects the expectation that States and private parties begin complying with the Final Rule immediately (if they have not already done so with regard to the 2023 Bulletin). The 2024 Bulletin stated, "CMS intends to begin routinely asking questions about possible hold harmless arrangements in conjunction with reviews of health care-related tax waiver requests and state payment proposals funded, at least in part, by health care-related taxes." Ex. E at 3. The 2024 Bulletin also notes that "CMS will . . . continue to review new health care-related taxes and any new provider payment redistribution arrangements about which [they] may learn about during the period of non-enforcement," meaning CMS plans to "disapprov[e] . . . state Medicaid payment proposals and/or disallow[] . . . Federal Financial Participation" believed to run afoul of its enjoined, atextual

interpretation of 42 U.S.C. §§ 1396b(w)(4)(C)(i), 1903(w)(4)(C)(i). *Id.* CMS therefore "expect[s] states with existing hold harmless arrangements to undertake changes necessary" well "before" the claimed enforcement date in 2028. *Id.* As further detailed in the attached Grady Declaration (Ex. A at ¶¶ 13, 16), CMS's actions in the intervening months further underscore that immediate compliance is expected.[6]

STANDARD OF REVIEW

In assessing whether the Final Rule as well as the 2023 and 2024 Bulletins, "independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). In exercising that judgment, this Court is to "effectuate the will of Congress" as expressed through the words it chose to enact. *Id.* at 2263. Similarly, "whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022),

JURISDICTION

In its answer, CMS asserts that the Court lacks subject-matter jurisdiction. ECF 66 at 13. This Court has already comprehensively rejected those arguments in granting Texas's preliminary injunction. ECF 31 at 10-20. Because it is unclear which jurisdictional arguments CMS will continue to raise, rather than burden the Court with duplicative and potentially unnecessary briefing, Texas reserves the right to address jurisdiction in response to CMS's forthcoming motion. Nonetheless, mindful of its obligation to provide "specific facts" evidencing at least its standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013), Texas refers this Court to its arguments in favor of jurisdiction at the preliminary-injunction phase, ECF 22 at 2-6, submits that the same injuries that entitled it to a preliminary injunction persist, Ex. A at ¶¶ 15-23, and

---

[6] The 2024 Bulletin also continues to threaten the ability of non-profit organizations to solicit and accept donations lest they be forced to reveal their donors if and when CMS begins to enforce the Final Rule. Ex. A at ¶ 18.

13

maintains that these injuries support summary judgment. *Compare with, e.g.*, *Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, 691 F. Supp.3d 730, 738 (E.D. Tex. 2023).

In short, the Final Rule and 2024 Bulletin—as well as the 2023 Bulletin that the 2024 Bulletin seems to leave in effect at least in part—will have an immediate impact on not just HHSC's ability to provide vital healthcare services to Texans but also on Texas's sovereign interest in enforcing its laws. Relying on the text of both the Social Security Act and CMS's regulations, the Texas Legislature has never deemed it necessary to create a regulatory body with authority to examine contractual agreements that might exist between two private businesses. ECF 56-5 at ¶ 19. Nor has the Legislature ever seen fit to provide HHSC with such authority. *Id.* As a result, to comply with the 2023 Bulletin, the 2024 Bulletin and Final Rule—including aspects that are effective as of July 9, 2024, but are unenforceable against Texas only due to this Court's preliminary injunction—HHSC will have to arrogate power to itself that it lacks under state law. *E.g.*, *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001).

Beyond that injury to its sovereignty, Texas faces significant monetary costs to comply with the Final Rule: "[T]o make available all . . . documentation" that could be requested under the rule, Ex. C at 5, HHSC would be required to establish and operate a regulatory entity with sufficient resources to examine the contractual arrangements and financial management of every private hospital that exists in a jurisdiction with an LPPF. *Cf.* 89 Fed. Reg. at 41,237-39 (estimating implementation costs). Although CMS purported to delay any enforcement action on this intrusive requirement, it states in no uncertain terms that "[d]uring the period before January 1, 2028, we expect [S]tates with existing hold harmless arrangements to undertake changes necessary" so that a State can answer questions about such arrangements immediately, and "so that by no later than January 1, 2028, the state is compliant with all non-Federal share financing requirements." Ex. E at 3; *accord* Ex. C at 5 (explaining in the enjoined 2023 Bulletin that States must "curtail these practices if they exist").

As before, HHSC estimates that compliance will require it to expend tens of millions of dollars and hire many new staff. There are 304 privately-owned hospitals located in jurisdictions that

currently have an LPPF, approximately 27% of which are not-for-profit organizations. ECF 10-2 ¶ 47. Texas hospitals are extremely complex organizations, which have innumerable private contracts with various types of entities that Texas would be required to examine to determine whether each contract constituted hold harmless arrangements under the Final Rule's vague standards, which continues those promulgated in the 2023 Bulletin and made further complicated by the 2024 Bulletin. *Id.* ¶ 45.

Because current law requires only that HHSC monitor agreements involving local government entities, HHSC currently employs roughly a dozen compliance staff aimed at "annually, reporting and monitoring procedures to ensure that local governments providing non-federal share funds for Medicaid comply with all legal requirements authorized by Congress." ECF 56-5 ¶19 (noting the $3 million price tag). HHSC would need to hire hundreds of additional staff including auditors, financial examiners, financial analysts, and attorneys who could competently interpret the thousands (potentially millions) of contracts or other business arrangements at each hospital and the billions of dollars of revenues and expenditures that are associated with operating those hospitals. ECF 10-2 ¶47.

