**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 6:23-cv-161 (JDK) |
| | ) | |
| **CHIQUITA BROOKS-LASURE**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

STATEMENT OF THE ISSUES............................................................................................ 3

BACKGROUND ................................................................................................................... 3

   A.   Statutory and Regulatory Background........................................................................ 3

       i.     The Medicaid Program .......................................................................... 3

       ii.    Statutory Background ............................................................................. 5

       iii.   Earlier Regulations and Proposed Regulations...................................... 7

       iv.   Previous Litigation................................................................................. 9

       v.     The challenged agency actions ............................................................ 10

   B.   Procedural Background............................................................................................ 13

LEGAL STANDARD......................................................................................................... 14

ARGUMENT ...................................................................................................................... 15

   1.   The challenged actions are consistent with the agency's statutory authority. .................. 15

       A.   The legal interpretation articulated in the 2023 Bulletin and 2024 Rule is lawful. ............................................................................................................. 15

             i.     Congress adopted the hold harmless provision to prevent federal matching in cases where no true contribution is made by State taxpayers. ....................................................................................... 16

             ii.    A "hold harmless provision" is "in effect" under Subsection (4)(C)(i) on the facts described in the 2023 Bulletin and 2024 Rule........ 18

             iii.   Texas's interpretation of Subsection (4)(C)(i) is inconsistent with the............................................................................................ 19

       statute's plain language and its purpose in the Medicaid program....................... 19

             iv.   The agency's statutory interpretation does not implicate the major questions doctrine. ................................................................... 23

i

B.    The 2024 Rule does not strip jurisdiction from the federal courts. ...................... 23

2.    The challenged actions are neither arbitrary nor capricious. ............................................ 25

A.    The 2023 Bulletin and 2024 Rule did not reverse prior agency
interpretations, much less arbitrarily.................................................................... 25

B.    The 2024 Rule did not ignore reliance interests, nor fail to respond to
significant comments. ........................................................................................... 28

3.    Texas's challenge to the 2008 Rule is barred by the statute of limitations, and its
procedural claim against the 2023 Bulletin should be dismissed for failure to prosecute....
.................................................................................................................................................. 28

4.    Any relief should be limited to Texas........................................................................................ 29

CONCLUSION ..................................................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Am. Stewards of Liberty v. U.S. Dept. of Interior*,
370 F. Supp. 3d 711 (W.D. Tex. 2019)..................................................................... 3, 14

*Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*,
597 U.S. 424 (2022)................................................................................................... 16

*Braidwood Mgmt., Inc. v. Becerra*,
104 F.4th 930 (5th Cir. 2024) ................................................................................... 31

*Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ..................................................................................... 31

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023),
*aff'd*, 602 U.S. 406 (2024) ........................................................................................ 31

*Cent. & S.W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ..................................................................................... 31

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
144 S. Ct. 2440 (2024)................................................................................................ 28

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................................................... 16

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004)..................................................................................................... 3

*Gandy Nursery, Inc. v. United States*,
318 F.3d 631 (5th Cir. 2003) ..................................................................................... 29

*Groff v. DeJoy*,
600 U.S. 447 (2023)................................................................................................... 15

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)................................................................................................... 16

Hawaii Dep't of Hum. Servs. Bd.,
DAB No. 1981, 2005 WL 1540188 (2005) ....................................................... 25, 26

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)................................................................................................... 30

*Howery v. Allstate Ins. Co.*,
   243 F.3d 912 (5th Cir. 2001) ............................................................. 29

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ........................................................................... 24

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ....................................................................... 23

*Louisiana v. HHS*,
   905 F.2d 877 (5th Cir. 1990) ................................................................. 4

*Luna Perez v. Sturgis Pub. Sch.*,
   598 U.S. 142 (2023) ........................................................................... 16

*Lyng v. Payne*,
   476 U.S. 926 (1986) ........................................................................... 24

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ........................................................... 14

*Martin v. Occupational Safety & Health Rev. Comm'n*,
   499 U.S. 144 (1991) ........................................................................... 24

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   583 U.S. 109 (2018) ........................................................................... 15

*NB ex rel. Peacock v. District of Columbia*,
   794 F.3d 31 (D.C. Cir. 2015) ....................................................... 3, 6, 9

*R.J. Reynolds v. FDA*,
   65 F.4th 182 (5th Cir. 2023) ............................................................... 28

*S.D. ex rel. Dickson v. Hood*,
   391 F.3d 581 (5th Cir. 2004) ................................................................. 4

*Schweiker v. Gray Panthers*,
   453 U.S. 34 (1981) ............................................................................. 16

*Smiley v. Citibank*,
   517 U.S. 735 (1996) ........................................................................... 28

*Starbucks Corp. v. McKinney*,
   144 S. Ct. 1570 (2024) ....................................................................... 30

iv

*Texas Med. Ass'n v. HHS*,
 110 F.4th 762 (5th Cir. 2024) ............................................................ 29

*Texas v. Brooks-LaSure*,
 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ..................................... 9

*Texas v. Brooks-LaSure*,
 2022 WL 741065 (E.D. Tex. Mar. 11, 2022) .................................. 9, 10

*United States v. Texas*,
 599 U.S. 670 (2023) ........................................................................... 30

*West Virginia v. EPA*,
 597 U.S. 697 (2022) ........................................................................... 23

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
 165 F.3d 43 (D.C. Cir. 1999) ....................................................... 24, 26

## Statutes

5 U.S.C. § 702 .................................................................................... 30

5 U.S.C. § 703 .................................................................................... 30

5 U.S.C. § 705 .................................................................................... 31

5 U.S.C. § 706 .................................................................................... 29

28 U.S.C. § 2401 ................................................................................ 28

42 U.S.C. § 1315 .............................................................................. 4, 9

42 U.S.C. § 1396a ................................................................................ 4

42 U.S.C. § 1396b ......................................................................... *passim*

42 U.S.C. § 1396d ................................................................................ 4

42 U.S.C. §§ 1396 *et seq.* ..................................................................... 3

Pub. L. No. 102-234, 105 Stat. 1793 ................................................... 6

## Rules

Fed. R. Civ. P. 56(a) .......................................................................... 14

## Regulations

42 C.F.R. Part 435 ................................................................................................ 4

42 C.F.R. § 430.10 .............................................................................................. 4

42 C.F.R. § 430.3 (2024) ............................................................................ *passim*

42 C.F.R. § 433.68 ................................................................................... 8, 11, 12

42 C.F.R. § 433.74 ......................................................................................... 6, 7

42 C.F.R. § 438.6 ................................................................................... 4, 12, 15

57 Fed. Reg. 55,118 (Nov. 24, 1992) ................................................... 7, 8, 25, 27

72 Fed. Reg. 13,726 (Mar. 23, 2007) ............................................................. 7, 8

73 Fed. Reg. 9685 (Feb. 22, 2008) .............................................................. *passim*

84 Fed. Reg. 63,722 (Nov. 18, 2019) ...................................................... 5, 8, 9, 26

86 Fed. Reg. 5105 (Jan. 19, 2021) ................................................................... 9

89 Fed. Reg. 41,002 (May 10, 2024) ........................................................... *passim*

## Other Sources

137 Cong. Rec. 32,871 (1991) ...................................................................... 6, 7

*Provision,* Black's Law Dictionary (12th ed. 2024) ........................................ 17

# INTRODUCTION

The States and federal government share responsibility for funding the Medicaid program, which provides medical care to some of the neediest Americans. Each State raises revenue for Medicaid, and the federal government "matches" the amount the State spends on medical assistance according to a State-specific "federal medical assistance percentage." In Texas, the State raises about 40 cents of every dollar spent on Medicaid services, and the federal government provides the remaining 60 cents. In the 1980s, the possibility of unlimited federal "matching" motivated States to find ways to raise revenue for Medicaid, and then return the revenue to its source after using it to obtain federal "matching" funds. Such arrangements allowed States to obtain an increased federal contribution to Medicaid without increasing its corresponding contribution, leaving the federal government to bear more than its statutory share of the costs of Medicaid.