The last several years have been challenging for Texas Medicaid: the pandemic, combined with CMS's conduct that precipitated both Texas's earlier lawsuit and that here, have put providers and patients on edge. ECF 56-5 ¶ 21. CMS's latest salvo threatens to undermine the work that HHSC—not to mention local governments and this Court—has done to restore confidence in the Texas Medicaid Program and will destabilize the safety net upon which millions of Texans rely for life-saving care. LPPFs fund nearly a fifth of Texas's state share of Medicaid expenditures. Ex. A at ¶ 8. Neither Texas hospitals nor the Texans they serve can afford the uncertainty in funding that has resulted, and will imminently continue to result, from CMS's unlawful conduct. *See, e.g.*, Ex. 10-2 ¶¶ 14-21. Such harm establishes standing.[7]

---

[7] The harm also establishes that Texas is entitled to a permanent version of the Court's preliminary injunction, as the standard for granting a permanent injunction is "essentially the

## Argument

The APA empowers courts to "hold unlawful and set aside" certain "agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Moreover, a rule that was adopted without following the procedural requirements of the APA cannot stand. *State v. Biden*, 10 F.4th 538, 549 (5th Cir. 2021) (per curiam). Texas is entitled to summary judgment on both grounds. *E.g.*, *Amin*, 24 F.4th at 391; *see also, e.g.*, *Kovac v. Wray*, 660 F. Supp. 3d 555, 563 (N.D. Tex. 2023) (citing *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996)).

### I.    CMS Has Again Exceeded Its Statutory Authority.

To start, CMS has exceeded its statutory authority in the Final Rule as well as the 2023 and 2024 Bulletins by redefining the Social Security Act's definition of a hold harmless provision and expanding Congress's enumeration of actions that are properly subject to DAB review. This would justify summary judgment without the major-question doctrine which requires "clear congressional authorization" for an agency to assume regulatory authority over issues, *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), of substantial "economic and political significance." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Taking the doctrine into account makes the statutory violation even more clear. The Supreme Court has recognized on multiple occasions that Medicaid and Medicaid funding is both politically fraught, *see, e.g.*, *King v. Burwell*, 576 U.S. 473 (2015), and of fundamental economic significance to States, *e.g.*, *NFIB*, 567 U.S. at 581. Under those circumstances, the Court should reject the Administrator's "assertion of administrative authority [that] 'conveniently enables [her] to enact a program' that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 482, 503 (2023) (quoting *West Virginia*, 597 U.S. at 731).

---

same" as the standard for granting a preliminary injunction. *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022).

### A. CMS's conception of hold-harmless arrangements is inconsistent with the Social Security Act.

Unlike many regulatory schemes, this is not an instance in which Congress has enacted vague terms and left CMS to fill in the details. Section 1903(w)(4) of the Act expressly provides that "there is in effect a hold harmless provision with respect to a broad-based health care related tax imposed with respect to a class of items or services if the Secretary determines" that one of three carefully delineated circumstances applies. 42 U.S.C. § 1396b(w)(4). Only one is relevant here:

> (C)(i) The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax;

42 U.S.C. § 1396b(w)(4)(C)(i).[8] Congress even defined what it meant by "indirect" for "purposes of clause (i)": It expressly ratified and adopted "paragraph (3)(i) of section 433.68(f) of title 42, Code of Federal Regulations, as in effect on November 1, 2006." *Id.* § 1396b(w)(4)(C)(ii).

**1.** Nothing in the plain language of this statute reaches an arrangement between private parties—let alone bars such an arrangement as a hold harmless provision. Instead, the defining feature of a hold harmless provision is a guarantee by *the government* to the taxpayer. After all, without involvement by the State in those agreements, the payment of Medicaid reimbursements alone cannot constitute a "guarantee[] to hold taxpayers harmless." *See* 42 U.S.C. § 1396b(w)(4)(C)(i). A guarantee denotes an obligation by the guarantor. *See Guarantee*, Black's Law Dictionary (10th ed. 2014). But as a non-party to any agreement that may or may not exist, Texas assumes no obligation regarding any reimbursements by private providers. Framed another way, the "unit of government ... provid[ing] ... payment" cannot assume an obligation that something outside of its control will happen. Private parties may fail to honor redistribution agreements without the State's control, involvement, or even knowledge. This means that even

---

[8] There is an "exception" to this provision which adjusts the percentages discussed in the cited provision of the Code of Federal Regulations based on the year. 42 U.S.C. § 1396b(w)(4)(C)(ii). That exception is not relevant here.

when private redistribution arrangements exist, the State's payment provides no guarantee that the taxpayer will be held harmless.

Nor can CMS find refuge in the Social Security Act's reference to an "indirect[]" guarantee. To the contrary, Congress specifically provided that "the existence of an *indirect* guarantee shall be made under paragraph (3)(i) of section 433.68(f) of Title 42, Code of Federal Regulations, as in effect on November 1, 2006." 42 U.S.C. § 1396b(w)(4)(C)(ii) (emphasis added).[9] This fixed statutory definition is no more subject to notice-and-comment reimagination by CMS in 2024 than it was by sub-regulatory guidance in 2023. *Texas v. Brooks-LaSure*, 680 F.Supp.3d 791, 808-11 (N.D. Tex. 2023); *see also Loper Bright*, 144 S.Ct. at 2263.