Congress closed this loophole in 1991. A statutory "limitation on [the] use of provider-specific taxes to obtain Federal financial participation under Medicaid," 42 U.S.C. § 1396b(w), excludes state tax revenue from federal matching if the tax is paid by health-care providers, and the "State or other unit of government imposing the tax provides . . . for any payment . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i) ("Subsection (4)(C)(i)"). Congress thus prohibits federal matching when the "State or other unit of government" first imposes a tax on health-care providers, and then "provides . . . for a[] payment" that reimburses the providers for paying all or part of the tax.

The Centers for Medicare & Medicaid Services (CMS), which administer Medicaid for the federal government, have discovered a relatively new type of arrangement in which (1) a group of health-care providers ask a local government to tax them to support Medicaid; (2) the State uses

1

the resulting revenue to obtain federal matching Medicaid funds; and (3) the State uses the combined state and federal funds to make increased payments to Medicaid providers, and (4) the providers redistribute these payments to ensure that all taxpaying providers are compensated for the tax they paid. The result is a net increase in Medicaid funding, at no real cost to either the State or its providers, but at significant cost to the federal government. After thoroughly evaluating this novel scheme, CMS issued an informational bulletin (2023 Bulletin) reminding States that using state funds to reimburse health-care providers' Medicaid taxes violates Subsection (4)(C)(i) regardless of the mechanism of reimbursement, and that Subsection (4)(C)(i) prohibits the private-redistribution scheme. CMS reaffirmed that interpretation of Subsection (4)(C)(i) in a 2024 final rule.

Texas challenges both actions on the grounds that the agency's interpretation is incorrect. But under the plain terms of Subsection (4)(C)(i), if private agreements are in place among providers to repay health care-related tax costs by redistributing Medicaid payments received from Texas, then CMS is entitled to find that a "hold harmless provision" is "in effect." Because CMS's interpretation does not rest on any assertion of delegated authority, the major questions doctrine does not apply. And because CMS has not changed its position on the applicability of Subsection (4)(C)(i) to private redistribution schemes, it had no obligation to justify a change in position, and the public had no legitimate reliance interests in a contrary interpretation.

Texas also asserts that another aspect of the 2024 final rule unlawfully imposes an administrative exhaustion requirement. *See* 42 C.F.R. § 430.3(e) (2024). But the challenged rule does no such thing, as its preamble makes perfectly clear.

CMS is therefore entitled to summary judgment on all of the claims that Texas has chosen to press. The two claims that the State has abandoned should be dismissed for failure to prosecute (or as time-barred, where applicable).

## STATEMENT OF THE ISSUES

1. Whether CMS correctly interpreted Subsection (4)(C)(i) in the 2023 Bulletin and 2024 Rule.

2. Whether that statutory interpretation was arbitrarily and capriciously adopted.

3. Whether 42 C.F.R. § 430.3(e) imposes an unlawful administrative exhaustion requirement, when the preamble to the 2024 Rule expressly disclaims that interpretation.

4. Whether the claims on which Texas has chosen not to seek summary judgment should be dismissed.

## BACKGROUND[1]

### A. Statutory and Regulatory Background

#### i. The Medicaid Program

"Medicaid, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, is a 'cooperative federal-state program that provides federal funding for state medical services to the poor.'" *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 35 (D.C. Cir. 2015) (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004)). "The federal government and the states jointly finance the program, and the states administer it." *Louisiana v. HHS*, 905 F.2d

---

[1] This background sections serves at the agency's statement of undisputed material facts. *See* Local Rule CV-56(a). In response to Texas's statement of undisputed material facts, *see* Local Rule CV-56(b), which was similarly a discussion of statutory, regulatory, and procedural background, CMS notes that the merits of this Administrative Procedure Act case do not present any factual disputes but only the question whether, "as a matter of law," its "action is supported by the administrative record and consistent with the APA standard of review." *American Stewards of Liberty v. United States Dept. of Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019).

877, 878 (5th Cir. 1990). "States electing to participate in the program must comply with certain requirements imposed by the Act and regulations of the Secretary of Health and Human [Services]." *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004).

The Medicaid statute and regulations leave participating states with considerable discretion to design their own programs. Those choices are memorialized in the State plan. 42 U.S.C. § 1396a; 42 C.F.R. § 430.10. Each participating state must cover certain individuals, and may cover others if it chooses. 42 U.S.C. § 1396a(a)(10); 42 C.F.R. Part 435. Some benefits are mandatory, but others are optional. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a). A state can set rates and pay doctors and hospitals directly for their services, *see id.* § 1396a(a)(23)(A), or it can pay managed care organizations to cover Medicaid beneficiaries, *see id.* § 1396b(m)(2)(A)(iii). In a managed care program, states can also direct increased payments to selected hospitals or other health care providers through "state-directed payments" (SDPs). *See* 42 C.F.R. § 438.6(c). Finally, states may request that the Secretary approve an "experimental, pilot, or demonstration project" and "waive compliance with" certain programmatic requirements. 42 U.S.C. § 1315.

Medical assistance expenditures made under a State plan are matched with federal funds according to a statutory formula. Those funds are known as "federal financial participation," or "FFP," and the rate at which they are provided is the "federal medical assistance percentage," or "FMAP." The FMAP varies from 50% to 83% according to each state's per capita income. *Id.* § 1396d(b). Approximately 60% of Texas's medical assistance expenditures are currently reimbursed by the federal government. The remainder must be covered by state funds. Because the federal payment is a percentage of state Medicaid expenditures, the more revenue the State generates to support those expenditures, the greater the federal payment. Congress has not capped the amount of federal Medicaid assistance a State can receive.