**2.**  That conclusion is further buttressed by the provision's statutory and historical context—particularly of 42 U.S.C. § 1396b(w)(4)(C)—the only subsection at issue. Starting with statutory context, Congress is presumed to understand the ordinary rules of English grammar and usage. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012). And that provision expressly makes the "State or other unit of government" the subject of the sentence—that is, the person or thing doing the action. *See* Sidney Greenbaum, *The Oxford English Grammar* § 3.14-15 (1996). Under the Social Security Act, Congress chose to consider only the activity of the "State or other unit of government" when prohibiting guarantees as hold harmless arrangements. The choice to omit private parties from the statute's ambit is therefore presumed intentional. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir. 2022) (discussing the *expressio unius* canon of construction).

---

[9] As this Court explained, "[i]n the Tax Relief and Health Care Act of 2006, Congress endorsed the 6% threshold test . . ., adopting by reference the test in paragraph (3)(i) of 42 C.F.R. § 433.68(f)." *Brooks-LaSure*, 2022 WL 741065, at *6 (citing Pub. L. No. 109-432, § 403, 120 Stat. 2922 (2006)). Under that test, "[i]f the tax on the providers' revenue was at or below 6% (selected as the national average sales tax), the tax would be assumed permissible." *Id.* at *5. "Congress did not . . . otherwise modify the relevant statutory text." *Id.* at *6.

Again, the word "indirectly" does not change this analysis. As an adverb, it describes the verb "provides." Greenbaum, *supra*, at § 4.26. It does not change *who* is doing the providing: "[t]he State or other unit of government." *See* 42 U.S.C. § 1396b(w)(4)(C)(i). Even HHS's own adjudicative system recognized this basic semantic reality, observing nearly two decades ago that it would be "unreasonable" to for CMS to regulate the downstream "'use of any State payment'" without an "explicit guarantee" *by the State. In re: Hawaii*, 2005 WL 1540188, at *23; *see also Brooks-LaSure*, 680 F.Supp.3d at 808-11. To read the Act as contemplating third-party conduct, without state involvement, is to ignore "that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (describing this as "[o]ne of the most basic interpretive canons") (citation omitted); *see also, e.g.*, *West Virginia*, 597 U.S. at 721 ("[T]he words of a statute must be read in their context . . . in the overall statutory scheme." (citation omitted)).

The statutory history of section 1396b(w)(4) underscores that it was aimed at obligations assumed by Texas or one of its political subdivisions—not obligations assumed by private parties that Texas cannot control and of which the State may be entirely unaware. *See Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (en banc) (per curiam) (Willett, J., concurring) (explaining that while legislative history is disfavored as an interpretive aid, statutory history may give important context). The "'loophole' in the Medicaid program" that Congress was trying to address, *Maram*, 471 F.3d at 726, was not private parties insuring against losses incurred from the Medicaid program or governmental taxes, including indemnifying themselves in a way that CMS does "not particularly like." Ex. B at 1010.

**3.** For decades, CMS adopted this straightforward interpretation of the statutory text and history. *Supra* pp. 4-5. Indeed, even in its 2008 rulemaking, CMS demonstrated that it was aware of the distinction between obligations assumed by Texas and those assumed by private parties. Specifically, in explaining what would constitute a hold harmless arrangement under the newly amended regulation, CMS invoked the example of a state law providing grants to a nursing-home residents who incur increased rates because of bed taxes on nursing homes. 73 Fed. Reg. 9,694.

This comment makes clear that CMS was seeking to address not private agreements between independent third parties, but a circumstance where one of two related parties receives a grant from the State but is compelled to pass that grant funding to a related party that pays the tax funding the grant, creating a state guarantee-by-proxy. *Id.*

Tellingly, when CMS departed from that understanding, HHS's own adjudicative board correctly *rejected* the argument, explaining that any reading that allows the agency "to examine the use of a payment without regard to the two-prong test where there is no explicit guarantee is unreasonable." *In re: Hawaii*, 2005 WL 1540188, at *23. Congress has not made any relevant change to those three definitions of a disqualifying hold harmless provision in the intervening decades. *Brooks-LaSure*, 2022 WL 741065, at *4. The board's analysis is thus as sound today as it was when the decision issued.

4.    CMS nevertheless attempts to justify this "unreasonable" position, *id.* at *6, in its Final Rule by pointing to subsection 1396b(w)(4)(C)(i), *id.* at *4. But that subsection creates two clear conditions: (1) the State or other unit of government imposing the tax must provide for the payment, offset, or waiver; and (2) that payment, offset, or waiver must guarantee to hold taxpayers harmless. *See* 42 U.S.C. § 1396b(w)(4)(C)(i). The private-provider agreements that CMS believes may exist satisfy neither. The statute requires an act by "[t]he State or other unit of government imposing the tax," *see id.*, and private agreements are not an act of the government. To the extent CMS implies that reimbursing private providers for qualified Medicaid expenditures constitutes an unlawful hold harmless provision, it is wrong for many of the same reasons this Court has already explained in issuing its preliminary injunction. ECF 31.