4

### ii. Statutory Background

A provision of the Medicaid statute, 42 U.S.C. § 1396b(w), addresses situations in which HHS must deduct state revenues used for Medicaid before it calculates the federal financial participation due to the State. *See id.* § 1396b(w)(1)(A) ("for purposes of determining the amount to be paid to a State" by the federal government, "the total amount expended" as "medical assistance under the State plan . . . shall be reduced by the sum of any revenues" described in Section 1396b(w)). Section 1396b(w)(4) generally applies where providers that have contributed Medicaid revenue to a state or local government through a health care-related tax get their money back once the State has used the funds as a basis for federal "matching." Providers paying a health care-related tax, for example, might agree to "support (or not oppose) a tax upon their activities or revenues," and the tax revenue "would generate funds that could then be used to raise Medicaid payment rates to the providers." 2019 Proposed Rule, 84 Fed. Reg. 63,722, 63,730 (Nov. 18, 2019). Such tax programs can be "designed to hold Medicaid providers 'harmless' for the cost of" the tax payment if the tax will be repaid through increased Medicaid payments once the federal share of the payment is secured. *Id.* Under such arrangements, "federal expenditures rapidly increase[] without any corresponding increase in state expenditures, since the funds used to increase provider payments came from the providers themselves and [are] matched with federal funds." *Id.*; *see also* 2008 Final Rule, 73 Fed. Reg. 9685, 9687 (Feb. 22, 2008) (explaining that "hold harmless" provisions "effectively shift a disproportionate burden of the Medicaid program to the federal government").

To prevent States from obtaining federal matching funds based on revenue that is functionally only on loan to the State, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (1991 Act), now codified in relevant part at Section

1396b(w)(4).  The statute provides that revenues from health care-related taxes are excluded from federal "matching" if "there is in effect a hold harmless provision with respect to [the] tax."  Pub. L. No. 102-234, § 2(a), 105 Stat. 1793, 1797.  States are required by regulation to collect the information CMS needs to ascertain that their taxes conform to the federal requirement.  *See* 42 C.F.R. § 433.74(a) (requiring States to give CMS "information on the source and use of all . . . health care-related taxes collected").  States must also "provide any additional information requested by [CMS] related to . . . any taxes imposed on[] health-care providers," and must "present a complete, accurate, and full disclosure of all of their . . . tax programs and expenditures." *Id.*

When Congress enacted the 1991 Act, many States were obtaining significant Medicaid funding through provider-specific taxes and donations provided to States under arrangements that included provisions for the subsequent repayment—with public money that included federal matching funds—of the cost of the tax or gift to the taxpayer or donor.  Some legislators debating the 1991 Act objected to a federal ban on these arrangements because States would have to "radically adjust programs in the middle of budget cycles," causing "drastic cuts in basic medical services" for the needy.  137 Cong. Rec. 32,871 (1991) (statement of Rep. McGrath). States' requests for federal matching Medicaid funds had ballooned, rising from $479 million in October 1990 to $3.8 billion in July 1991.  *See id.* at 32,876 (statement of Rep. Solomon).  A single state had raised "365 million through hospital charitable contributions to the State[,]. . . used that as a basis for getting a $385 million matching grant, and then in turn . . . refunded the charitable contributions to the various hospitals."  *Id.* (statement of Rep. Lent).  Doubts were raised about the federal government's capacity to bear these costs, when, as one legislator put it, "there is no limit on how much the Federal Treasury could be ravaged under one of these Ponzi schemes." *Id.*

Since 1991, Section 1396b(w)(4) has provided that a broad-based health-care tax will be excluded from state revenues before the federal financial participation is calculated "if there is in effect a hold harmless provision (described in paragraph (4)) with respect to the tax." 42 U.S.C. § 1396b(w)(1)(A)(iii). Since 1992, HHS has made clear that States "may not make Medicaid or other payments to providers that result in taxpayers being repaid dollar for dollar for their tax costs." 1992 Interim Final Rule, 57 Fed. Reg. 55,118, 55,129 (Nov. 24, 1992) (interpreting Section 1396b(w)(4)). Rather, "use of any State payment . . . in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation" prohibited by Section 1396b(w)(4). *Id.*

Paragraph 4 of Section 1396b(w) establishes that a "hold harmless provision"—a provision for repayment or partial repayment of a tax—exists in three situations, only one of which, Subsection (4)(C)(i), is directly at issue here. Subsection (4)(C)(i) recognizes a category of hold harmless arrangements that satisfies a "[g]uarantee [t]est." 2007 Proposed Rule, 72 Fed. Reg. 13,726, 13,730 (Mar. 23, 2007). This case involves payments provided for by the State, rather than the offset or waiver also mentioned in Subsection (4)(C)(i). As relevant here, Subsection (4)(C)(i) deems a hold harmless provision to exist when:

> [t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

42 U.S.C. § 1396b(w)(4)(C)(i).

### iii.    Earlier Regulations and Proposed Regulations

CMS has promulgated regulations implementing the hold-harmless provisions. *See* 42 C.F.R. § 433.68(f)(3). Since 1992, when CMS first implemented the statute, CMS has interpreted Subsection (4)(C)(i) as providing that "use of any State payment . . . in a way that is guaranteed to

repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation." 57 Fed. Reg. at 55,129; *see also* 72 Fed. Reg. at 13,730 ("A direct guarantee will be found when a State payment is made available to a taxpayer . . . in the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax.").

This case involves a type of "hold harmless" agreement of which CMS only "[r]ecently" became "aware." 2023 Bulletin at 2.[2] It arises when a State or local Medicaid tax program "involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs back (typically ensuring that each taxpaying provider receives at least its total tax amount back)." *Id.* Although the redistribution agreement is made among private parties, both the tax and the guaranteed repayment involve Medicaid funds: the tax raises money for the State portion of Medicaid expenditures, and the Medicaid payments that are redistributed are monies from the State that include the federal share.

In 2019, after CMS learned of and considered such arrangements, it explained in a proposed rulemaking why Subsection (4)(C)(i) renders taxes subject to private redistribution agreements ineligible for federal "matching." Subsection (4)(C)(i) prohibits such arrangements when the "net effect" is that "[t]he taxpayers have a reasonable expectation to be held harmless for all or a portion of their tax amount." 84 Fed. Reg. at 63,734. CMS explained that applying Subsection (4)(C)(i) to arrangements with private redistribution agreements did not "reflect any change in policy or approach," but described additional "prohibited practices" and provided additional clarification "regarding how [States] may finance the non-federal share of Medicaid expenditures" consistently with federal law. *Id.* at 63,734–35.

---

[2] Texas has filed the copy of the 2023 Bulletin from the certified administrative record for this case. *See* ECF No. 75-1 at 664. CMS will cite to the pagination of the Bulletin, which is publicly available at https://www.medicaid.gov/federal-policy-guidance/downloads/cib021723.pdf.