At bottom, the "guarantee" test in subsection (C) is not "a broad catch-all provision," *In re: Hawaii*, 2005 WL 1540188, at *3, and a private agreement that the State is neither aware of nor responsible for cannot constitute a "direct or indirect" provision *by the State*. For this reason, as well as the others described by this Court in its thorough preliminary injunction opinion, the Final Rule, the 2024 Bulletin, and (to the extent the 2024 Bulletin leaves it in place) 2023 Bulletin exceed the plain text of the Social Security Act and should be set aside.

**B.    The Final Rule's attempt to strip jurisdiction from federal courts is equally inconsistent with the Social Security Act.**

CMS also exceeded its authority by undertaking to strip federal courts of jurisdiction over SDPs. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015). This strong presumption in favor of judicial review can be rebutted only where "'a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct,'" *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Mach Mining*, 575 U.S. at 486), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *accord State v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) (per curiam). The Supreme Court has described this as "a 'heavy burden,'" and "'where substantial doubt about the congressional intent exists, the general presumption . . . is controlling.'" *Texas*, 809 F.3d at 164 (quoting *Mach Mining*, 575 U.S. at 486; *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)).

Here, Congress opted *not* to place SDP approval—which are of limited duration—within the scope of DAB review. 42 U.S.C. § 1316(a)-(e) (enumerating actions subject to review). By attempting to funnel such review *through* the DAB, by its terms, the Final Rule eviscerates States' ability to seek judicial review of both the unlawful attestation mandate and the illegitimate SDP denials that will follow. Directed payment programs are complex, and Texas must have its directed-payment-program proposals, called "preprints," approved annually to process payments the following year. *See generally* 42 C.F.R. §§ 438.2, 438.6(c)(3). Those programs have included:

- The Comprehensive Hospital Increase Reimbursement Program ("CHIRP"), which provides increased Medicaid payments to hospitals for inpatient and outpatient services to eligible recipients.
- The Texas Incentives for Physicians and Professional Services ("TIPPS") program, which provides increased Medicaid payments to certain physician groups providing healthcare services to eligible Medicaid recipients.

- The Rural Access to Primary and Preventive Services ("RAPPS") program, which is designed to incentivize rural health clinics that provide primary and preventive care services to eligible Medicaid recipients in rural areas of Texas.[10]

Each was scheduled to begin on September 1, 2021 but, due to the bad-faith behavior of CMS, was not approved until March 25, 2022. ECF 10-2 at ¶ 39. Each was renewed on August 1, 2022, and July 31, 2023. ECF 56, Pl. Supp. Compl., at 13. During preprint negotiations in 2021, 2022, and 2023, CMS used its interpretation of 42 U.S.C. § 1396(w)(4)(C)(i) to delay (and, on occasion, attempt to entirely deny) approval of Texas' preprints. Ex. A at ¶¶ 8-10. During the 2024 preprint, CMS admittedly did not perseverate over the issue of how the non-federal share of the SDPs are financed or use the interpretation of 42 U.S.C. § 1396(w)(4)(C)(i) found in the February 2023 Bulletin—but only because of this Court's preliminary injunction.

It is no accident that a bipartisan chorus of States, who are typically far from aligned, have echoed a common refrain that forcing DAB review of these limited-duration programs would prove pyrrhic at best. For example, California's Medicaid Director pointed out that "the length of the appeal process could render moot, in many cases, the subsequent approval—especially for SDPs that involve performance-based payments." Ex. D at 156; *see also, e.g.*, *id.* at 6 (noting claims can go years without even a hearing). Given that "Medicaid managed care is a prospective payment system," other commenters similarly observed, it remains unclear what relief the DAB could grant in situations where "the contract year ends and the appeal is not resolved," 89 Fed. Reg. 41,116, or in cases involving "performance-based payments," Ex. D at 156. Neither prospective nor retroactive approval would address the immediate, devastating consequences of disapproval—particularly where the DAB cannot award costs associated with CMS's unlawful attestation mandate. *See* ECF No. 31 at 19 (observing the same).

To be sure, CMS has claimed in the *preamble* of the rule that "[t]he administrative process finalized at § 430.3(e) is at the option of the appellant, and States may seek redress in the courts at any time." 89 Fed. Reg. 41,115 (explaining "[i]t was never our intent to imply that use of an

---

[10] Although Texas has additional SDPs, they are not funded by LPPFs.

administrative appeals process was a barrier or deterrent for States electing to utilize the courts"). But language in the preamble to a rule "is not binding and cannot be read to conflict with the language of the regulation itself." *E.g.*, *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) (collecting cases). And because estoppel typically does not run against the federal government, *e.g.*, *Linkous v. United States*, 142 F.3d 271, 277 (5th Cir. 1998), nothing prevents CMS from reversing course whenever it wants as it has already done with regard to its hold-harmless rules. *Infra* Part II.A.