The proposed rulemaking addressed a broad array of Medicaid related topics. CMS ultimately withdrew the proposed rule in its entirety to allow for further consideration in light of public comments and also intervening congressional action relevant to some of the topics addressed in the proposed rule (but not relevant here). 2021 Proposed Rule Withdrawal, 86 Fed. Reg. 5105, 5105 (Jan. 19, 2021). It explained that the withdrawal "does not affect existing federal legal requirements or policy that were merely proposed to be codified in regulation." *Id.*

### iv.    Previous Litigation

In 2021, Texas filed suit in this Court over the status of its Medicaid managed care program, which CMS had previously authorized as a demonstration project under Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315. Texas applied for an extension of that authorization, which CMS first granted, and then rescinded. Texas sued to challenge the rescission, which was preliminarily enjoined. *Texas v. Brooks-LaSure*, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021). CMS ultimately reinstated the extension, and the suit was dismissed. While the suit was pending, however, a dispute arose over several state-directed payments (SDPs) that Texas had proposed to make. CMS was concerned that the SDPs might be "funded by Texas through a state tax regime that . . . disqualifies the state from federal matching funds because of a hold-harmless provision." *Texas v. Brooks-LaSure*, 2022 WL 741065, at *8 (E.D. Tex. Mar. 11, 2022). As the Court explained, CMS and Texas had an "interpretive dispute regarding 42 U.S.C. § 1396b(w)(4)(C)," which prohibits hold-harmless guarantees. *Id.* CMS believed that "hospitals in certain Texas jurisdictions have likely entered into private agreements amongst themselves" in which hospitals subject to health care related taxes would be held harmless by "the other hospitals in the [taxing] jurisdiction," so that every hospital was guaranteed to recoup at least "an amount generally equal to 105% of its total tax cost." *Id.* at *9. Texas argued "that federal law does not allow CMS to

limit federal funds even if there are the private arrangements described by CMS." *Id.* The state argued that "without evidence that a unit of government is involved in the indemnity agreements," they were not prohibited. *Id.* CMS responded that a direct hold harmless guarantee exists when State payments are made available to a related party, with the reasonable expectation that the payments would result in the taxpayer being held harmless for any part of the tax, through direct or indirect payments. *Id.* The Court did not resolve this "interpretive dispute," *id.* at *8, and CMS ultimately approved the SDPs while reserving its right to disallow funding later if a hold harmless arrangement was discovered.

### v. The challenged agency actions

In February 2023, CMS issued the Bulletin principally at issue in this case. The 2023 Bulletin advised States that CMS had become aware of programs in which health-care providers paying certain local taxes to support Medicaid were agreeing "to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back," either in the form of "each provider's retained portion of any original Medicaid payment (either directly from the state or from the state through a managed care plan)," or as a "redistribution payment received by the provider from another taxpayer or taxpayers," or both. 2023 Bulletin at 3 (footnote omitted). In localities that include both Medicaid providers and providers with few or no Medicaid patients, "providers that furnish a relatively high percentage of Medicaid-covered services redistribute a portion of their Medicaid payments to providers with relatively low (or no) Medicaid service percentage" to cover the cost of the tax paid by the providers that do not themselves receive Medicaid payments. *Id.*

The 2023 Bulletin reminded States of the longstanding statutory and regulatory requirement that "CMS reduce a state's medical assistance expenditures by the amount of health

care-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation." 2023 Bulletin at 5. It explained that the Medicaid regulation implementing Subsection (4)(C)(i) covers arrangements where private parties agree to redistribute Medicaid payments to guarantee payment of a Medicaid tax. That regulation specifies that an impermissible arrangement exists when "[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment . . . such that the provision of the payment . . . directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." 42 C.F.R. § 433.68(f)(3). The Bulletin explained that "[t]he word 'indirect' in the regulation" underscores that "the state or other unit of government imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless" arrangement. 2023 Bulletin at 4. Rather, a hold harmless arrangement is present even when the redistribution agreement is private because "a State payment is made available to a taxpayer or a party related to a taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." *Id.* (quoting 73 Fed. Reg. at 9,694).

States "have an obligation to ensure that the sources of non-federal share of Medicaid expenditures comport with federal statute and regulations," and they can, and should, "make clear to their providers that these arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." 2023 Bulletin at 5. CMS accordingly told the States that it intends to conduct "detailed financial management reviews of health care-related tax programs that appear to include redistribution arrangements or that CMS has information may include redistribution arrangements." *Id.*

In April 2024, CMS issued a second bulletin (2024 Bulletin[3]) explaining that CMS will exercise its discretion not to take immediate enforcement action against States with preexisting private redistribution arrangements, to give States time to comply with the prohibition on hold harmless arrangements achieved through the private redistribution of Medicaid payments. CMS accordingly will continue to provide federal financial participation for States that "have the type of financing arrangements described in" the 2023 Bulletin, even if those arrangements "are prohibited under" Subsection (4)(C)(i) and the Medicaid regulations, "regardless of which Medicaid delivery system or type of payment the arrangement supports." 2024 Bulletin at 3. But during this period of forbearance, CMS "expect[s] states with existing hold harmless arrangements to undertake changes necessary so that by no later than January 1, 2028, the state is compliant with all non-Federal share financing requirements." *Id.*

The following month, CMS finalized a related rule requiring provider attestations. 2024 Rule, 89 Fed. Reg. 41,002, 41,072–83 (May 10, 2024). The 2024 Rule reiterated the interpretation of Subsection (4)(C)(i) and its implementing regulations set out in the 2023 Bulletin. *Id.* at 41,072–77. To overcome objections from the States that they are unaware of private redistribution agreements, as well as difficulties CMS itself has encountered in identifying and examining private redistribution agreements among providers, starting in January 2028, CMS will require Medicaid providers to attest that they do not participate in such agreements. *See* 42 C.F.R. § 438.6(c)(8)(vii) (effective date of 42 C.F.R. 438.6(c)(2)(ii)(H)(1)). The Medicaid regulations will require "providers receiving payment under a State directed payment" to "attest that they do not participate in any hold harmless arrangement for any health care-related tax as specified in § 433.68(f)(3) of

---

[3] The 2024 Bulletin is publicly available at https://www.medicaid.gov/federal-policy-guidance/downloads/cib042224.pdf.

this subchapter." *Id.* § 438.6(c)(2)(ii)(H)(1). And they require States making SDPs to "[c]omply with all Federal legal requirements for the financing of the non-Federal share." *Id.* § 438.6(c)(2)(ii)(G).

Separately, the Medicaid regulations now provide that "[d]isputes that pertain to disapproval of . . . State directed payments . . . are . . . heard by the [Departmental Appeals] Board." 42 C.F.R. § 430.3(e). As CMS explained in the 2024 Rule, this provision is not an exhaustion requirement. To the contrary, "[t]he administrative process finalized at § 430.3(e) is at the option of the appellant, and States may seek redress in the courts at any time." 89 Fed. Reg. at 41,115.

## B.    Procedural Background

Texas filed suit shortly after the 2023 Bulletin was published, raising four claims under the Administrative Procedure Act. Compl., ECF No. 1. The State moved for a preliminary injunction. ECF No. 10. In granting the injunction, the Court concluded that Texas was "likely to succeed on its first argument"—that the 2023 Bulletin "exceeds CMS's statutory and regulatory authority"— and did not address the other claims. ECF No. 31 at 22. The Court enjoined CMS from "implementing or enforcing the [2023] Bulletin" against Texas, or "otherwise enforcing an interpretation of the scope of 42 U.S.C. § 1396b(w)(4)(C)(i) found therein" against Texas. *Id.* at 29; *see* ECF No. 40 (discussing the scope of the injunction).

Texas then supplemented its complaint, updating two of the existing claims, and adding two new ones, for a total of six. Supp. Compl., ECF No. 56. Texas first alleges that the 2023 Bulletin and 2024 Rule are contrary to statute. Compl. ¶¶ 71–76; Supp. Compl. ¶¶ 32–33. Second, Texas claims that the 2023 Bulletin is procedurally invalid, because it was not issued following notice and an opportunity to comment. Compl. ¶¶ 77–84. Third, Texas alleges that the 2023 Bulletin and 2024 Rule are arbitrary and capricious. Compl. ¶¶ 85–91; Supp. Compl. ¶¶ 34–49.