There is little reason to believe that CMS will treat § 430.3(e) any differently in practice. To the contrary, CMS has argued *in this very case* that Texas could not bring its claims because "Congress intended to create an 'exclusive remedy' in the [DAB]," and this Court correctly rejected that position because it invited the intolerable possibility of "'foreclos[ing] all meaningful judicial review'" for States (Texas included) who reject the atextual notion that a private hold harmless agreement violates the *States'* federal obligations. ECF No. 31 at 20. Moreover, as Texas set out in its motion for preliminary injunction, ECF No. 10 at 13, CMS has proven in the 2021 litigation that it is perfectly willing to use its approval power over SDPs to force compliance with its atextual reading of the hold harmless prohibition. *See* ECF No. 10-2 ¶¶ 30-39. It was not until threatened with contempt that CMS ultimately relented and complied with its statutory obligations. *See id.* As a result, States have little choice but to read the language of § 430.3(e) to mean what it says: If they want to test the validity of the unlawful attestation mandate, they must "bet the farm" by ignoring the unlawful attestation mandate—possibly for years. ECF No. 31 at 21 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)).[11]

---

[11] It is no response to say such claims are premature. The payments at issue are crucial to Medicaid's operation in Texas for the reasons Texas explained with regard to the preliminary injunction. ECF 10 at 26. If CMS were to change its mind about whether section 430.3(e) creates an exhaustion requirement, it would place $10 billion in vital funding at immediate risk. Ex. 56-5 ¶¶ 16-17. Because hospitals must plan years in advance, they must already make contingency plans should Texans "again be deprived of federal funds that are pivotal to ensure the access and quality of Medicaid services." *Id.* ¶ 21.

CMS's conduct is unlawful. The Supreme Court has recognized that Congress intended an exception to administrative channeling requirements "where [those mandates] would not simply channel review through the agency, but would mean no review at all." *See, e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000) (construing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)). Because Congress has neither required SDP denials to be reviewed by the DAB nor permitted CMS to deny States a remedy in federal courts, the Final Rule exceeds CMS's statutory authority and should be set aside.

### C. CMS's effort to redefine what constitutes a "hold-harmless" provision violates the major-questions doctrine.

The illegality of CMS's efforts to define not just the terms of Medicaid but also the jurisdiction of the federal courts becomes even clearer under the major-questions doctrine. That doctrine recognizes that there are instances where "there may be reason to hesitate before accepting a reading of a statute" that the Court acknowledges is "plausible" and thus "would, under more ordinary circumstances, be upheld." *West Virginia*, 597 U.S. at 723-24 (cleaned up). In those cases, an administrative agency must "point to clear congressional authorization for the power it claims." *Id.* at 723 (cleaned up). Although the outer limits of this doctrine are far from clear, it generally applies where the political salience and economic significance of the question suggest that it is one that Congress would reserve for itself. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Whether CMS can first re-define access to billions in Medicaid funding and then shield that decision from federal-court review is precisely such a question.

*First*, there is little room to dispute that the legality of the CMS's ongoing efforts to redefine what constitutes a hold-harmless provision is of enormous economic significance. The Supreme Court has recognized how deeply entrenched federal funding has become within state budgets, observing that "Medicaid spending accounts for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *NFIB*, 567 U.S. at 581. Although the challenged definition does not implicate *all* of Texas's Medicaid funding as did the law at issue in *NFIB*, even the Final Rule makes clear that SDPs "represent a substantial amount

of State and Federal spending," accounting for "$52.2 billion" in 2022 and "$78.1 billion in 2023." 89 Fed. Reg. 41,257-58. That dollar figure alone puts what constitutes a hold-harmless provision in "major question" territory. *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (deeming "$50 billion" sufficient).

*Second*, CMS's definition of what constitutes a hold-harmless provision raises a major policy question for Congress because of its potential constitutional implications. Specifically, as HHSC explained with respect to the preliminary injunction, ECF No. 10-2 at ¶ 43, the rule announced in the 2023 Bulletin and now carried forward into the Final Rule and the 2024 Bulletin, would require HHSC to investigate private associations or individuals who may have financial or other contractual relationships with any Medicaid provider. HHSC would have to review private donations made to non-profit hospitals, or non-profit organizations affiliated with a hospital, to proactively disprove that such donations are not intended to create a hold harmless provision. Ex. A at ¶ 18. That has First Amendment implications regarding the free-association rights of individuals and nonprofit organizations—including nonprofit hospital associations. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 605-07 (2021). After all, it is difficult to see how HHSC could fully implement the challenged definition without demanding that nonprofit organizations disclose the identities of their donors. The Supreme Court has recognized that such a demand can, under certain circumstances, *id.* at 610-19, "create[] an unnecessary risk of chilling" that could deter free association in violation of the First Amendment. *Sec'y of State of Md. v. Joseph H. Munson Co.*, Inc., 467 U.S. 947, 968 (1984).

*Third*, decisions regarding how and to what extent Medicaid will be funded are also among the most contentious of our time. Indeed, in a first-of-its kind decision, the Supreme Court has explicitly held that Medicaid represents so large a percentage of the State's budget that threatening that funding represents "economic dragooning" equivalent to a fiscal "gun to the head," capable of coercing a sovereign State to obey congressional edicts. *NFIB*, 567 U.S. at 581-82; *accord id.* at 632 (Ginsberg, J., dissenting in relevant part) ("Prior to today's decision, . . . the Court has never ruled that the terms of any grant crossed the indistinct line between temptation and coercion.").