Fourth, Texas claims in the alternative that the 2008 rule is invalid as contrary to statute. Compl. ¶¶ 92–96. Fifth, Texas alleges that the 2024 Rule unlawfully strips the federal courts of the ability to review agency denials of state-directed payments. Supp. Compl. ¶¶ 50–60. Finally, Texas claims that the 2024 Rule violates the major questions doctrine. *Id.* ¶¶ 61–66.

Texas has now moved for summary judgment on four of its six claims. ECF No. 75. Texas does not seek summary judgment on its claim against the 2008 Rule, *see id.* at 9 n.4, nor on its procedural claim against the 2023 Bulletin.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In challenges to agency action under the Administrative Procedure Act ("APA"), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Am. Stewards of Liberty v. Dep't of Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019) (citation omitted); *see Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("The entire case on review is a question of law, and only a question of law.").

## ARGUMENT

**1.    The challenged actions are consistent with the agency's statutory authority.**

Texas challenges the statutory interpretation articulated in the 2023 Bulletin and 2024 Rule as contrary to statute.[4] And the State also takes issue with an administrative review provision of

---

[4] For the reasons set forth in the government's opposition to Texas's motion for preliminary injunction, this Court lacks jurisdiction over the State's challenge to the 2023 Bulletin. *See* ECF No. 17 at 21–27. But because Texas has challenged the 2024 Rule on the same legal grounds, CMS does not repeat those arguments here. To the extent that Texas means to challenge the 2024

the 2024 Rule.  *See* 42 C.F.R. § 430.3(e).  CMS is entitled to summary judgment on these claims, because its interpretation of Subsection (4)(C)(i) is correct, and the administrative review provision does not impose an exhaustion requirement, as Texas claims.[5]

### A.  The legal interpretation articulated in the 2023 Bulletin and 2024 Rule is lawful.

"[S]tatutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (second alteration in original) (quoting *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018)).  The text of Subsection (4)(C)(i), parsed carefully, unmistakably expresses Congress's intention to prohibit Medicaid payments from being used—directly or indirectly—to repay taxes that are used as State revenue to obtain federal matching funds.  That is true even when health-care providers, rather than the State, devise and implement the mechanism for using the Medicaid funds to repay those taxes.

"The Social Security Act is among the most intricate ever drafted by Congress."  *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981).  Medicaid's hold-harmless provisions are "technical: They call to mind Justice Frankfurter's injunction that when a statute is 'addressed to specialists, [it] must be read by judges with the minds of the specialists.'"  *Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*, 597 U.S. 424, 434 (2022) (alteration in original).  In construing provisions embedded in a program like Medicaid, the manner in which "an ordinary reader would

---

Bulletin, which simply articulates a non-enforcement policy, it lacks standing to do so.  The non-enforcement policy announced in the 2024 Bulletin does not injure Texas in any way.

[5] To the extent that Texas means to challenge 42 C.F.R. § 438.6(c)(2)(ii)(G), which requires States making SDPs to "[c]omply with all Federal legal requirements for the financing of the non-Federal share," CMS is also entitled to summary judgment on that claim.  Even if the Court were to conclude that CMS has misinterpreted Subsection (4)(C)(i), that would not be a reason to vacate a regulation that simply requires States to follow the law.

understand [a] particular provision" must be informed by "contextual clues" from the surrounding statute. *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 148 (2023).

Crucially, the Medicaid hold harmless provisions "should not be read as a series of unrelated and isolated provisions," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995), but rather as part of "a symmetrical and coherent regulatory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson*, 513 U.S. at 569). Subsection (4)(C)(i) thus must be understood in conjunction with the structure and operation of Section 1396b(w) and especially all the sub-parts of Section 1396b(w)(4).

**i.**  **Congress adopted the hold harmless provision to prevent federal matching in cases where no true contribution is made by State taxpayers.**

Section 1396b(w)(4) addresses situations in which federal funding will be unavailable to "match" expenditures financed by a state or local tax because a "hold harmless provision" is "in effect" with respect to the tax. 42 U.S.C. § 1396b(w)(4). Structurally, Section 1396b(w)(4) consists of an introductory paragraph that explains that the complete subsection defines the types of "hold harmless" provisions that disqualify tax revenue from federal financial participation. The introductory paragraph is followed by three subparagraphs (labeled (A) – (C)) that set forth the indicia of the three types of "hold harmless" arrangements in which a taxpayer is deemed to recover all or part of the cost of the tax from government funds. The first sentence of the subsection provides that "there is in effect a hold harmless provision with respect to a broad-based health-care related tax imposed with respect to a class of items or services if the Secretary determines that any of the following applies." *Id.*

The words "the following" are followed by subparagraphs (A), (B) and (C), which describe three situations in which a prohibited "hold harmless" provision is "in effect." The three statutory tests for a "hold harmless" provision are the presence of:

- a payment from the State in an amount "positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan," 42 U.S.C. § 1396b(w)(4)(A);

- a Medicaid payment that "varies based only upon the amount of the total tax paid," *id.* § 1396b(w)(4)(B); and

- "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax," *id.* § 1396b(w)(4)(C)(i).

Reading the three subsections of Section 1396b(w)(4) in parallel, each subsection defines a type of "hold harmless provision" by setting forth factual criteria whose presence establishes that a "hold harmless provision" is "in effect."

A "hold harmless provision" that precludes federal "matching" thus need not be written, express, or even a "provision" in the sense in which that term is ordinarily understood in other legal settings (such as a contractual or statutory "provision"). *See Provision*, Black's Law Dictionary (12th ed. 2024) ("A clause in a statute, contract, or other legal instrument"). Rather, Section 1396b(w) defines a prohibited "hold harmless provision" by inference from the facts described in the statute, such as a correlation between the amounts of certain taxes and payments, *see* 42 U.S.C. § 1396b(w)(4)(A), or the existence of state Medicaid tax revenues and payments back from the State that serve to guarantee repayment of the tax, *see id.* § 1396b(w)(4)(C)(i).

**A "hold harmless provision" is "in effect" under Subsection (4)(C)(i) on the facts described in the 2023 Bulletin and 2024 Rule.**

By its plain terms, Subsection (4)(C)(i) is satisfied—and a "hold harmless provision" is "in effect"—when two elements are present. First, "the State or other unit of government impos[es]" a "broad-based health care related tax" for Medicaid. 42 U.S.C. § 1396b(w)(4)(C)(i). Second, the State or other unit of government "provides . . . for any payment . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* The payment may be provided for "directly or indirectly." *Id.*

Subsection (4)(C)(i) thus looks to whether a particular tax arrangement includes two Medicaid-related transfers of funds. The "State or other unit of government" must both (1) raise a health care-related tax that the State uses for federal "matching," and (2) provide for a "payment . . . that guarantees to hold taxpayers harmless" for the costs of the tax. Fittingly for the statute that defines the relationship between the States and the federal government in this area, Congress regulated only State revenues and State payments. No other criteria must be satisfied for a hold harmless provision to come into effect.