25

This funding has increasingly been used as a sword to force States to adopt politically sensitive healthcare policies. *See, e.g.*, *Biden v. Missouri*, 595 U.S. 87, 89 (2022) (per curiam) (suit involving CMS's omnibus rule mandate tying Medicaid funding to a nationwide vaccination mandate); *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 794 F. Supp. 2d 892, 913 (S.D. Ind. 2011) (suit involving "threatened partial or total withholding of federal Medicaid dollars to the State of Indiana," which risked "pit[ting] the federal government against the State of Indiana in a high-stakes political impasse"), *aff'd in part, rev'd in part*, 699 F.3d 962 (7th Cir. 2012). Whether CMS can use its power to define programmatic rules and shield itself from judicial review presents a question of political significance in the heartland of major-questions territory.

CMS's glib invocation of section 1902 of the Act does nothing to change the analysis. CMS repeatedly emphasized during notice and comment that its authority under section 1902(a)(4) and (w) confers the ability to regulate anything believed to implicate "the proper and efficient operation of . . . Medicaid State Plan[s]," like wholly private hold harmless arrangements. *See, e.g.*, 89 Fed. Reg. 41,075-77. But this is precisely the type of reasoning that the major-questions doctrine was designed to avoid: Based on a reading of broad language, which is (at best) "plausible," CMS has "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'" *West Virginia*, 597 U.S. at 723-24 (citation omitted). Put another way, if the ability to define a federal court's jurisdiction falls within this power to ensure the "proper and efficient operation" of Medicaid, the only limit is the extent of CMS's imagination. Because such a theory would turn vague language into a blank regulatory check of "vast 'economic and political significance,'" courts greet it with "skepticism." *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014). And because nothing in section 1902 overcomes that skepticism, this Court should "hesitate before concluding that Congress" intended to confer

the authority now claimed by CMS. *See West Virginia*, 597 U.S. at 725 (cleaned up).[12] The Court need go no further to hold that the Final Rule failed to cure the legal flaws identified in its preliminary injunction.

## II.    CMS's Definition of What Constitutes a Hold-Harmless Provision Is Arbitrary and Capricious.

CMS has also failed to satisfy the APA's "require[ment] that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action fails that standard—and thus is deemed as arbitrary and capricious—"'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review has never been "toothless," and after *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), "it has serious bite." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022) (quotation omitted). The Final Rule fails to satisfy this standard for three independently fatal reasons.

### A.    Like the 2023 Bulletin, the Final Rule failed to acknowledge, let alone adequately explain, CMS's change in position regarding the definition of a "hold harmless agreement."

To start, it is a "foundational precept of administrative law" that a reasoned justification "is

---

[12] That is particularly so given that Congress itself has expressly considered the question of when indirect guarantees by the State constitute an impermissible hold harmless agreement. *Compare supra* p. 4, *with Nebraska*, 144 S.Ct. at 2358; *West Virginia*, 142 S.Ct. at 2596.

especially important where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020); *see also, e.g.*, *Wages & White Lion Invs. V. FDA*, 90 F.4th 357, 371 (5th Cir. 2024). Although an agency need not show that a new policy is *better* than a "prior policy," it must provide a "detailed justification" for why it is making the change. *Wages & White Lion*, 90 F.4th at 381 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (plurality op.)). Regardless of how "the agency justifies its new position, . . . it may not . . . 'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)).

At the preliminary injunction stage of this case, both Texas, ECF 10, and the Court, ECF 31 at 13-18, brought out to CMS' attention that its position in this litigation is irreconcilable with (among other things): (1) the views of its own internal adjudicatory system that its interpretation is unreasonable, *In re: Hawaii*, 2005 WL 1540188, at *23; (2) the testimony of its own Office of the Inspector General's prior testimony that private pooling agreements do not violate the Act's prohibition on hold harmless arrangements, Opening Brief for Appellant at 55, *Kindred Hosps. E., LLC v. Sebelius*, 694 F.3d 924 (8th Cir. 2012) (No. 11-3555), 2012 WL 248356, at *55; and (3) the similar assurance from the then-Director of Medicaid Financial Management Group "that CMS did not have the legal authority to reduce [federal financial participation] for actions exclusively among private parties," Ex. B at 1010 (quoting correspondence between CMS official and private parties); *see also, e.g.*, ECF No. 10-2 ¶ 25. To the extent more notice was required, commenters raised the same issues as part of the agency process. Ex. D at 7-50.

Nevertheless, like the 2023 Bulletin before it, the Final Rule reverses "prior policy" without providing a "detailed justification" for doing so, *Wages &d White Lion*, 90 F.4th at 381 (quoting *Fox Television*, 556 U.S. at 515); *see also* ECF No. 1 ¶¶ 87-88. Indeed, CMS offered little more than bald insistence that it made explicit what was already required by "Federal legal requirements for the financing of [a State's] non-Federal share." 89 Fed. Reg. 41,077; *accord, e.g.*, 89 Fed. Reg. 41,075 (claiming the Final Rule resolves "ambiguity"). And guided by its desire to "target[] the Texas Medicaid program as its test case to create a precedent for its expanded interpretation of a

hold harmless arrangement," Ex. B at 1009, CMS expressly disclaimed that the Final Rule requires "anything beyond what is currently required." 89 Fed. Reg. at 41,081. In so doing, CMS completely ignored this Court's holding to the contrary. ECF No. 31 at 13-17, 22-29.