The arrangements addressed in the 2023 Bulletin and 2024 Rule, in which health-care-provider taxpayers enter "into oral or written agreements . . . to redirect or redistribute . . . Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back," satisfy both elements of Subsection (4)(C)(i), as CMS has correctly concluded. 2023 Bulletin at 3; *see* 89 Fed. Reg. at 41,075–76. First, "the State or other unit of government impos[es]" a "broad-based health care related tax" for Medicaid. 42 U.S.C. § 1396b(w)(4)(C)(i). Second, on the repayment side of the ledger, the "State or other unit of government . . . provides . . . (directly or indirectly) for any payment . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i). Under the arrangements the 2023 Bulletin and 2024 Rule describe,

"the taxpaying providers" are "redistributing Medicaid payments after receipt" to reimburse the tax costs, "typically ensuring that each taxpaying provider receives at least its total tax amount back." 2023 Bulletin at 2 (punctuation omitted); *see* 89 Fed. Reg. at 41,075–76. On these facts, the "State or other unit of government" has provided for the payment that guarantees that providers will be repaid their costs of the tax, and both requirements of Subsection (4)(C)(i) are satisfied.

Under the plain terms of Subsection (4)(C)(i), therefore, if private agreements are in place among providers to repay health care-related tax costs by redistributing Medicaid payments received from Texas, CMS is entitled to find that a "hold harmless provision" is "in effect." *See* 42 U.S.C. § 1396b(w)(4) ("there is in effect a hold harmless provision with respect to a broad-based health care related tax" when CMS concludes that the factual predicate described in Subsection (4)(C)(i) is satisfied).

### iii. Texas's interpretation of Subsection (4)(C)(i) is inconsistent with the statute's plain language and its purpose in the Medicaid program.

Texas contends that under the "plain language" of Subsection (4)(C)(i), "the defining feature of a hold harmless provision is a guarantee by the *government* to the taxpayer." ECF No. 75 at 17. But Texas misinterprets the statutory text.

I. Under Subsection (4)(C)(i), the presence of a hold harmless provision is not contingent upon a State or local government's promise to repay the tax. Rather, a "hold harmless provision" is "in effect" when "the State or other unit of government imposing the tax *provides* (directly or indirectly) *for any payment* . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i) (emphases added). The statute requires that the *payment* must come, directly or indirectly, from the State or local government, but it does not require that the payment be used in any particular manner to guarantee repayment of the tax. CMS

has concluded that a hold harmless provision comes into effect under Subsection (4)(C)(i) when Medicaid payments are redistributed by agreement among taxpaying health-care providers, in such a way that each provider is reimbursed by Medicaid for its cost of the tax.

CMS's interpretation of the statute is the only reasonable one. The purpose of Section 1396b(w) is "ensur[ing] that State claims for federal funding are supported by non-federal expenditures." 73 Fed. Reg. at 9687–88. A private arrangement to use Medicaid payments to guarantee repayment of a Medicaid tax serves to "effectively shift a disproportionate burden of the Medicaid program to the federal government" by rendering the State's financial contribution illusory. *Id.* Indeed, an arrangement that unwinds each provider's health care-related tax burden only makes sense as a mechanism to generate federal matching funds. This is just as true for privately-arranged guarantees as it would be for an express guarantee by the State. Private agreements to redistribute those Medicaid payments among the hospitals that paid a health care-related tax could allow Texas to obtain federal matching funds at no real cost to providers or the State. If Medicaid funds are redistributed so as to offset tax payments, rather than to merely compensate providers that provide services to Medicaid patients, that would constitute exactly the type of "hold harmless" agreement that Subsection (4)(c)(i) has prohibited since it was first enacted. Texas is mistaken in claiming that the Medicaid program allows States to obtain federal matching funds and then disburse payments to hospitals that participate in such agreements.

CMS has observed that "state laws" are "rarely overt in requiring that state payments be used to hold taxpayers harmless," and the existence of hold-harmless provisions are often inferred from the circumstances. 73 Fed. Reg. at 9694 (discussing a hold harmless provision effectuated through a nursing home bed tax and correlated "grants" to nursing home residents that could be used to pay the tax). Under Subsection (4)(C)(i), prohibited hold harmless provisions are not

limited to those in which a State provides money with an express direction that those funds be used to hold providers harmless for the cost of their Medicaid taxes. Rather, when a State provides for a payment that is used to guarantee repayment of a Medicaid tax, a "hold harmless provision" barred by Subsection (4)(C)(i) is "in effect," even when health-care providers arrange among themselves to use the State funds to effectuate the repayment. As CMS explained in 2008, "[a] direct guarantee will be found when a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments))." *See id.* at 9694–95.

II. Texas is equally mistaken in contending that the word "guarantee" in Subsection (4)(C)(i) means that a hold harmless provision comes into effect under that subsection only if a State acts as "guarantor." ECF No. 75 at 17. Under the plain language of the statute, it is the state-provided "payment . . . that guarantees to hold taxpayers harmless," 42 U.S.C. § 1396b(w)(4)(C)(i), not the State itself; there is no statutory requirement that the State also provide an explicit repayment guarantee. CMS's 2008 Final Rule made that abundantly clear. *See* 73 Fed. Reg. 9694 (a "direct guarantee does not need to be an explicit promise or assurance of payment," because "the element necessary to constitute a direct guarantee is the provision for payment" by the State). Congress's adoption in the statute of the Secretary's interpretation of an "indirect guarantee" in Subsection (4)(C)(ii) confirms that Congress did not intend to require that the State make a formal guarantee. Under that provision, an "indirect guarantee" is in effect when the provider tax rate exceeds 6% of a provider's revenues and 75% of providers taxed receive 75% of more of their taxes back in higher Medicaid payments. 42 U.S.C. § 1396b(w)(4)(C)(ii). Thus,

Congress recognized that a hold harmless arrangement can exist under Subsection (4)(C) without the State making any formal guarantees.

In its preliminary injunction order, this Court faulted CMS for "decoupl[ing] the 'grammatical link' found in the statute" by "disallowing funds where the state makes no guarantee." ECF No. 31 at 23. But no such "grammatical link" exists. Under Subsection (4)(C)(i), the government "provides (directly or indirectly) for any payment . . . that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i) (emphases added). Grammatically, the verb phrase "provides . . . for" takes as its object the noun "payment." And the subject of the verb "guarantees" in Subsection (4)(C)(i) is not the State, but "any payment, offset, or waiver," and thus, all that is required is that a payment "guarantees" to hold a taxpayer harmless. If Congress had wanted to require that the State instead guarantee to hold taxpayers harmless, it could easily have done so by defining a hold harmless provision as one in which "the State or other unit of government imposing the tax guarantees to hold taxpayers harmless for any portion of the costs of the tax." But Congress did not do so.