This intransigence is fatal. Although an agency "'need not always provide a *more detailed justification* than what would suffice for a new policy,'" it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox Television*, 556 U.S. at 515) (emphasis added). This is not to say "that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for *disregarding* facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 515-16 (emphasis added). Nor is it any response that prior guidance was written in broad terms. Even "flexible, qualified, and hazy" guidance carries with it a need to, at an absolute minimum, "acknowledge" and "explain" the departure. *Wages & White Lion*, 90 F.4th at 382. Yet nothing in the Final Rule comes close. Far from shouldering its legal obligation, CMS instead chose to "'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines*, 926 F.3d at 856). This warrants nothing short of vacatur. *Encino Motorcars*, 579 U.S. at 222; *accord Wages & White Lion*, 90 F.4th at 384.

### B. CMS has still failed to adequately address States' good-faith reliance on its prior position.

Perhaps unsurprisingly, having refused to acknowledge that it was changing position, CMS also fails to adequately address States' reliance on its *prior* position. "[A]gencies must give notice of conduct the agency 'prohibits or requires' and cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012)). Indeed, courts "refuse[] to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *accord Azar v. Allina Health Servs.*, 587 U.S.Ct. 566, 571 (2019) (acknowledging the "surprise switcheroo"

doctrine); *R.J. Reynolds*, 65 F.4th at 189 n.6 (same). Thus, although an agency can change its position, it cannot penalize a party's "good faith reliance" on the agency's prior position, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. at 156-57, "even when an agency lawfully changes its position, it cannot fault a party for relying in good faith on the prior one," *Wages & White Lion*, 90 F.4th at 384—even if that policy were entirely illegal, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

For over a decade, *supra* pp. 6-7, Texas has "operate[d] Medicaid programs that have relied (in part) on local health care-related taxes." Ex. B at 1010. Because these programs are crucial to Medicaid's operation in Texas, tinkering with their functions risks "dire consequences" to Texas communities, *supra* pp. 10, 22. As HHSC explained in greater detail in its preliminary injunction briefing, ECF 10, HHSC now estimates that compliance will require it to expend tens of millions of dollars and hire many new staff. ECF 22 at 15. Not only are there 304 privately-owned hospitals located in jurisdictions that currently operate an LPPF, but taxes deposited into LPPFs fund nearly a fifth of Texas's state share of Medicaid expenditures. Ex. A at ¶8.

During that period, "Texas has repeatedly shared its progress regarding implementation of a comprehensive monitoring mechanism to review whether all local sources of non-federal share funds meet federal requirements." Ex. B at 1011. But Texas has never been under an obligation to monitor private business arrangements, and this is one of many reasons why the Texas Legislature never bestowed HHSC with authority "to seek the information the Bulletin obligates it to collect." ECF 31 at 26; *accord* Ex. A at ¶¶ 18-19; *see also, e.g.*, Tex. Health & Safety Code § 300.0151. That belief was directly fostered by statements from CMS such as those discussed above that "CMS did not have the legal authority to reduce [federal financial participation] for actions exclusively among private parties." Ex. B at 1010.

The Final Rule and 2023 Bulletin give no consideration to these reliance interests. Indeed, the administrative record—which supposedly comprises "all documents and materials directly or indirectly considered by agency decision-makers," *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (Higginbotham, J.) (mem. op.)—entirely omits vital correspondence fostering

such reliance that had already featured prominently in the preliminary-injunction in this very case, ECF 31 at 13, as well as the earlier 2021 litigation, Ex. A at ¶ 9.

Such disregard is unacceptable under the APA. This obligation is one of substance over form, *see, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (observing agency invocation of "'unique' threats" did not substantively address the notice-and-comment concerns with "'global supply-chain risks'"), especially where CMS "was 'not writing on a blank slate,'" *e.g.*, *Regents*, 591 U.S. at 33. CMS was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* CMS did not do so.

Nor can there be any serious claim that Texas's understanding of CMS's longstanding position was somehow "[il]legitimate." *Regents*, 591 U.S. at 30; *accord Wages & White Lion*, 90 F.4th at 386. Congress has never dictated what private parties can do with their own money after the State reimburses them for care provided to Medicaid recipients, 42 U.S.C. § 1396b(w)(4)(C), and if anything, reassured States that it was not concerned with these types of private agreements by defining what constitutes an "indirect" payment extremely narrowly. *See supra* pp. 4, 19. CMS's public positions, too, "confirmed that CMS did not have the legal authority to reduce [federal financial participation] for actions exclusively among private parties." Ex. B at CMS 1010; *see also, e.g.*, Opening Brief of Appellant, *Kindred*, *supra*, at *55. Having actively encouraged States like Texas to develop their Medicaid financing program around existing agency policy, CMS cannot now pull a "surprise switcheroo" and "ignore[e] the reasonable reliance interests engendered by its previous statements." *Wages & White Lion*, 90 F.4th at 386.

C.  **The Final Rule was unlawfully promulgated without response to significant comments.**

The Final Rule is thus "arbitrary and capricious [because] it 'entirely failed to consider an important aspect of the problem'" by "fail[ing] to respond to significant comments." W. *Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 954 (D.C. Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. 29 at 43 ). Although the agency need not respond to literally every comment

submitted on a major rule, it does need to take account of comments "that 'can be thought to challenge a fundamental premise underlying the proposed agency decision' or include points that 'if true . . . would require a change in an agency's proposed rule.'" *Chamber of Com. of the U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023)). The Final Rule flunks this test, too for at least two separate reasons.