This Court suggested that in the situation contemplated by the Bulletin "[a]ll a state provides for . . . is its Medicaid payment, which makes no 'guarantee' to hold anyone harmless." ECF No. 31 at 23. But if providers agree to distribute Medicaid payments among themselves to repay their tax costs, then a "hold harmless provision" is "in effect" under Subsection (4)(C)(i) because the State has "provide[d] . . . for" the "payment" used to satisfy a guarantee that the tax will be repaid. All the statute requires is provider-furnished tax revenue that Texas can use to obtain matching federal funds, and Texas's provision for the payments—it does not require that Texas also sponsor the direct guarantee. Congress in Section 1396b(w) acted comprehensively to protect the federal fisc from schemes to evade the requirement that States pay their fair share

towards Medicaid. It did not leave a gaping loophole that would allow that intent to be subverted if the State, while not itself expressly guaranteeing the return of tax revenues, achieves functionally indistinguishable guarantees by tacitly allowing its health-care providers to redistribute Medicaid funds among themselves.

### iv. The agency's statutory interpretation does not implicate the major questions doctrine.

Texas also argues that CMS's interpretation of Subsection (4)(C)(i) violates the major-questions doctrine. ECF No. 75 at 24–27. That doctrine addresses delegations of authority to administrative agencies. In "certain extraordinary cases," courts require "something more than a merely plausible textual basis" before they will "read into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted). When a court assesses whether the "the best reading of a statute is that it delegates discretionary authority to an agency," then the major questions doctrine may sometimes come into play. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024). But the doctrine has no application where, as here, an agency does not claim that its statutory interpretation rests on an exercise of delegated authority. CMS's position is that it has interpreted Subsection (4)(C)(i) correctly in light of the statute's language, structure, and purpose, not that its interpretation is a permissible exercise of delegated authority. When an agency does not claim delegated authority, the major questions doctrine does not apply.

### B. The 2024 Rule does not strip jurisdiction from the federal courts.

Texas goes on to argue that, in the 2024 Rule, CMS "exceeded its authority by undertaking to strip federal courts of jurisdiction over [challenges to denials of] SDPs." ECF No. 75 at 21. Under the terms of a regulation issued as part of that rule, "[d]isputes that pertain to disapproval

23

of . . . State directed payments . . . are . . . heard by the [Departmental Appeals] Board." 42 C.F.R. § 430.3(e).

In the 2024 Rule, CMS explained that this provision is not an exhaustion requirement: it does not say that disputes pertaining to the disapproval of SDPs are *only* heard by the Departmental Appeals Board, nor that such disputes *must* be brought to the Board in the first instance. To the contrary, "[t]he administrative process finalized at § 430.3(e) is at the option of the appellant, and States may seek redress in the courts at any time." 89 Fed. Reg. at 41,115. CMS emphasized that "[n]othing in this final rule precludes any party from seeking redress in the courts," and that "States always have the option to utilize the courts if they prefer." *Id.* The preamble thus expressly disclaims any argument that 42 C.F.R. § 430.3(e) requires exhaustion of administrative remedies before SDP denials can be reviewed in federal court.

As the Supreme Court has explained, if you "[w]ant to know what a rule means," you should usually "ask its author," "because the agency that promulgated a rule is in the 'better position [to] reconstruct' its original meaning." *Kisor v. Wilkie*, 588 U.S. 558, 570 (2019) (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152 (1991) (alteration in *Kisor*)). That interpretive approach "holds good for a significant category of 'contemporaneous' readings," such as the reading of 42 C.F.R. § 430.3(e) offered in the 2024 Rule. *Id.* (quoting *Lyng v. Payne*, 476 U.S. 926, 939 (1986)). To the extent that there is any ambiguity as to whether this regulation imposes an exhaustion requirement, the agency's contemporaneous reading—which makes clear that it was not intended to require exhaustion—should govern. *See Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("Although the preamble does not 'control' the meaning of the regulation, it may serve as a source of evidence concerning contemporaneous agency intent.").

Texas's argument appears to be that CMS will, at some point in the future, reverse its contemporaneous interpretation of its own regulation, and that 42 C.F.R. § 430.3(e) should be set aside *now* on the basis of that imagined future reversal. Even if Texas had standing to pursue this speculative claim, the Court should reject it. The challenged regulation simply does not do what Texas contends, and the State has not identified any basis for this Court to preclude other parties from utilizing an alternative administrative appeals process if they so choose.

## 2. The challenged actions are neither arbitrary nor capricious.

### A. The 2023 Bulletin and 2024 Rule did not reverse prior agency interpretations, much less arbitrarily.

Since 1992, CMS has interpreted Subsection (4)(C)(i) to mean that States "may not make Medicaid or other payments to providers that result in taxpayers being repaid dollar for dollar for their tax costs," because "use of any State payment . . . in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation" covered by Section 1396b(w)(4). 57 Fed. Reg. at 55,129. That is the legal principle embodied in Subsection (4)(C)(i), CMS's 2008 regulations and the 2019 Proposed Rule, and it bars the arrangements the 2023 Bulletin and 2024 Rule describe.

On this basis, CMS in 2008 superseded the Departmental Appeals Board (DAB) decision in Hawaii Department of Human Services Board, DAB No. 1981, 2005 WL 1540188 (2005), which had held that Subsection (4)(C)(i) did not extend to "grants and/or tax credits . . . designed by the States to compensate private pay residents of nursing homes for the costs of [a] tax passed on to them by their nursing homes." 73 Fed. Reg. at 9686. CMS responded by clarifying for the States that Subsection (4)(C)(i) applies whenever "a State payment is made available to a taxpayer . . . with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." *Id.* at 9694. Importantly

here, when CMS explained that Subsection (4)(C)(i) reached state grants to nursing-home patients that would allow the patients to cover the costs of the nursing-home tax, it emphasized that a "direct guarantee does not need to be an explicit promise or assurance of payment," because "the element necessary to constitute a direct guarantee is the provision for payment" by the State. *Id.*

CMS reiterated the same understanding of Subsection (4)(C)(i) in a 2019 proposed regulation. By 2019, CMS had encountered privately arranged tax reimbursements, and after thorough consideration, it determined that the statute prohibited federal matching under such arrangements. CMS reiterated that Subsection (4)(C)(i) "prohibits hold harmless arrangements in which collected taxes are returned directly or indirectly to taxpayers." 84 Fed. Reg. at 63,730. It directly addressed the situation where "tax revenue" is used "to fund the non-federal share of Medicaid payments back to the taxpayers" through private agreements among the taxpaying providers "to redistribute . . . Medicaid payments to ensure that" the providers "receive all or any portion of their tax amount back." *Id.* at 63,734. CMS explained that because Subsection (4)(C)(i) prohibits matching for state revenue when tax funds are returned to taxpayers, such a scheme would be "inconsistent with existing statutory and regulatory requirements prohibiting hold harmless arrangements." *Id.*

Texas asserts that CMS previously took a narrower view of the hold-harmless provision, ECF No. 75 at 28, but none of its scattered sources reflects an authoritative pronouncement of CMS's understanding of the statute. *First*, Texas points to the 2005 decision of the Departmental Appeals Board that CMS superseded in 2008. But when CMS amended its regulations in 2008, it made very clear that this Board decision was in error, and that these were indeed hold harmless arrangements. 73 Fed. Reg. at 9691 & 9694. Texas's reliance on a Board decision that the agency disavowed nearly twenty years ago does not show an unexplained departure from past practice.