*First*, multiple commenters specifically invoked this Court's prior ruling in support of the concern that "the proposed regulation and the requirements of [the] final rule overstep the plain language of the statute." 89 Fed. Reg. 41,081. Rather than substantively engage with the problems identified by this Court, however, CMS glibly invoked "section 1903(w) of the Act," repeating its tired refrain that the proposed rule would not "require . . . anything beyond what is currently required under statute and regulation." 89 Fed. Reg. 41,081. This, CMS insists, was confirmed by the nursing-home hypothetical cited in its 2008 rulemaking where "'a State payment is made available to a taxpayer or a party related to the taxpayer . . . in the reasonable expectation that the payment would result in the taxpayer being held harmless.'" 89 Fed. Reg. 41,081 (quoting 73 Fed. Reg. 9,694). But that is no response.

CMS flatly ignored the fact—raised by a broad coalition of commenters—that this Court concluded, *inter alia*, CMS's position "decouples the 'grammatical link' found in the statute, and conditions a state's Medicaid funding on private agreements over which states have no knowledge or control." ECF No. 31 at 23. CMS further failed to acknowledge that the preamble to the 2008 final rule amending 42 C.F.R. § 433.68(f)(3) was raised to this Court as well. ECF No. 1 ¶ 93; *see also, e.g.*, ECF No. 5-1 at 22-23 (Texas's Motion for Preliminary Injunction). The Court declined to accept the argument, and for multiple good reasons, including that a rule's preamble cannot impose obligations that are inconsistent with the rule's text. *See, e.g.*, *Entergy Servs., Inc. v. FERC*, 375 F.3d 1204, 1209 (D.C. Cir. 2004). The Defendants were, of course, entitled to appeal that decision. 28 U.S.C. § 1292(a)(1). But having chosen not to do so, CMS was not entitled to ignore

that the decision existed—particularly when its reasoning was brought to the attention of the agency by various stakeholders.

*Second*, Commenters also explained how not even the 2008 preamble supports CMS's position. Instead, as a bipartisan coalition of States noted, that preamble stated CMS was "not aware of any state tax programs that would have been permissible under the Secretary's prior interpretation . . . but are no longer permissible under the new rules." Ex. D at 3.[13] This is particularly telling because, as the commenting States also observed, CMS was aware of private redistribution agreements in States like Missouri, *id.* (citing Office of Inspector General, Report No. A-07-02-02057, Review of Medicaid Disproportionate Share Funds Flow in the State of Missouri (2003)). And, as the Commenters explained, CMS deemed such programs "compliant because '[t]he [S]tates did not directly guarantee to hold hospitals harmless." *Id.* at 11. These comments are amply supported by the preamble itself, which demonstrates that CMS was focused on governmental—not private-party—guarantees, including guarantees by proxy. 73 Fed. Reg. at 9,694 (explaining that "[t]he clarification of the guarantee test is meant to specify that a State," not the taxpayer, "can provide a direct or indirect guarantee through a direct or indirect payment").

CMS did not acknowledge or respond to these or other comments that referenced this Court's ruling, which highlighted post-2008 statements—like agency testimony in 2012 explaining that pooling agreements do not violate the Act's hold harmless prohibition. *See, e.g.*, Ex. D at 10 & n.9, 37-38. Because such comments (at minimum) "can be thought to challenge a fundamental premise underlying the proposed agency decision"—namely, that the Final Rule is a continuation of existing policy under the 2008 Rule—failure to offer a "reasoned response" to these comments

---

[13] Other commenters similarly noted that the 2008 Preamble fails to support CMS's position. *E.g.*, Ex. D at 11 (Texas Essential Healthcare Partnerships), 55-56 (Florida Essential Healthcare Partnerships), 101 (Sutter Health), 120-24 (Baker Donelson), 140 (America's Essential Hospitals).

invalidates the rule under current U.S. Supreme Court and Fifth Circuit precedent. *Ohio*, 603 U.S. 279, 292-93; *Chamber of Com.*, 85 F.4th at 774.

## Conclusion and Request for Relief

The Court should grant summary judgment and vacatur to Texas on the grounds that CMS's definition of what constitutes a hold-harmless provision as reflected in the February 2023 Bulletin, the 2024 Bulletin, and the Final Rule is substantively and procedurally invalid. The Court should further convert the preliminary injunction previously granted and issued by this Court on June 20, 2023, into a permanent injunction, thereby permanently enjoining the Defendants from enforcing or relying on the interpretation of 42 U.S.C. § 1396(w)(4)(C)(i) found in the 2023 Bulletin, the 2024 Bulletin, and the Final Rule.

Dated: November  22, 2024.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-2100

Respectfully submitted.

AARON L. NIELSON
Solicitor General

/s/ LANORA C. PETTIT
LANORA C. PETTIT
Principal Deputy Solicitor General
*Lead Counsel*
Texas Bar No. 24115221
Lanora.Pettit@oag.texas.gov

JACOB C. BEACH
Assistant Solicitor General
Texas Bar No. 24116083
Jacob.Beach@oag.texas.gov

MUNERA AL-FUHAID
Special Counsel
Tex. State Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed and served electronically (via CM/ECF) on November 22, 2024.

/s/ Lanora C. Pettit
Lanora C. Pettit
Principal Deputy Solicitor General