*Second*, Texas invokes 2012 testimony from someone in the Office of Inspector General, which does not make policy for CMS. *Third*, and finally, Texas cites a CMS official's answer to a "confirming-our-conversation" email from a provider's counsel, in which the official herself said nothing about statutory authority. That email might be significant for that provider, but CMS does not advise States of its considered interpretation of the Medicaid statute through emails to individuals, and mistaking individualized communications for authoritative interpretations risks cutting short the agency's deliberative process. When novel facts arise outside the scope of CMS's existing interpretive decisions, CMS must look at the statute afresh to determine whether the plain text of the statute reaches the new financing arrangement. CMS is hesitant for good reason to take a formal position, with significant financial consequences for providers, until it has completed the thorough internal review that precedes the issuance of an interpretive document like the 2023 Bulletin or 2024 Rule.

In sum, CMS has since 1992 taken the position that Subsection (4)(C)(i) prohibits States from "mak[ing] Medicaid or other payments to providers that result in taxpayers being repaid dollar for dollar for their tax costs." 57 Fed. Reg. at 55,129. The 2023 Bulletin applies exactly that principle: A permissible "health care-related tax cannot have a hold harmless provision that guarantees to return all or a portion of the tax back to the taxpayer," regardless of whether the reimbursement mechanism is public or private. 2023 Bulletin at 6. And the 2024 Rule reiterates it. 89 Fed. Reg. at 41,072–77. Texas's claim of an arbitrary reversal fails, because CMS has not reversed its policy at all. To the contrary, the 2023 Bulletin and 2024 Rule merely applied the agency's existing interpretation of Subsection (4)(C)(i) to new facts.

**B. The 2024 Rule did not ignore reliance interests, nor fail to respond to significant comments.**

The State's other arbitrary-and-capricious arguments fail for similar reasons. Texas invokes a line of cases concerning "good-faith reliance on the agency's prior positions." *R.J. Reynolds v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quotation omitted). But those cases only govern where a party can show "legitimate reliance on prior interpretation." *Smiley v. Citibank*, 517 U.S. 735, 742 (1996). Where, as here, the agency is not changing its interpretation, there are no "legitimate reliance" interests at stake.

The State's argument that the 2024 Rule failed to respond to significant comments rests on the premise that CMS's statutory interpretation is incorrect. Texas says that CMS failed to adequately respond to commenters who argued that it was misinterpreting Subsection (4)(C)(i) and its own regulations. ECF No. 75 at 32–34. But that argument merely recasts the State's substantive objections in procedural terms. There is no question that CMS explained its interpretation of the statute and regulations in great detail. *See* 89 Fed. Reg. at 41,072–77. If the Court accepts that interpretation, which it should, Texas cannot prevail on an arbitrary-and-capricious argument that presumes the interpretation is invalid.

**3. Texas's challenge to the 2008 Rule is barred by the statute of limitations, and its procedural claim against the 2023 Bulletin should be dismissed for failure to prosecute.**

Texas has pleaded an APA challenge against the 2008 Rule as contrary to statute. Compl. ¶¶ 92–96; *see* 73 Fed. Reg. 9685 (Feb. 22, 2008). APA claims have a six-year statute of limitations, which begins to run when the complainant "suffers an injury from final agency action." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S. Ct. 2440, 2450 (2024) (citing 28 U.S.C. § 2401(a)). To bring this claim, therefore, Texas would need to show that it was injured by the 2008 Rule, but that the injury did not occur until at least 2017. Texas bears the burden of

proof on this jurisdictional issue.  *See, e.g.*, *Gandy Nursery, Inc. v. United States*, 318 F.3d 631, 637 (5th Cir. 2003); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001).  Because it cannot carry its burden, the State's claim against the 2008 Rule should be dismissed as time-barred.

Alternatively, the State's claim against the 2008 Rule should be dismissed for failure to prosecute.  The parties agreed "that this APA case should be decided through dispositive motions based on the administrative record," and asked the Court to order them to file such motions on their claims.  ECF No. 49 at 1.  The Court did so.  ECF Nos. 50, 61, 69, 74.  At no point did Texas seek leave to file a motion for partial summary judgment, reserving some of its claims for a later date.  Texas has therefore abandoned its claim against the 2008 Rule by declining to raise the claim in its dispositive motion.  *See* ECF No. 74 at 9 n.4.  And it has abandoned its procedural claim against the 2023 Bulletin as well, for the same reason.  *See* Compl. ¶¶ 77–84.  Both claims should be dismissed for failure to prosecute.

### 4.     Any relief should be limited to Texas.

If the Court concludes that the 2023 Bulletin and 2024 Rule were unlawful, and even if the APA authorizes vacatur of agency action,[6] the Court should decline, as a matter of equitable discretion, to enter a universal vacatur of the challenged actions.  Text and precedent both make clear that whether to enter vacatur—and the scope of any such relief—is constrained by equitable principles.  And those principles limit proper relief to redressing the injuries of the named parties, thus foreclosing universal vacatur in this case.

---

[6] CMS preserves for further review the argument that the APA's provision for the courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek.  *But see Texas Medical Ass'n v. HHS*, 110 F.4th 762, 778–80 (5th Cir. 2024) (rejecting the argument that the APA does not authorize vacatur).

The APA is not properly read to require vacatur—much less universal vacatur—of challenged action, in light of traditional equitable principles generally restricting relief beyond the parties. Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle of interpretation, instructing that, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And the Court explained that even seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles" governing relief. *Id.* at 1577. "[S]uch an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.*; *see also Hecht Co.*, 321 U.S. at 329 (Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances.").

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibition or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702. In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—there is no sound reason to conclude that Congress did not merely authorize but compelled courts to abandon the "bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the unremarkable "set aside" language in § 706. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (quotation omitted).

Finally, this construction of the APA—as permitting, but not requiring, universal vacatur—is consistent with Fifth Circuit precedent. The Fifth Circuit has treated universal vacatur as a discretionary equitable remedy, not one that is automatic or compelled in every case. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy … is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024); *see Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 n.102 (5th Cir. 2024) (noting that the en banc *Cargill* court remanded the case to district court for briefing on the appropriate scope of any relief under the APA). And the Fifth Circuit has sometimes declined to enter vacatur in favor of a remedy termed "remand, without vacatur" when equitable principles so directed. *E.g.*, *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).[7]

In this case, the Court could afford complete relief to Texas through a permanent injunction prohibiting the enforcement of the 2023 Bulletin and the challenged aspects of the 2024 Rule against the State. In light of the traditional equitable principles incorporated by the APA, the Court should limit any relief to the parties before it—and Texas has not argued otherwise.

## CONCLUSION

For the reasons set forth above, CMS is entitled to summary judgment on the claims that Texas has raised against the 2023 Bulletin and 2024 Rule. The claims that it has abandoned should be dismissed.

---

[7] In addressing the scope of relief under 5 U.S.C. § 705, the Fifth Circuit recently observed that, "[w]hen a reviewing court determines that agency regulations are unlawful, the *ordinary* result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (emphasis added) (citation omitted). But "ordinary," of course, does not mean "mandatory."

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE BENNETT
Assistant Director, Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

Date: January 17, 2025